IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ESTATE OF GREGORY WRIGHT, et al. | ) ) ) | CASE NO. 4:17-cv-02383-BYP |
| | ) | JUDGE BENITA Y. PEARSON |
| Plaintiffs | ) ) | |
| v. | ) ) | |
| TRUMBULL COUNTY BOARD OF COMMISSIONERS, et al. | ) ) ) | AFFIDAVIT OF CARLA BASTER, D.O. |
| Defendants | ) | |

CARLA BASTER, D.O., being first duly sworn according to law, deposes and states as follows:

1. My name is Carla Baster, D.O. I am over the age of eighteen (18), of sound mind, and am competent to make this Affidavit. I have personal knowledge, unless otherwise stated, of the facts stated herein, all of which are true and correct.

2. I obtained my Board Certification from the American College of Osteopathic Family Practice Physicians in 1989. I am currently serving as the Medical Director at the Geauga County Jail, the Ashtabula County Jail, and the Lake County Juvenile Justice Center. I am also the Associate Medical Director at the Hospice of the Western Reserve in Mentor, Ohio, I provide family practice medical services at MetroHealth Medical Center in Cleveland, Ohio, and I am a faculty member of Case Western Reserve School of Medicine. A true and accurate copy of my curriculum vitae is attached hereto as Exhibit A, which sets forth my education, experience, and credentials.

**EXHIBIT G**

3. Attached hereto and incorporated herein as Exhibit B is a true and accurate copy of my expert report in *Estate of Gregory Wright, et al. v. Trumbull County Board of Commissioners, et al.*, Case No. 4:17-cv-02383-BYP. All expert opinions expressed in my report are based on a reasonable degree of medical certainty.

FURTHER AFFIANT SAYETH NAUGHT.

_____
**CARLA BASTER, D.O.**

SWORN TO BEFORE ME and subscribed in my presence this 31st day of October, 2018.



_____
Notary Public

CURRICULUM VITAE

Carla Baster DO
29 Minnewawa Dr.
Timberlake, OH 44095
(440) 269-8105 home
(440) 749-1669 cell
carlabaster@gmail.com

1989 Board Certification American College of Osteopathic Family Practice

1984 Federal Law Enforcement Training Center, Glynco, Georgia

1983 Family Practice Internship, Brentwood Hospital, Cleveland, OH

1982 Ohio University College of Osteopathic Medicine, Athens, OH: Doctor of Osteopathy

1978 Malone College, Canton, OH: BA Chemistry

## EXPERIENCE

1994 to Present
Medical Director
Geauga County Jail, Chardon, OH
Director of Health Services for county jail. Responsible for providing medical care to inmates and developing policies and procedures for the operations of the medical department.

1998 to Present
Medical Director
Juvenile Justice Center, Painesville, OH
Director of Health Services. Responsible for providing medical care to Juvenile inmates and developing policies and procedures for the operations of the medical department.

2003 to Present
Medical Director
Ashtabula County Jail, Jefferson, OH
Director of Health Services. Responsible for providing medical care to inmates and developing policies and procedures for the operations of the medical department.

2004 to Present
Associate Medical Director
Hospice of the Western Reserve, Mentor, OH
Provide home care medical services to terminally ill patients. Provide inpatient medical services in Hospice House.



2014 to Present
> Family Practice/Express Clinic
> MetroHealth Medical Center, Cleveland OH
> Provide services in ExpressCare walk-in clinic at MetroHealth, a major inner city medical center with level 1 Trauma Center
> Precept and train medical students, residents, NPs and PAs
> Faculty Member of Case Western Reserve School of Medicine
> Lead procedure classes in Simulation Center

2000 to 2016

> Lake County Health Department
> Painesville, OH
> Provide services to county health department in well child clinic.
> Served as interim Medical Director


1993 to 2013
> Medical Director
> Lake County Jail, Painesville, OH
> Director of Health Services in a 350 inmate facility. Responsible for providing medical care to inmates and developing policies and procedures for the operations of the medical department.

1988 to 2000
> Emergency Medicine
> University Suburban Urgent Care Center, Euclid, OH
> Responsible for patient evaluation and treatment of outpatients, Including acute trauma, critical care and industrial injuries.

1988 to 2000
> Family Practice
> Family Practice Associates, Mentor OH (1992 to 2000)
> Concord Family Practice, Concord OH (1988 to 1992)

1990 to 1994
> Cuyahoga County Jail, Cleveland, OH
> Responsible for the treatment of acute and chronic medical conditions in a 1200 inmate facility.

1988 to 1990
> Deepwood Center, Mentor OH
> Provided medical care for the mild to severely mentally disabled.

1987 to 1988
> Emergency Physician
> Brentwood Emergency Physicians, Warrensville Hts, OH
> Provided emergency care in fully staffed emergency department of Brentwood Hospital, including acute trauma and critical care. Responsible for supervision of Emergency Medicine residents, interns and medical students. Presented lectures in the Medical Lecture Series.

1985 to 1987
> Chief of Health Programs
> Metropolitan Correctional Center, New York, New York
> Duties performed in a Federal Bureau of Prisons institution, housing 800 inmates with 6000 yearly new commitments. Responsible for the professional quality of care of the entire Health Care Services. Supervised other physicians and physician; assistants. Examined and treated inmates and staff. Directed Methadone Detoxification Program. Prepared medical evaluations for court and presented testimony in court. Performed and chaired medical audits at other correctional facilities. Conducted national policy making task forces.

1983 to 1985
> Medical Officer
> Fort Worth Federal Correctional Institution, Fort Worth, Texas
> Duties performed at the Regional Medical Referral Center of the Federal Bureau of Prisons, an institution housing 800 inmates, with a Chronic Health Services Unit and a 28 bed hospital. Responsible for inpatient and outpatient care and supervision of physician assistants.

1983 to 1984
> Emergency Medicine
> Haltom Hospital, Haltom, Texas
> Involved in outpatient emergency care in Emergency Room and provided coverage for emergencies arising in house.

June 1982 to July 1982
> Charge Physician Pediatric Ward and Woman's Medical Ward
> Tenwek Hospital, Bomet Kenya
> Provided care during period of absence of missionary on furlough.

1981
> Volunteer Physician
> Cleveland Free Clinic, Cleveland OH

**Carla Baster DO**
29 Minnewawa Dr.
Timberlake, Ohio 44095
<u>carlabaster@gmail.com</u>
(440)749-1669

The following report represents the expert opinion of myself, Carla Ann Baster DO, a physician certified in Family Practice with 32 years experience in correctional medicine. It is regarding the Estate of Gregory Wright, et al. vs Trumbull County Board of Commissioners, et al. Case No 4:17-cv-02398. This expert report was requested by Leah M. Hohenberger of Dickie, McCamey & Chilcote, attorneys at law.

### Credentials:

I have 4 years of experience working with The Federal Bureau of Prisons and 28-years experience working in county jails. While with the Federal Bureau of Prisons, I attended Federal Law Enforcement Training in Glynco, Georgia and became a certified Federal Law Enforcement Agent with the Federal Bureau of Prisons. The federal complex at Glynco, trains all Federal Law Enforcement Agents with the exception of the FBI. While with the Federal Bureau of Prisons, I worked as a Medical Officer at Fort Worth Federal Correctional Institution and was the Chief of Health Programs at the Metropolitan Correctional Center in Manhattan. I was responsible for writing federal policies and procedures and worked with the Assistant Surgeon General to develop new policies. I also traveled to federal facilities throughout the U.S. to audit the medical departments of these facilities.

For the last 28 years I have worked in county jails including Cuyahoga County Jail, Lake County Jail, Geauga County Jail, Ashtabula County Jail, and Lake County Juvenile Justice Center. I served as medical director in all the aforementioned jails except Cuyahoga County Jail. I presently continue serving at Geauga County Jail, Ashtabula County Jail, and Lake County Juvenile Justice Center. I provide hands on medical care and am responsible for writing and reviewing the policies and procedures. I also have experience in Emergency Room Medicine, outpatient Family Practice, and Hospice Care. (My CV is available upon request.)

### Preparation for Statement:

In preparing this statement, the documents reviewed include the following:

Complaints and Amended Complaints of the Estate of Gregory Wright et al Vs Trumbull County
    et al.
Officer intake form
Booking Assessment Form (medical department)
General Assessment Form (medical department)
Medical Progress Notes

**Exhibit B**

Physicians Order Form
Medication Administration Records
Inmate Personal Medication List
LCI Transfer Document
Autopsy Report
Outside medical records of Dr. Dunlap Dunlap DO
Outside medical records of MercyHealth St Joseph's Hospital from 07-03-08 until 05-05-17
    (including ER Report following cardiac arrest)
Employee files of Carla Ahart, Jessie Clay, Bethany Lobdell, Rachel Hake, and Laura Yoder
Interrogatories responses of Phillip Malvasi DO and Trumbull County
Deposition Transcript of Barbara Wright,
Medical Service agreement with Phillip Malvasi DO
Medical Protocols established by Dr. Malvasi for medical staff.
Shift reports
Jail Activity Reports
Trumbull County Incident Reports written by 11 officers.
Recorded Statements of 25 jail officers, nurse and medical assistants.
Internal Investigation reports of 46 jail officers, nurse and medical assistants
Standards for Jails in Ohio-minimal standards established by State of Ohio Department of
    Rehabilitation and Correction from 2014
Trumbull County Jail Policies and Procedures, including Medical Policies and Procedures
Plaintiff's Expert report of Cameron K. Lindsay
Plaintiff's Expert report of Dr. Melanie Tyler MD
Gregory Wright Criminal History

### Review of Documents in chronological order. Comments and opinions follow in bold print.

Gregory Wright presented to Trumbull County Jail on May 3, 2017. He had been sentenced to Lorain Correction Institution and was permitted to self-report to the Trumbull County Adult Justice Center and was to be transferred to prison. He presented to window at Central Control at 9:43 AM. He was instructed by Officer Osborne to go the east van door where booking was located. He arrived at booking at 10:24 (41 minutes later). This delay was reported by Officer Osborne to her supervisor.

**This delay brought concern as to what the inmate was doing for 41 minutes. This is certainly a legitimate concern. In my long career in correctional medicine I have seen many patients who ingest or shoot drug to get a final high prior to incarceration. For short acting drugs such as heroin I have seen cardiac arrests in booking. In other instances, with longer acting agents, they later decompensate when the drugs take effect. If symptoms of overdose are not displayed, staff frequently is unaware the inmate has taken something as the inmate is unlikely to tell staff. (Mrs. Wright, during her deposition, states the delay was due to returning to the house to use the bathroom.)**

Upon booking at 10:48, the correctional officer filled out the jail medical questionnaire. Mr. Wright admitted having medications with him (Xarelto), listed his doctor as Dr. Douglas Dunlap and indicated he had been hospitalized two weeks earlier at St Joe for blood clots in his legs. He denied use of drugs or alcohol.

Per the recorded statement and Internal Affairs Investigation. LPN Carla Ahart, was summoned to the booking area. Mr. Wright was carrying Xarelto. He also stated he had blood clots in both legs, he had a wound on his right leg that needs dressing. The wound was wrapped up and she did not unwrap it at that time. He also admitted to using heroin that morning. The patient was in no distress. LPN Ahart called Dr. Malvasi to get orders and wrote the orders in his chart. Documentation on the inmate personal medication list shows nurse Ahart logged in Xarelto 20 mg # 30 tablets. A medication sheet was filled out to permit the patient to receive the Xarelto.

On Thursday May 4 at approximately 4:30 pm inmate Wright came to medical to get the dressing changed on his leg. Per the Internal Affairs Investigation and recorded statements of MTA Bethany Lobdell, inmate Wright came down to medical to get a wound on his leg cleaned and dressed. He complained of having some nausea and vomiting and said he was coming off of heroin. She arranged to place him on medications to help with his withdrawal symptoms. Later that evening she gave the patient two ibuprofens, 30 ml of Maalox, and an Imodium.

Per the Internal Affairs Investigation and recorded statements of Correctional Officer (CO) Anthony Zadroski, he was the officer to transport inmate Wright to the medical department. He was asked to transport the inmate via wheelchair. When he went to the pod to assist the inmate, "He jumped right out of his porta bunk like he didn't need any help, so I was kind of like, does he really even need the wheelchair? He looked like he might have been sick, or coming off of something, and I just proceeded to take him down to medical in a wheelchair." Officer Zadroski was present during the dressing change, and reported that when the nurse started to clean the wound he refused to have any more treatment done other than the dressing change. He also refused to have any creams placed on his wound.

LPN Carla Ahart, also present in the treatment room, additionally reported inmate Wright not wanting anything for his wound, "no lotions, no ointments."

**At the time of the patient's transfer to medical for the dressing change, he complained of coming off heroin and presented with nausea and vomiting. Multiple witness reported him to be in no distress. He was transported by wheelchair, although the officer questioned why he needed a wheelchair. In my experience, inmates are commonly transported to see me in medical to expedite inmate movement if an inmate is not feeling well. It also gives a message to the inmate that concern is being shown and assistance is being provided. It is clear from the statements of those in the medical department that the patient was not interested in much care other than a dressing change as he complained about the cleansing of the wound and did not want creams or ointments applied. MTA Lobdell acknowledged his concern about symptoms related to heroin withdrawal and ordered medications to assist with his symptoms. It is also of note that Dr. Malvasi has written extensive nursing protocols for Over**

the Counter (OTC) medications for the medical staff to use for treatment of common medical conditions. These OTC medications are frequently used by jail medical staff, but specific protocol may vary from jail to jail. He also provided guidelines in what signs and symptoms to look for in drug and alcohol withdrawal or overdose. Drug and alcohol withdrawal is most likely the most common ailment I see in jails in new commits.

Later that evening the patient was given two ibuprofens, 30 ml of Maalox, and an Imodium.

Several officers had interaction with Mr. Wright between 11:30 PM on May 4 and 12:07 AM on May 5. Per the recorded statements and the Internal Affairs Investigation, these are some of those interactions:
Sarah Whitaker saw coffee like substance on the ground and spoke with the inmate. He said he had been sick. When asked if he had seen the nurse he answered "yeah" and stated he was OK.
CO Eric Vens saw a spilled substance from the bunk extending out toward the day room area. He stopped to see what was going on and the inmate raised both hands and said "my fingers are kind of numb." The officer questioned him about medications, about possible withdrawal and asked if he had taken anything prior to coming in. He reported to having a conversation with Mr. Wright for a couple minutes.
MA Rachel Hake was called to the pod at 12:07 She reported that the patient was laying on the bunk, hunched over and throwing up. She reported him to be noncompliant and used the assistance of a female officer to hold his arm to try to get his blood pressure. Mr. Wright told her his stomach hurt.

At 4:30 AM on May 5, officers and MA Hake again had interactions with Mr. Wright. CO Whitaker reports Mr. Wright making a real loud sound and it looked like he almost started shaking on camera so she went in and he was covered with sweat, and remained conscious. She reports MA Hake arriving and attempting to get his blood pressure but he was moving around too much. CO Sargent Craig Tomko reports arriving with MA Hake and that she attempted to get his blood pressure and put a pulse ox on his finger but that he continued to pull away. He reported the patient to be uncooperative. Progress notes and recorded statements of MA Hake indicate that she was called for a possible seizure. She placed smelling salts under his nose and he turned his head and began breathing through his mouth. He would not stay still for a BP but his heart rate was 168 and PO2 96%. She reported he kept putting his arms across his chest so she could not get a BP. She asked what was going on, asked what he was coming off, but he would not answer. She commented she did not think it was a seizure, did not think he was faking but that he was working himself up.

Inmate Wright was transferred to another pod via wheelchair. CO Benjamin Bowker witnessed CO Alonzo McCall helping Wright into the wheelchair. The inmate needed assistance but the officer did not feel he was in need of emergency medical treatment. CO William Millik witnessed officers getting the inmate out of the wheelchair. He commented that he definitely needed assistance. But he did pretty good but they were guiding him to the bed. CO Millik did not feel that Mr. Wright was in need of emergency medical treatment. CO Yeager reported that

Wright needed a little bit of assistance, he pushed off the arms (of the wheelchair). "We set him on the bed, but he stood up.

**Although several officers were concerned the patient may be having a seizure, shaking is not considered a seizure. Seizures are usually associated with loss of consciousness. The patient quickly responded to ammonia (smelling salts). This would not have an effect on a truly unconscious or seizing patient. Ammonia inhalants stimulate the sympathetic nervous system causing a "fight or flight" reflex. This results in an acceleration of the heart rate, and respiratory rate and can cause sweating. Clearly the patient was ill, but the officers responded appropriately and summoned medical assistance and the patient was transferred to another pod.**

On the morning of May 5, CO Whitaker spoke with inmate Wright at approximately 5:00 AM. When she asked if he was feeling any better, he shook head and stated, "yes, a little." He was sitting up and more awake and alert than earlier. CO Whitaker again saw Mr. Wright at approximately 5:45 while passing breakfast. She asked inmate Wright if he wanted his breakfast and he "shook his head yes."

Inmate Wright was seen by MA Jessie Clay. He refused medicine in the AM med pass. "I asked him if he wanted it and he said bad stomach acid and shook his head no. I said I have Maalox here and he just shook his head again. He just seemed like he was going through withdrawal."

**Inmate Wright is more interactive in the morning, speaking with the medical staff and refusing medication and accepting his breakfast bag.**

**It is unclear from chart review what the cause of Mr. Wright's symptoms of nausea and vomiting and other symptoms were at the Trumbull County Jail. It most certainly could have been due to opiate withdrawal.**

**Review of records from admission at St Joseph's Hospital from 3-13 2017 to 3-16-2017 for treatment of blood clots show the patient was also experiencing nausea and vomiting while hospitalized. He received Phenergan and Zofran. Both medications are used for nausea and vomiting. He also was on Protonix which helps with stomach acid.**

**His symptoms could have also been due to whatever was causing similar symptoms while hospitalized when he was being treated for the blood clots. The symptoms could have also been related to his gall bladder. He had an ultrasound on 4-27-2017 showing gallbladder stones.**

**Review of his medical records form St Joseph's Hospital also show a pattern of patient frequently refusing medical attention:**
On 4-17 07 The patient was presented to the ER with decreased level of consciousness and a marked decreased respiratory rate of 4. He received Narcan to reverse an opiate overdose.

Afterwards the patient refused to supply a urine sample and tried to leave. The ER doctor tried to pink slip the patient to keep him in the hospital. "They protested rather vehemently. Ultimately security was called, and both the patient and his wife calmed down. "
On 2-28-10, the patient presented to the ER with chest pain. It was recommended that he be admitted to the hospital. The patient refused and signed out against medical advice (AMA). On 7-25-13, he again presented to the ER; this time with an abscess. Again, admission was recommended but he signed out AMA.
A note from Dr. Douglas Dunlap's records shows a note from Mercy Home Health Care dated 3-21-17. "She said that she went to the patient's home today and he told her 'I've been taking care of these legs by myself for a long time now and I will continue to do so'...'I don't need or want your help. ' "

It is clear that Mr. Wright continued to refuse medical attention, was not upfront with his medical history, and aggressively refused to have a medical evaluation. (Trumbull County's Policies and Procedure number 11.01 allows that "inmates have a right to refuse routine medical attention." This is consistent with the requirements for Ohio Minimal Standards for Jails) Nor did he submit any medical request forms. He was checked by the concerned correctional staff numerous times and also evaluated by the medical staff. This was a pattern he frequently displayed in the past as evidenced by the aforementioned times that he signed out of the hospital against medical advice and by the refusal to allow home care to assist with his wound.

On May 5 at 1200, when inmate did not get up for his lunch tray he was checked by officer Krista Reed. He was found to be unresponsive and she could not palpate a pulse. Officer Reed radioed for medical and all available officers to report to the third floor, and EMS was called. An AED was applied and CPR stated. The patient was removed from the cell to the day area where there was more room to provide care. Chest compressions were performed by officers Reed, Eckenrod, and Watkins, and MA Clay gave respiratory breaths with an Ambu bag. EMS arrived at 12:14.

Review of the Event List Summary Report from the AED shows proper use of AED. Initial analysis showed shock not advised and CPR started. Two more analyses were conducted and no shock advised. CPR was continued. The recording lasts 9 min 40 seconds.

The question was raised as to how long the patient lay in his bunk until he was found to be without pulse and respirations. This question can never be fully answered. However, review ER records show an admission rectal temperature of 99.4. This is a normal temperature. Although variable, the rectal temperature will begin to fall within 30 minutes to 3 hours following death.

The final autopsy report listed cause of death to be Probable Cardiac Arrhythmia due to Probable Hypertensive Cardio Vascular Disease. Toxicology was positive for Fentanyl (an opiate), and Carboxy THC (a metabolite of cannabis). The left side of his heart was enlarged, indicate of hypertensive cardiovascular disease. Of negative significance, there was no

evidence of a heart attract, nor was any brain pathology noted. He was found to be gaunt with sunken eyes, cachexic, and had skin atrophy, indicate of chronic illness. Sudden cardiac death is an unfortunate cause of death of up to 15% of deaths in patients in the age range of this patient. Even with a witnessed out of hospital arrest where CPR is started by bystanders, survival to hospital is 12%. Survival to hospital discharge is a dismal 2 % to 7.6%

## Conclusion and Summary:

I hold the following opinions with reasonable medical certainty:

A sudden death is always tragic and brings questions and concerns as to what may have transpired. With Mr. Wright, it is certain that he was not healthy when he entered the jail. He had a recent admission for blood clots and was severely anemic requiring a blood transfusion less than two months earlier. He was experiencing nausea and vomiting during the recent admission requiring two medications for nausea and vomiting and another medication to help with stomach acid. Upon admission to the jail he was not upfront with providing his medical history and initially lied about his drug use. Upon admission, a medical screening was done by medical staff and medication was set up for the patient. When he admitted he had used heroin and developed nausea and other symptoms of withdrawal, the written protocol for opiate withdrawal was followed and medication was given to him. When he requested a dressing change he was brought to the medical department for the dressing change. However, he refused to have the wound cleansed and he refused to have creams or ointments applied.

As his symptoms of nausea and vomiting progressed he was frequently checked on by Correctional Officers. He was evaluated by medical staff two times in the early hours of May 5. Each time he was uncooperative with care. Review of previous medical records show he has displayed a pattern of refusing medical care and signing out of the hospital against medical advice (AMA). He presented to St Joseph's Hospital with chest pain and signed out AMA. Once when presenting with an abscess he signed out AMA. Even when he was brought into the hospital follow a heroin overdose requiring Narcan to revive him, when the ER doctor wanted him to stay in the hospital he protested so vehemently that security needed to be called. When a nurse visited his home after his most admission to assist with his leg wound he refused her care saying, "I don't need or want your help." He displayed similar behaviors when offered medical care in the jail and pulled himself away from the nurse, refusing to have has blood pressure checked or further exam done. When questioned about other possible drug ingestion or other symptoms he refused to answer.

Several hours before he experienced a cardiac arrest, he was more interactive, accepting breakfast but refusing medications offered by nursing.

At the time of his cardiac arrest, he was immediately given CPR with chest compressions and received ventilation by an Ambu bag. An AED was placed, and an analysis prompted no shock advised, CPR appropriately was continued. Resuscitation attempts were performed until EMS

arrived. Autopsy revealed cause of death to be Probable Cardiac Arrhythmia, the most common cause of sudden death in a patient of this age.

Review of policies and procedures of Trumbull County Jail show them to be in compliance with the Minimal Standards for Jails in Ohio as established by the Department of Rehabilitation and Correction. The written policies were followed by correctional and medical staff. Separate protocols, established by Dr. Malvasi, providing medical guidelines are extensive and appropriate. These protocols were followed by the medical staff. There is no evidence that the Trumbull County Jail, administrative staff, the correctional staff, nor the medical staff present at the jail departed from the acceptable standard of care. There is no evidence of deliberate indifference, in fact Mr. Wright was frequently checked despite his refusal of care. Dr. Malvasi had no interaction with the patient but provided extensive protocols to guide the medical staff in caring for withdrawal and for numerous other ailments that are commonly seen in a correctional environment. These protocols are consistent with the standard of care both inside and outside correctional facilities.

Sincerely,

*[signature]*

Carla Baster DO