# Estate of Gregory Wright, et al.,

# vs.

# Trumbull County Board of Commissioners, et al.

U.S. District Court, Northern District of Ohio, Eastern Division
4:17-cv-02383

## Barbara Wright
Taken on June 26, 2018

Reporter Shawn Gross



Court Reporting & Videotaping
www.tacklacourtreporting.com
216-241-3918   fax: 216-241-3935



**Exhibit I**

 1    record?

 2              MR. RASKIN:  Sure.

 3                        - - - - -

 4              (Thereupon, a recess was had.)

 5                        - - - - -

 6    **Q.      I will withdraw the question.  Have you ever**

 7    **seen Mr. Wright use any illegal drugs at all, ma'am?**

 8              THE WITNESS:  Can I answer that?

 9              MR. SMITH:  If you know, yes.  If you have seen.

10              THE WITNESS:  Can I tell him?

11              MR. SMITH:  Answer the question.

12    A.        Marijuana.

13    **Q.      Have you ever seen him use any illegal drugs**

14    **during his lifetime other than marijuana?**

15    A.        No.

16    **Q.      So you never saw him use heroin?**

17    A.        No, I have not.  Never seen him use heroin.

18    **Q.      And you have never seen him smoke crack?**

19    A.        No, I ain't never seen him.  No, I know -- no.

20    **Q.      Or use cocaine in any form?**

21    A.        No.

22              MR. SMITH:  Breath deep.  You're doing fine.

23    **Q.      Are you aware that in December of 2015 Mr.**

24    **Wright was arrested and convicted of possession of crack**

25    **cocaine, a fifth degree felony, as well as failure to**

1  comply with the order of a police officer, a third

2  degree felony?

3  A.     No.

4  Q.     Well, you're aware that he was sentenced to 18

5  months in jail as a result of a criminal conviction in

6  2015, aren't you?

7  A.     I don't know.

8  Q.     Is that because you don't remember?

9  A.     I don't know.

10  Q.     So you wouldn't be able to help me to understand

11  how it is that Mr. Wright would have been in possession

12  of crack cocaine if he wasn't using it?

13         MR. SMITH:   Objection.

14  A.     I don't know.

15  Q.     Are you aware that his 2015 conviction was not

16  the first time that he had been convicted of possession

17  of both crack cocaine and heroin?

18  A.     I don't know.

19  Q.     Would it help to refresh your recollection that

20  in December of 1996 in Trumbull County Mr. Wright was

21  convicted of trafficking and drugs, four counts

22  possession, heroin one count, and crack cocaine four

23  counts?

24  A.     I don't know.

25  Q.     Let me ask you some questions regarding Mr.

```
 1   your marriage?

 2   A.      Yes.

 3   Q.      Has Mr. Wright ever been convicted of crimes of

 4   dishonesty in any county other than Trumbull County that

 5   you are aware of?

 6   A.      I don't know.

 7   Q.      Are you aware that Mr. Wright was taking a

 8   medication called Xarelto?

 9   A.      No.

10   Q.      Do you know what Xarelto is prescribed for, what

11   kind of condition?

12   A.      No.

13   Q.      Did Mr. Wright have a history of blood clots

14   that you're aware of?

15   A.      I don't know.

16                          - - - - -

17     (Thereupon, Defendant's Exhibit B was marked for the

18                  purpose of identification.)

19                          - - - - -

20   Q.      Let me show you what I have marked for

21   identification purposes as Defendant's Exhibit B.  If

22   you look at the very bottom right-hand corner of Exhibit

23   B you will see the name "Trumbull" and a number.  Do you

24   see that?

25   A.      Yes.
```

1    Q.       The first page ends with the numbers 46.

2    A.       Yes.

3    Q.       And then, if you flip through you will see that

4    the last page ends with the number 52.  Do you see that?

5    A.       Yes.

6    Q.       And I will represent to you that these are the

7    records of the Trumbull County Justice Center relating

8    to Mr. Wright's incarceration in May of 2017.  I assume

9    that you have never seen these documents before?

10   A.       No.

11   Q.       I'm going to ask you some questions about the

12   answers that Mr. Wright gave.  On the first page of

13   Exhibit B, which the number ends in number 46 at the

14   bottom, do you see that?

15   A.       Yes.

16   Q.       Mr. Wright was asked whether or not he was

17   taking medications, currently taking medications, and

18   his answer was Xarelto.  Do you see that?

19   A.       Number three?

20   Q.       Yes, ma'am.  Do you see that question and

21   answer?

22   A.       Yes.

23   Q.       Do you know why he was taking Xarelto?

24   A.       No.

25   Q.       Number four asks:  "Is the inmate under doctor's

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

CASE NO. 4:17-CV-002383

ESTATE OF GREGORY WRIGHT AND        )
BARBARA WRIGHT,                     )
                                    )              DEPOSITION
             Plaintiff             )
                                    )                 OF
        VS                          )
                                    )       LIEUTENANT ERIC C. SHAY
TRUMBULL COUNTY BOARD OF            )
COMMISSIONERS, ET AL.,              )
                                    )
             Defendants             )

        DEPOSITION taken before me, Tracey R. Winck,

a Notary Public within and for the State of Ohio, on

the 27th day of June A.D., 2018, pursuant to agreement

and at the time and place therein specified, to be

read in evidence on behalf of the Plaintiff in the

aforesaid cause of action, pending in the United States

District Court for the Northern District of Ohio,

Eastern Division.

1   advice of rights, does that include Garrity protections?

2   A       The form that I use has Garrity on it and

3   that's what it is, advice of rights but yes.

4   Q       When you interview the correction officer

5   in regards to your internal investigation are their

6   statements sworn?

7   A       No.

8   Q       You require that they all sign their

9   statements?

10   A       Correct.

11   Q       You advise them of their Garrity rights --

12   A       Before questioning them.

13   Q       -- before questioning?  Handing you what we

14   will mark as Plaintiff's Exhibit 1.

15          (Plaintiff's Exhibit No. 1 was marked for

16   identification by the court reporter.)

17   Q       Are you familiar with this document?

18   A       I am.

19   Q       Can you peruse it and make sure its total?

20          MR. RUCKER:  We are off the record for a

21   second.

22          (A brief recess was taken.)

23          MR. RUCKER:  Back on.

24   Q       Lieutenant Shay, have you had a chance to

25   look at what's been marked as Plaintiff's Exhibit 1?

1    A       I have.

2    Q       What is that document?

3    A       This is a, parts of my internal investigation.

4    Q       When you say parts, what do you mean by parts?

5    A       This isn't the complete document. This is,

6 it appears to be my summary, my findings, my documentation

7 as far as notifying individuals of their questioning,

8 any statements that they have made and also an advice

9 of rights or Garrity form for each individual.

10   Q       All of those were generated as a result of

11 your investigation, is that correct?

12   A       Correct.

13   Q       So when you say part, those items that were

14 not included are those items documents you would have

15 collected to supplement your investigation?

16   A       Yes.

17   Q       So those documents would have already been

18 in existence, is that correct?

19   A       Yes.

20   Q       Also, with that there is a CD that is

21 included in Plaintiff's Exhibit 1 which is, purports

22 to be, and I will state is a CD, a copy of the audio

23 interviews that took place, I believe 25 individuals,

24 is that correct?

25   A       I would have to count them all but I will

1    take your word for it.

2    Q        You trust me more than your attorney does.

3              MS. AMBROSE RUBRIGHT:  I haven't counted

4    them.  If your math is good, I would hope that we can

5    rely on the number.

6    A        According to my count I am showing 23, sir.

7    Q        Okay.

8    A        Twenty-three.

9    Q        I believe that one of them has two parts

10   but if 23 individuals --

11             MS. AMBROSE RUBRIGHT:  We can just say

12   whoever he has listed here was interviewed, whatever

13   the number is the number is.

14   Q        Whoever you have listed is what would be

15   expected to be on the CD, is that correct?

16   A        Whoever I have listed under part three of

17   my internal, that says interviews I would say that's

18   correct, sir.

19   Q        What prompted this statements of the

20   individuals, the written statements?

21             MR. RUCKER:  Strike that.

22   Q        Let me make it simpler.  Did you instruct

23   each individual that submitted a written statement

24   to make that statement?

25   A        No.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

ESTATE OF GREGORY )CASE NO. 4:17-CV-02383
WRIGHT,et al. )JUDGE BENITA Y. PEARSON
                         )
            Plaintiffs )    DEPOSITION OF
vs.                      )
                         )  PHILLIP MALVASI, D.O.
TRUMBULL COUNTY BOARD    )
OF COMMISSIONERS,et al   )
                         )
                         )
            Defendants   )

          Deposition taken before me, Micheline

Simoni, Notary Public within and for the State

of Ohio, on the 12th day of July, 2018, at

10:10 AM, pursuant to notice, taken at the

offices of Trumbull County Jail, 150 High

Street, Warren, Ohio, 44481, to be used in

accordance with the Federal Rules of Civil

Procedure or the agreement of the parties in

the aforesaid cause of action pending in the

United States District Court within and for the

Northern District of Ohio, Eastern Division.

1   Q.   And whose signature is that?

2   A.   Rachel Hake.

3   Q.   Okay.  What are they attesting to by their

4        signatures on this document?

5   A.   That they are the ones that are passing

6        meds.

7   Q.   Does that document indicate that

8        Mr. Wright should be receiving

9        Ibuprofen, Imodium, and Maalox?

10  A.   Yes.

11  Q.   And this MARS is for Gregory Wright; is

12       that correct?

13  A.   Yes.

14  Q.   And next to his name, is that "TCJ"?

15  A.   Yes.

16  Q.   And it has "Malvasi," is that correct?

17  A.   Correct.

18  Q.   What is that next block?  Do you know what

19       that next block says?

20  A.   That's the month and the year.

21  Q.   So, you're charting for May of 2017?

22  A.   Correct.  These only last one month,

23       according to -- the top has the 1 to

24       31.  So, every month these need to be

25       changed.  The next month would be a 6

SIMONI COURT REPORTING
(330) 399-1400    (330) 746-0934
1-800-399-6686

1          of 17.

2    Q.    For them to have placed on this document,

3          "Ibuprofen, Imodium, and Maalox,"

4          would they have had to receive

5          instructions from you to do that?

6    A.    No.  These are over-the-counter

7          medications.

8    Q.    So, is it your understanding that medical

9          assistants can administer

10         over-the-counter medications without

11         your approval?

12   A.    Yes.

13   (PLAINTIFF'S EXHIBIT 2 MARKED)

14   Q.    Doctor, I'm going to hand you what is

15         marked as Deposition Exhibit 2.  Are

16         you familiar with this document?

17   A.    Yes.

18   Q.    What is this document?

19   A.    Physician Order Form.

20   Q.    Okay.  The top of it says "Physicians

21         Order Form."  What is the purpose of

22         this document?

23   A.    This gets faxed to the pharmacy to get

24         medications filled and sent back.

25   Q.    When we look at the first box it indicates

1          the name of the inmate, which is

2          Gregory Wright; is that correct?

3  A.   Correct.

4  Q.   His date of birth, his allergies --

5          aspirin?

6  A.   Yes.

7  Q.   And the date -- is that the date of the

8          order?

9  A.   Yes.

10 Q.   Coming across it says "Bactrim."  What is

11         that?

12 A.   An antibiotic.

13 Q.   What is that typically used for?

14 A.   Infections.

15 Q.   Do you recall what the infection was?

16 A.   No.

17 Q.   Okay.  And at the bottom of that it says

18         "TO: Dr. Malvasi/."   Who is that?

19 A.   Raymond Gallanti.

20 Q.   Who is Raymond Gallanti?

21 A.   He was a medical assistant in the past.

22              MS. HOHENBERGER:  We are talking

23 about 8-28-16?

24              MR. RUCKER:  Yes.

25 Q.   Okay.  If we come down one block, we have

1          the same name, "Greg Wright,

2          Gregory"?

3  A.  Yes.

4  Q.  Same date of birth?

5  A.  Yes.

6  Q.  "Allergies, ASA."  What is "ASA"?

7  A.  Aspirin.

8  Q.  Date 5-3-17.  And, it indicates "Xeralto."

9          What's that on number 2?

10 A.  "Dressing changes PRN until healed."

11 Q.  Was this sent to you?  It says, "To:

12         Dr. Malvasi."

13 A.  No, it doesn't say "To: Dr. Malvasi."

14 Q.  What does that say?

15 A.  It says "Telephone order Dr. Malvasi."

16 Q.  Okay.  So, what does it mean, "Telephone

17         order Dr. Malvasi"?

18 A.  That they called me and asked me -- they

19         said, "This inmate brought this

20         medication in, and is he okay to have

21         it?"

22 Q.  So, they had indicated to you that he was

23         on Xarelto?

24 A.  Correct.  Just like the previous one,

25         Raymond called me on is Bactrim.  He

1             must have brought in the Bactrim, and

2             he had ten days left of it; so, is it

3             okay to give it to him?  Yes.

4  Q.    Okay.  What we saw on Exhibit 1; the

5             Ibuprofen, the Imodium, and the

6             Maalox, is that referred to as a

7             "protocol"?

8  A.    No.

9  Q.    It's not?

10 A.    No.

11 Q.    Do you have a protocol for withdrawal from

12            heroin?

13 A.    No.

14 Q.    Is Heroin an opiate?

15 A.    Yes.

16 Q.    Do you have an opiate withdrawal policy?

17 A.    Yes.

18 Q.    And what is that?

19 A.    Medications for me, for severe

20            withdrawals?

21 Q.    Yes.  What is it comprised of?

22 A.    Medications that help with the symptoms of

23            a severe withdrawal.

24 Q.    Do you have specific drugs that you have

25            the medical assistants administer for

1           withdrawals?

2  A.   With an order from me, yes.

3  Q.   Okay.  If there's no order from you, they

4           are not to administer any drugs?

5  A.   No prescription medications.

6  Q.   Ibuprofen is not a prescription

7           medication, is it?

8  A.   There's a list of over-the-counter

9           medications that inmates will ask for

10          on a regular basis.  If they have a

11          headache, Tylenol.  If they have a

12          cough, cough medicine.  If they are

13          constipated, diarrhea.  It's

14          basically the same medications that's

15          in their cabinets at home that they

16          could grab.  But, of course, they

17          can't keep them on them in the

18          correctional setting.  They have to

19          be kept by the staff, and that

20          clarifies it.

21 Q.   So, you do not have a routine policy of

22          Ibuprofen, Maalox, and Imodium that

23          is termed as a "withdrawal protocol"?

24 A.   This treats their signs and symptoms.

25 (PLAINTIFF'S EXHIBIT 3 MARKED)

1  Q.   They have handed you what's captioned as
2            General Assessment Form.  Are you
3            familiar with that document?
4  A.   Yes.
5  Q.   And what is that document?
6  A.   General Assessment Form.
7  Q.   What is its purpose?
8  A.   Just a streamlined charting for an inmate
9            that's seen.
10 Q.   And this inmate is Gregory Wright?
11 A.   Yes.
12 Q.   And this is dated May 5, 2017?
13 A.   Yes.
14 Q.   And it indicates "12:15."  Is that a.m.?
15 A.   It says "A" and it's cut off.
16 Q.   And the complaint and subjective data; it
17            says, "Coming off heroin.  Says, 'I'm
18            sick.'  Won't tell me anything else."
19            Okay, and it indicates the
20            medication as Xarelto.  For "Level of
21            Consciousness," what does that say?
22 A.   "Alert and oriented times three."
23 Q.   And what does that -- "Alert and oriented
24            times three," indicate in layman's
25            terms?

1  A.    That he's alert and oriented to person,

2            place, and time.

3  Q.    Okay.  And the general appearance is

4            "disheveled"?

5  A.    Yes.

6  Q.    "Skin appearance is clammy.  No indication

7            of blood pressure, pulse,

8            respiration" --

9  A.    Yes.

10 Q.    What does the "T" stand for?

11 A.    Temperature.

12 Q.    What does "SPO 2 percent" indicate?

13 A.    Pulse oximetry.

14 Q.    Okay.  There's no indications in that; is

15            that correct?

16 A.    Yes.

17 Q.    Would you expect that when a general

18            assessment form is completed that

19            they would take the vitals -- are

20            those considered to be vitals?

21 A.    Well, the statement underneath says,

22            "Unable to obtain vital signs due to

23            inmate being uncooperative."  So, I

24            don't think -- she was unable to do

25            vital signs secondary to the inmate's

1              being uncooperative.

2  Q.   But, would it be your expectation,

3              generally speaking, that if an inmate

4              comes in and is complaining that he's

5              sick and he's coming off heroin, that

6              they would take the vitals?

7  A.   They do do the vitals.

8  Q.   And why is it important that they do the

9              vitals?

10 A.   Just to have an understanding of the blood

11             pressure, the pulse, the respiration.

12 Q.   Okay.  And, as a physician, what would

13             that indicate to you?  Why would you

14             look at vitals?

15 A.   To assess a patient thoroughly.

16 Q.   When you say, "to assess a patient

17             thoroughly," there are vitals that

18             are within a normal range; is that

19             correct?

20 A.   Correct.

21 Q.   And when your vitals are outside of that

22             normal range, what would that

23             normally, as a physician, cause you

24             to do -- as a physician?

25 A.   It would depend on the treatment.  It

1              would depend on which one we're

2              dealing with.

3                  If it's blood pressure, it

4              depends on what the treatment would

5              be, if the patient needs treatment.

6  Q.   Okay.  And they would be important in your

7              making a diagnosis; is that a correct

8              statement?

9  A.   Yes.

10 Q.   As you read, it indicated that the patient

11             was uncooperative?

12 A.   Yes.

13 Q.   How long have you been a physician?

14 A.   Twenty years.

15 Q.   Have you, in your 20 years practicing

16             medicine, ever seen where someone is

17             uncooperative as a symptom or a sign

18             of their medical condition?

19 A.   I'm not sure if I understand the question.

20 Q.   Okay.  Could a patient be confused or in a

21             disoriented state; and, for an

22             untrained observer to see that as

23             being uncooperative?  Is that

24             possible?

25 A.   Are you talking in general or this

 1                patient?
 2  Q.    In general.
 3  A.    Because he's alert and oriented; so, I
 4                wouldn't think of the description you
 5                give.  I would want to know if this
 6                is my general patients, or just
 7                anybody?
 8  Q.    Just general.
 9  A.    Yes.
10  Q.    Okay.  Now, specifically to you, since the
11                medical assistant indicates that they
12                are alert and oriented to time,
13                place -- and what else?
14  A.    Person, place, and time.
15  Q.    Person, place, and time -- then it would
16                be your, based on that annotation,
17                that he was not disoriented or that
18                his, what is considered to be
19                uncooperative, was not a symptom of
20                any underlying medical condition.  Is
21                that correct?
22  A.    Correct.
23  Q.    Under that it indicates, "Treatment Plan."
24                What is a treatment plan?
25  A.    A treatment plan is for the medical

1             assistants to give medications based

2             on the symptoms of what he's telling

3             her that he's going through heroin

4             withdrawals.

5   Q.    Okay.  Now, who determines the treatment

6             plan?

7   A.    It's a protocol for, like, signs and

8             symptoms of what an inmate might

9             present with.  If an inmate presents

10            with a headache, it's okay to give

11            him Tylenol.  When he comes up and

12            he's complaining of a cough, it's

13            okay to give him cough medicine.  If

14            he's nauseous you give medication for

15            nausea that are not prescriptions.

16            They are over-the-counter.

17  Q.    Who would determine what treatment plan to

18            give an inmate based on their

19            complaint?

20  A.    It would be on my list of medications that

21            are approved to give for what they

22            are going through -- their symptoms.

23  Q.    So, if an inmate came in and complained of

24            a headache, you have some list that

25            says, "If the inmate complains of a

1                  headache, give him this"?  Is that

2                  what you're saying?

3    A.   Mostly they come up and they come to the

4                  cart and they say, "I'm having a

5                  headache.  Could I have some aspirin

6                  or Tylenol?  Or, they might say

7                  they're constipated, or nauseous, or

8                  have heartburn.  They have the

9                  medications that they are allowed to

10                 supply to them for a limited amount

11                 of time.

12   Q.   And they don't need your approval to do

13                 this?

14   A.   No.

15   Q.   Okay.  What is Imodium used for?

16   A.   Stomach issues, nausea.

17   Q.   Vomiting?

18   A.   Vomiting.  Maalox for the vomiting,

19                 Imodium for the diarrhea.

20   Q.   And Ibuprofen?

21   A.   Generalized; headaches, pain, swelling.

22   Q.   So, based on this general assessment form

23                 which was done by -- is that Medical

24                 Assistant Hake?

25   A.   Yes.

1  Q.    That on her own judgment she entered into

2            a treatment plan of Ibuprofen,

3            Imodium, and Maalox to Mr. Wright?

4                 MS. HOHENBERGER:  I'm just going

5  to object, because the document speaks for

6  itself.

7  A.    She uses the protocol that's for the signs

8            and symptoms of nausea, vomiting,

9            that's she's trained to do.

10 Q.    Okay.  None of those signs or symptoms are

11           indicated on this form; is that

12           correct?

13 A.    Correct.

14 Q.    What are the signs and symptoms that will

15           warrant Ibuprofen, Imodium, and

16           Maalox?

17 A.    Him coming off the heroin.

18 Q.    So, if an inmate is coming off of heroin,

19           then the medical assistants have your

20           authority without consulting you, to

21           administer Ibuprofen, Imodium, and

22           Maalox.  Is that correct?

23 A.    It's used to give him -- to treat his

24           signs and symptoms.  Of course, you

25           know, we can't give heroin as a

1                     withdrawal for heroin.  On the

2                     streets when you withdraw from

3                     heroin, what do you do?  You go get

4                     more heroin.

5                          In a correctional setting, you

6                     have to give whatever is non-opiate,

7                     non-narcotic, in this type of setting

8                     to help them alleviate through the

9                     symptoms.  It's a protocol that we've

10                     used for years that's been successful

11                     in treating their signs and symptoms

12                     to help them alleviate their

13                     discomfort with going through the

14                     detoxification of the heroin.

15   Q.    Okay.  How long, if you know, at the time

16                     of this general assessment form had

17                     Rachel Hake been a medical assistant?

18   A.    I'm not sure.

19   Q.    How long has she been working for you at

20                     the time of this assessment?

21   A.    I'm not sure.

22   Q.    You have a private practice; is that

23                     correct?

24   A.    Yes, Sir.

25   Q.    And how long have you had a private

1  Q.  Other than what you presume they learned
2          in school, had they received any
3          training since employed by you at
4          Trumbull County Jail in regards to
5          those issues?
6  A.  They are always in training being here.
7          Training is something in the medical
8          field that you go through forever.
9          I'm currently still in training and
10         will be on training the rest of my
11         life.
12             But, the training that I
13         received in medical school -- they
14         get their training through MA school
15         just to determine the appropriateness
16         of someone having a stroke, a heart
17         attack -- are signs that they are
18         trained through their University or
19         school where they are trained.
20 Q.  All right.  Do you have to take continuing
21         education courses?
22 A.  Yes.
23 Q.  As a physician in the State of Ohio to
24         maintain your license; is that
25         correct?

1   A.   Well, a medical assistant certificate.

2   Q.   Okay.  Do you know that for certain?

3   A.   I'm certain my nurse, Debbie, does

4        continuous education to continue to

5        be a certified medical assistant.

6   Q.   So, would you be you surprised to learn

7        that they are not required to have

8        continuing classes to maintain their

9        license?

10  A.   No.

11  Q.   So, is there any formal training in the

12       Trumbull County Jail of your staff?

13  A.   Yes.

14  Q.   Who does that formal training?

15  A.   Carla.

16  Q.   And you're saying Carla Ahart?

17  A.   Yes.

18  Q.   Who determines what training they receive?

19  A.   Well, after their certificate they are

20       given on-the-job training working in

21       the correctional setting and what

22       their job entails.

23  Q.   Let me be more specific, then.  When I say

24       "formal training" do they ever sit

25       down with written materials and go

1           through specific topics in regards to
2           enhancing their medical knowledge?
3  A.   Not through me.
4  Q.   Do they do that with Carla Ahart?
5  A.   Not that I am aware of.
6  Q.   So, the training you believe they receive
7           is basically on-the-job training?
8  A.   For the Trumbull County Jail.
9  Q.   Is that any different than at your private
10          practice?
11 A.   My private practice staff does not go
12          through any advanced training for the
13          jail; so, they don't go through the
14          extra training.
15 Q.   Training for your private office practice.
16 A.   No.  There is no training.
17 Q.   But you're there on a consistent basis; is
18          that correct -- at your private
19          practice?
20 A.   Yes.
21 Q.   And at your private practice you have the
22          ability to be on site and to
23          supervise your medical assistants; is
24          that correct?
25 A.   Mostly Debbie Cornicelli supervises when

1   A.   Sometimes it's p.m.

2   Q.   Are you ever here on midnight shift?

3   A.   Never -- unless there's an emergency.  If

4        I get called in -- very rarely.

5   Q.   Is Carla Ahart a supervisor here?

6   A.   She's a supervisor for the medical

7        assistants.

8   Q.   What are her duties?

9   A.   To supervise the medical assistants.

10  Q.   What does that entail in your thought

11       process?

12  A.   Making sure that the medications are

13       ordered for the inmates, sick call is

14       done, evaluations are done, charting

15       is done, filing, getting reports,

16       seeing inmates when they come in on a

17       booking.

18  Q.   Is training one of her responsibilities?

19  A.   Training the medical assistants; yes.

20  Q.   Have you sat down and spoken with her in

21       regards to her duties as training the

22       medical assistants?

23  A.   We go over what needs to be done, yes.

24  Q.   When you say "we go over," is that a

25       formal --

1  A.    101.

2  Q.    Talking?

3  A.    Yes.

4  Q.    When you say, "what needs to be done,"

5        what determines what needs to be

6        done?

7  A.    The things that aren't getting done.

8  Q.    Would that include administration and

9        recordkeeping; things like that?

10 A.    Filing.  If they are behind in filing

11       charts, filing documentation, getting

12       supplies ordered.

13 Q.    What training is given in regard to

14       patient care?

15              MS. HOHENBERGER:  Are you

16 talking about here, for the inmates?

17              MR. RUCKER:  Yes, for the

18 inmates.

19 A.    What do you mean by "training"?

20 Q.    What training is given, just like you

21       training and your continuing

22       education; where they go and talk to

23       you about signs and symptoms of

24       stroke, or new developments in

25       medicine, cardiology, or pulmonary --

1          things that would enhance your

2          practice.  What type of training is

3          given to the medical assistants here

4          at Trumbull County Jail in regards to

5          the treatment of inmates -- signs and

6          symptoms, what you can do, what you

7          can't do?

8   A.   That's all done through their 80 weeks of

9          training before they start.

10  Q.   How many weeks?

11  A.   Eighty hours.

12  Q.   Eighty hours.  And who does that?

13  A.   Carla.

14  Q.   That's equivalent of two weeks?

15  A.   Yes.

16  Q.   How would that be annotated that they

17         received that 80 hours of training?

18  A.   There's a schedule that she sets up for

19         them before they are hired.

20  Q.   Is that a written schedule?

21  A.   Yes.

22  Q.   Where is that schedule maintained?

23  A.   Probably through Carla.

24  Q.   When you say "through Carla" what does

25         that mean?

1  A.    It has to be documented somewhere because

2        they have to get paid for their

3        training.

4  Q.    Is there something that indicates what

5        specifically they are trained on?

6  A.    Yes.

7  Q.    And Carla would have that?

8  A.    Yes.

9  Q.    Do you know what that form is called?

10 A.    I have seen it.  I don't know the exact

11       name for it, though.

12 Q.    Could it possibly be called "training

13       checklist"?

14 A.    Could be.

15 (WHEREUPON A RECESS WAS TAKEN AT 11:24 AM AND

16 TESTIMONY RESUMED AT 11:43 AM)

17 (PLAINTIFF'S EXHIBIT 4 MARKED)

18 BY MR. RUCKER:

19 Q.    Doctor, you have been handed what's been

20       marked as Deposition Exhibit 4

21       captioned as a "training check-off

22       list."  Is this the document you were

23       referring to when you talked about

24       the 80-week (sic) training?

25 A.    Yes.

1  Q.    You indicate that this is for Laura Yoder?

2  A.    Correct.

3  Q.    Her job title at this time was medical

4           assistant extern.  What is "extern"?

5  A.    We take externs from area medical

6           assistant programs for 160 to 180

7           hours to train them towards their

8           medical assistant degree.

9  Q.    And it indicates here that the starting

10          date of Laura Yoder was February of

11          2017?

12  A.    Yes.

13  Q.    And just looking at this as an example of

14          the training check-off list that you

15          have previously indicated that all

16          your medical assistants go through

17          prior to them becoming employees.  Is

18          that correct?

19  A.    Yes.

20  Q.    Should Medical Assistant Hake have one of

21          these?

22  A.    Yes -- or went through it.

23  Q.    Where would that be maintained?

24  A.    I don't know if she keeps them after she

25          goes through them or not.  I think

1          when she goes through them and if she

2          signs off, and Carla sees they have

3          done it all, she may keep them in her

4          file or discard them.  I don't know.

5  Q.   As a physician, recordkeeping is

6          everything; isn't it?

7                MS. HOHENBERGER:  Objection.

8  A.   In patient care it is.

9  Q.   So, in regards to patient care you would

10         expect that records would be

11         maintained.  Is that correct?

12  A.   Patient records, yes.

13  Q.   In regards to patient care.  Training

14         directly reflects on the care that a

15         patient receives.  Would that be an

16         accurate statement?

17                MS. HOHENBERGER:  Objection.

18  Training as to who?

19  Q.   Training of medical assistants has a

20         direct relationship with the care

21         that patients receive.  Would that be

22         an accurate statement?

23  A.   To some degree.

24  Q.   What degree would it not be an accurate

25         statement?

1          learning, continuous learning

2          experience.

3  Q.    But, the State does require that you

4          maintain those records?

5  A.    Yes.

6  Q.    And it's important to the State; right?

7  A.    Yes.

8  Q.    And it's very important to you because

9          it's important to the State; right?

10 A.    Yes.

11 Q.    You don't think it's important to maintain

12         training records for the medical

13         assistants for the same reason?

14 A.    The State of Ohio has none of my training

15         records at all.

16 Q.    Personally -- you.  Do you think it's

17         important to maintain those records

18         of training?

19 A.    My training records for my residency,

20         internship, externship, are nowhere

21         at the State.  The hospital destroys

22         them when you're done.

23 Q.    Do you, as a physician employing medical

24         assistants to render care to patients

25         in or out of the jail -- do you think

1          it's important that training records

2          be maintained on your employees?

3  A.   They are not allowed to be hired unless

4          this checklist is completely done.

5          If this checklist is done, then we

6          know they went through the training.

7          It's not vital that they're kept

8          personally for me; because, I know

9          that their 80 weeks (sic) of training

10         goes over this whole sheet.  And in

11         order to be employed you need that

12         extra 80 hours of training, or that

13         extra 160 plus 80.  But this is just

14         the checklist that we know that they

15         went through ABC -- A through Z.

16         And, once it's done then we know they

17         have had the training.

18 Q.   Okay.  Let's go over the training

19         check-off -- your Exhibit 4.  It

20         says, "Orientation to jail and

21         medical department."  What would that

22         consist of?

23 A.   Where is that?

24 Q.   The first activity under the "Activity

25         orientation."

1  A.  Basically, take them through, you know,

2      the jail, the booking department,

3      medical department, showing them

4      where everything is at.

5  Q.  Next one is "Clocking in, time sheets"?

6  A.  Correct.

7  Q.  "Review of medical manual."  What is the

8      medical manual?

9  A.  That's the manuals and the policies and

10     procedures left in medical of the

11     things that they need to read over.

12 Q.  Okay.  The next one is "Doors and cabinets

13     locked"?

14 A.  Yes.

15 Q.  "Shift reports"?

16 A.  Yes.

17 Q.  "Phone extensions"?

18 A.  Yes.

19 Q.  "Vaccine"?

20 A.  Yes.

21 Q.  "Filing"?

22 A.  Yes.

23 Q.  "Charts"?  Is that how to complete a

24     chart?

25 A.  I can't read what it says.  It is

1   Q.   What would indicate to me if there is no

2        initial?

3             MS. HOHENBERGER:   Objection.

4   Q.   Would I be correct in assuming that they

5        did not receive training in that

6        area?

7   A.   No.

8   Q.   Why wouldn't I?

9   A.   I don't know if it's just not documented

10       or -- you would have to find out

11       through Carla through the evaluation

12       form if that was done or not.

13            This is an extern.  This is not

14       an employee.  She's going through her

15       externship.

16  Q.   Does she work for you now?

17  A.   No.

18  Q.   So, is there a difference between an

19       extern going through the training and

20       your employee going through the

21       training?

22  A.   An extern is given more time because they

23       are trained through the school; and,

24       this has to be faxed to the school to

25       make sure they have completed the

1             majority of it.

2    Q.    If there is no training check-off list

3             included in any of your employees'

4             personnel files, how would you

5             explain that?

6             MS. HOHENBERGER:  Objection.

7    You're assuming that it's not?

8             MS. RUBRIGHT:  Yes, it's a

9    hypothetical.

10            MR. RUCKER:  I haven't seen it.

11   I've requested it and it hasn't been provided

12   to me.

13            MS. HOHENBERGER:  Objection,

14   again.  Are you talking about files that you've

15   received on three or four medical assistants,

16   his employees generally?  I'm not sure what

17   you're asking.

18   BY MR. RUCKER:

19   Q.    In regards to your employees who work at

20            the Trumbull County Jail, if there

21            are no training check-off lists

22            contained in their personnel files

23            that have been provided to me

24            pursuant to a discovery request

25            issued to your attorney, how would

1             you explain that?

2  A.    I don't know.  I don't know if she keeps

3             them somewhere else.  I don't know

4             where they are kept after they check

5             them out.

6  Q.    Are you even sure that these forms are

7             utilized for the training of

8             permanent employees?

9  A.    Yes.

10 Q.    Do you use these forms in your private

11            practice?

12 A.    No.

13 Q.    Do you use any form in your private

14            practice?

15 A.    No.

16 Q.    I think you have indicated Miss Cornicelli

17            does all the training in your private

18            practice.

19 A.    No.

20 Q.    Who does the training in your private

21            practice?

22 A.    There's no training.

23 Q.    If we continue down it says, "Test list

24            binder."  What is that?

25 A.    The list of the drug screening pregnancy

1  Q.    "Medical request forms."  What does that

2            consist of?

3  A.    Making a medical request for Tylenol; if

4            they need to see the dentist, you

5            need to get his medication from the

6            pharmacy.

7  Q.    Would that relate to sick calls?

8  A.    No.  That's the medical request form.  The

9            inmates fill that out.

10  Q.    Okay.  So, this would be what the inmate

11           or the LPN would fill out to order

12           those things?

13  A.    No.  The inmates are given that form to

14           fill out -- "Joe Smith.  I need

15           ibuprofen," or, "I need to see the

16           dentist," or, "I need something from

17           the pharmacy."

18  Q.    "Verification of medications"?

19  A.    Yes.

20  Q.    "Review of alcohol.  Opiate protocols"?

21  A.    Okay.

22  Q.    Is that review of alcohol, barbiturates

23           and opiate protocols?

24  A.    Yes.

25  Q.    I think we had talked about this earlier.

1                What is your opiate protocol?

2  A.    Mine is, for medication, giving Catapres,

3            Thiamine, for the treatment of

4            symptoms.

5  Q.    It says, "What to do if someone" -- what's

6            that say?

7  A.    Your guess is as good as mine.

8  Q.    Let's see if we can find a clear one.

9                MS. HOHENBERGER:  It looks like

10  "pregnant," to me.

11                MS. RUBRIGHT:  It does to me,

12  too.

13  Q.    "What to do if someone is pregnant"?

14  A.    Right.

15  Q.    Is that "Constipation," the next one?

16                MS. RUBRIGHT:  No.  "Computer

17  password, email, pharmacy look-up."

18  (OFF THE RECORD)

19  Q.    Next is "How to make an appointment"?

20  A.    I agree.

21  Q.    "Medication"?

22  A.    "Pass."  Yeah, "Med pass.  Pharmacy, order

23            medications and how, scan in

24            medications that came in from the

25            pharmacy, sign and date invoices to

1                     go to Carla for payment, pre-book in

2                     assessment form, evaluations,

3                     packaging medications, date each,

4                     order forms, and progress notes."

5    Q.    Next is, "Approval of" --

6    A.    -- "medications.  Personal medication

7                     sheet."  That's the ones they bring

8                     in.

9                          "Court ordered drug screen,

10                    EKGs, and aerosol breathing

11                    treatments."

12   Q.    Okay.  Are these the topics in which you

13                    would expect your medical assistants

14                    to be trained?

15   A.    Yes.

16   Q.    Do you have any other training other than

17                    training topics or training areas

18                    that you insist upon or that are

19                    required for your medical assistants

20                    other than what's on this check-off

21                    list?

22   A.    No; but, when I'm down here seeing inmates

23                    they are continuously training when

24                    I'm evaluating somebody because they

25                    are in the room with me.  At that

1           time I'm teaching and training at the
2           same time.
3    Q.   Are the shifts of the medical assistants,
4           are they rotating shifts or are
5           they -- if you are on midnights
6           you're on midnights?
7    A.   They rotate; or, personal preferences.  If
8           someone wants to work midnights this
9           week or days this week because of
10          babysitting, or whatever else, they
11          put the request in a week before -- a
12          month before.
13   Q.   You're aware that they were interviewed by
14          Lieutenant Shay in regards to the
15          investigation of Mr. Gregory Wright?
16   A.   Yes.
17   Q.   So, is that only temporary, or are they on
18          midnights for long periods of time?
19   A.   It's personal preference for scheduling.
20   Q.   Would you be aware, if you are -- for
21          example, Medical Assistant Hake, how
22          long was she on midnights?
23   A.   I'm not sure.
24   Q.   Are you familiar with Medical Assistant
25          Lockdale's shift?

1  A.    She sets the hours because she does the

2        scheduling; but, she's on-call, like

3        myself, 24/7.  She's always

4        available.  I'm always available.

5            I don't know how many shifts

6        she's here.  I know she worked all

7        three shifts.  But, it would be up to

8        her how many shifts she wanted.  She

9        had the benefit of saying, "I want to

10       work these four days; midnights,

11       days, afternoons."  She was in charge

12       of the schedule.

13  Q.   So, what Carla wants Carla gets?

14            MS. RUBRIGHT:  Objection.

15  A.   Pretty much.

16  Q.   Okay.  Are you familiar with minimum

17       standards for jails in the State of

18       Ohio?

19  A.   Yes.

20  Q.   And how are you familiar with that?

21  A.   I have read through them.

22  (PLAINTIFF'S EXHIBIT 5 MARKED)

23  Q.   Okay.  I'm going to give you, for your own

24       reading pleasure what's marked as

25       Exhibit 5.

1              health authority shall develop

2              specific policies and protocols in

3              accordance with local, State, and

4              Federal laws for the treatment and

5              observance of inmates manifesting

6              symptoms of intoxication or

7              detoxification from alcohol, opiates,

8              hypnotics, or other drugs.  Specific

9              criteria are established for

10             immediately transferring inmates

11             experiencing severe life threatening

12             intoxication, overdose, or

13             detoxification symptoms to a hospital

14             or detoxification center."  Is that

15             your responsibility?

16  A.    Yes.

17  Q.    Have you developed specific policies and

18             protocols in accordance with local,

19             State, and Federal laws for the

20             treatment and observation of inmates

21             manifesting those symptoms?

22  A.    Yes.

23  Q.    Where are those policies and procedures

24             located?

25  A.    In medical.

1  Q.    Under what caption?

2  A.    "Opiate Withdrawal and Alcohol Withdrawal"

3        protocals.

4  Q.    Is that like the COWS?

5  A.    Yes.

6  (PLAINTIFF'S EXHIBIT 7 MARKED)

7  Q.    I have handed you what's been marked as

8        Exhibit 7; "Clinical Opiate

9        Withdrawal Skill," otherwise called

10       COWS.  Are you familiar with that

11       document?

12 A.    Yes.

13 Q.    Is it your testimony that this document

14       meets the requirement that is listed

15       in 5120:1-8-09W?

16 A.    For intoxication and detoxification? Yes.

17 Q.    And that it complies with it fully in

18       regards to:  Specific criteria are

19       established for immediately

20       transferring inmates experiencing

21       severe life-threatening intoxication

22       or detoxification symptoms to a

23       hospital or detoxification center.

24       Are you saying that what's been

25       marked as Exhibit 7 complies with

1  A.  Correct.

2  Q.  So, if you were assessing or if a medical

3      assistant who believes that an inmate

4      was going through withdrawal, in this

5      case an opiate withdrawal, was to use

6      this form and that's something above

7      36, it should cause them some

8      concern.  Is that correct?

9  A.  They call after a score is over 15 to 20.

10 Q.  So, when they use this form, anything from

11     15 to 20 they should call you?

12 A.  They do call me.

13 Q.  Is that written somewhere that they should

14     call you?

15 A.  They are trained in it.

16 Q.  They're trained in that; but, there's

17     nothing in writing that would

18     indicate that?

19 A.  Not that I am aware of.

20 Q.  Okay.  After using this form they can look

21     at this number and know to call

22     Dr. Malvasi; that there's some

23     concern?

24 A.  Yes.  That's part of their training on

25     COWS.

```
 1              and look at somebody.
 2  Q.   So, the medical assistant, in this case
 3              Medical Assistant Hake, is not on the
 4              floor when she received the call;
 5              right?
 6  A.   No.  She's in medical.
 7  Q.   So, the only person that could relay to
 8              her the significance of the event,
 9              whether or not it was an emergency or
10              not, would be the corrections
11              officers who are physically observing
12              Mr. Wright; is that correct?
13  A.   Right.
14  Q.   So, they indicated it was an emergency;
15              then, she should have come prepared
16              to deal with that emergency.  Is that
17              correct?
18  A.   Yes.
19  Q.   If I understand you, you said that the
20              COWS was not used on both occasions;
21              that Medical Assistant Hake tended to
22              Greg Wright because he refused
23              medical attention.  Is that what your
24              testimony is?
25  A.   His signs and symptoms might not have
```

1           warranted to start the COWS report.
2           Everybody doesn't start on the COWS
3           report from day one.  They go through
4           the signs and symptoms; and, if they
5           continue to worsen then the COWS
6           report is established.
7                So, her initial was to alleviate
8           his systems by giving him the
9           Ibuprofen, the Maalox, and -- the
10          three cocktails.
11  Q.   But, where Medical Assistant Hake has
12          indicated that he is having opiate
13          withdrawal, the COWS is for the
14          purpose of opiate withdrawal; is that
15          correct?
16  A.   The COWS is for the purpose of the mild to
17          moderate and severe cases of COWS.
18          It's not used on everybody.
19          Everybody's heroin use is different.
20               If you would like to walk back
21          to medical now, we have a numerous
22          amount of people withdrawing from
23          heroin that are just on the three
24          medications that get them through
25          their symptoms.  It depends on what

1        they're using.  If someone is using

2        an enormous amount, a long-term

3        amount of heroin, their withdrawals

4        are sometimes worse than the guy

5        that's not using as much.

6  Q.    But, the score on this takes that into

7        consideration.  Is that correct?

8  A.    Yes.

9  Q.    So, if she believed and indicates that a

10       knowledge that Mr. Wright is going

11       through opiate withdrawal, that

12       Mr. Wright is experiencing medical

13       complications regardless of the

14       severity, you're indicating that that

15       would not necessitate Medical

16       Assistant Hake to fill out this form

17       so that she could call you and

18       indicate the level of severity of his

19       withdrawal?

20 A.    She wouldn't be able to fill out this

21       report due to the patient's

22       non-compliance.  She was unable to do

23       the vital signs, which means she

24       wouldn't be able to look at his pupil

25       size.  She wouldn't be able to do a

1                   thorough assessment on the inmate

2                   because of his combativeness.

3    Q.    Okay.  If we go down to the box above

4                   "Score," where it says "Anxiety or

5                   irritability," on 4, "Inmate so

6                   irritable or anxious that

7                   participation in the assessment is

8                   difficult."  Would you say that that

9                   covers "uncooperative"?

10   A.    No.

11   Q.    It doesn't?

12   A.    No.

13   Q.    Does Carla Ahart ever indicate to you

14                  whether or not she has given a formal

15                  training session involving

16                  documentation, materials, a sit-down

17                  training session with your employees?

18   A.    She notifies me after she completed the

19                  whole training assessment and

20                  somebody is ready to be hired -- or

21                  if they need more training.  She'll

22                  say, "We have to extend her one more

23                  week because we weren't able to get

24                  through whatever."  It happens very

25                  seldomly, but it does happen.

1              administrator, to your knowledge?

2  A.    No.

3  Q.    "All staff" -- it continues to read, "All

4              staff responding to medical

5              emergencies are certified in

6              cardiopulmonary resuscitation in

7              accordance with the recommendations

8              of certifying health organizations."

9              Are all your staff certified in CPR?

10 A.    Yes.  And I think it's every two years.

11             They go through a class at the

12             office.  I know that's a bi-annual

13             thing.

14 Q.    Do they have records of being certified in

15             CPR?

16 A.    Uh huh.

17             MS. HOHENBERGER:  Yes?

18 A.    Yes, from the American Red Cross.

19 Q.    Let's go to (U).  It says, "Continuing

20             Education for Health Trained

21             Personnel."

22             "All qualified healthcare

23             professionals participate annually in

24             continuing education appropriate for

25             their position."  Do you have that?

 1              practice medicine.

 2                   They are able to diagnose.  They

 3              are able to write prescriptions.

 4              They are able to do everything a

 5              physician can do.

 6 Q.   Okay.  So, under that thought process then

 7              you do not believe that there's a

 8              standard that requires continual

 9              training for medical assistants.  Is

10              that correct?

11 A.   Like I said earlier, the training that

12              they get -- the extra training

13              through myself and Carla on a

14              one-on-one basis is the only training

15              that I am acknowledging that they do

16              outside of the office.

17 Q.   And you do not believe that it is mandated

18              that they have continuing education

19              on an annual basis.  Is that correct?

20 A.   Well, other than like their CPR

21              certification -- the update.  That's

22              all the stuff they need to require to

23              maintain their medical assistant

24              certification.

25 Q.   But that you specifically, as the health

1  A.    I'm here every day; but, if there's no one

2           to be seen on my sick-call list, if

3           I'm not seeing anybody, I might be

4           doing charts, going over evaluations,

5           looking at reports from faxes, labs.

6           Not every day is there patient

7           contact.

8  Q.    But you are there every day?

9  A.    Sometimes two, sometimes three times a

10          day.

11 Q.    Okay.  What do you consider to be

12          delegation of responsibilities?

13 A.    Can you elaborate on that a little bit

14          more?

15 Q.    As a physician, you can only delegate --

16          you cannot delegate tasks to a

17          medical assistant that they are not

18          competent to perform; is that

19          correct?

20 A.    Correct.

21 Q.    What is the limitation of the competency

22          of the medical assistant, if you

23          know?

24 A.    Basically, they are just like ears and

25          voices down here -- eyes -- to relay

1          messages to me for me to make a

2          decision.

3               It's almost like a nursing home.

4          If there's not a physician available

5          there's medical assistants and staff

6          that find out what's wrong with the

7          patient.  Same thing in a

8          correctional setting.

9  Q.   Do you have a system in place that ensures

10          that medical assistants contact you

11          in regard to inmate medical

12          conditions when they should?

13 A.   That's part of their training.  I mean,

14          they call me regularly numerous times

15          a day.  There's always that

16          continuity of care.  When somebody

17          comes in, if they're allowed to have

18          medication, like I said, that you're

19          familiar with.  And, if there's an

20          issue, they call me.

21               If somebody gets in a fight,

22          somebody sprains their ankle, they

23          call me.

24 Q.   Did anyone call you in regards to Inmate

25          Wright other than to obtain your

1          he's just faking because he doesn't

2          want to go to prison, he doesn't want

3          to be transported to prison, what

4          would you say that was?

5                MS. HOHENBERGER:  Objection.

6    Q.   Is that an assessment?

7    A.   An evaluation.

8    Q.   What kind of basis would you look for in

9          that type of evaluation as a medical

10         assistant?

11   A.   In a corrections facility, of course,

12         their main objective is not to be

13         here.  So, they do have strategic

14         plans for not staying further in a

15         jail or prison setting.

16   Q.   Would you expect that they would take some

17         vitals or things along that line to

18         determine whether or not that's a

19         true statement?

20   A.   Vitals are always very important in the

21         initiation of an inmate; as long as

22         it doesn't put the girls at risk of

23         somebody that's going to be forceful

24         with them.

25                Once again, these girls are

1          threatened on a regular basis from

2          these guys; and, our policy is not to

3          put yourself in harm's way, not to be

4          struck at.

5               There's been episodes where

6          these girls are swung on.  They are

7          insulted on a daily basis, as you

8          know, being in a correctional

9          setting.  Derogatory comments from

10         inmates to the staff is done

11         regularly.

12              So, when an inmate refuses

13         anything, any type of treatment, they

14         are not forced to initiate any

15         confrontation that's going to result

16         in an injury, for their protection.

17              MR. RUCKER:  All right.  I don't

18    have any further questions.

19              MS. HOHENBERGER:  He'll read.

20    (WHEREUPON THE DEPOSITION OF PHILLIP MALVASI,

21    D.O., WAS CONCLUDED AT 1:35 PM AND IT WAS AGREED

22    BY AND BETWEEN COUNSEL AND THE PARTIES THAT THE

23    DEPONENT WILL READ AND SIGN THE TRANSCRIPT OF

24    SAID DEPOSITION)

25

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF OHIO

EASTERN DIVISION

CASE NO. 4:17-CV-002383

ESTATE OF GREGORY WRIGHT AND )
BARBARA WRIGHT,                )
                               )
              Plaintiff        )      DEPOSITION
                               )
        VS                     )          OF
                               )
TRUMBULL COUNTY BOARD OF       )      MS. CARLA AHART
COMMISSIONERS, ET AL.,         )
                               )
              Defendants       )


DEPOSITION taken before me, Tracey R. Winck,

a Notary Public within and for the State of Ohio, on

the 9th day of July A.D., 2018, pursuant to agreement

and at the time and place therein specified, to be

read in evidence on behalf of the Plaintiff in the

aforesaid cause of action, pending in the United States

District Court for the Northern District of Ohio,

Eastern Division.

1     60 hours one week and 30 hours the next week that's

2     my hours, but I cannot tell you that I am 40 hours a

3     week and that's all.

4     Q     Did you ever work less than 40 hours a

5     week?

6     A     Yes.

7     Q     Did you ever work less than 30 hours a week?

8     A     Yes.  Now, I am on call 24 hours a day seven

9     days a week

10    Q     Who can call you?

11    A     Anybody, officers, lieutenants, sergeants,

12    medical staff, Dr. Malvasi.

13    Q     Have you gotten calls from correction officers?

14    A     All the time.

15    Q     In regards to inmates?

16    A     Yeah.

17    Q     Do you note those calls?

18    A     Do I write them down on paper?

19    Q     Yes.

20    A     No, I do not.

21    Q     If the correction officer calls you, he is

22    calling you in regards to a medical condition of an

23    inmate, is that correct?

24    A     Yes.

25    Q     And he relays to you how he observes this

1    Dr. Malvasi or a corporation?

2    A        I believe by a corporation.

3    Q        Do you know the name of that corporation?

4    A        Correctional Health Care, LLC.

5    Q        At some point as supervisor were you also

6    responsible for training?

7    A        Yes.

8    Q        When did you become responsible for training?

9    A        When I became a supervisor.

10   Q        That would be upon your return in 2016?

11   A        Yes.

12   Q        Did you have formal training for the staff,

13   formal training being predetermined topics and

14   written materials?

15   A        For training?

16   Q        For training?

17   A        No.

18   Q        How would you train staff?

19   A        Well, I would train them on what needs to

20   be done at the jail.

21   Q        How would you document that?

22   A        Well, I have a sheet of paper, a form to

23   make sure I go through everything to train them on.

24   Q        When you say you have a form --

25   A        Yeah.  I made it up so I remember what to

1    train them on.

2    Q        Can you tell me some of the topics or areas

3    that are on that form?

4    A        Yes, passing medication, packaging

5    medication, ordering medications, dressing changes,

6    diabetics, all policies and procedures, answering

7    phones, calling physicians, calling pharmacies.  If

8    I had the document, I could tell you it all.  There

9    it is, sorry.

10            (Plaintiff's Exhibit No. 1 was marked for

11   identification by the court reporter.)

12   Q        I will hand you what's been marked for

13   identification as Ahart Exhibit 1.  Have you had a

14   chance to look at that?

15   A        Yes.

16   Q        Can you tell me what that is?

17   A        It is a checkoff list for training that I

18   made up so I don't forget to train them in specific

19   areas.

20   Q        When did you begin using this form?

21   A        December of 2016.

22   Q        Would you use this form to train all of

23   your employees?

24   A        Yes.  It's just a guideline.

25   Q        Would this form be placed in each employee's

1   personnel file?

2   A       Not necessarily.

3   Q       Okay.  If it's not in their personnel file,

4   where would it be?

5   A       The trash.

6   Q       Why would it be in the trash?

7   A       Because it's just a guideline for my personal

8   use to make sure that I go over each and every one of

9   them.

10  Q       How would you --

11  A       It's not a -- Sorry, go ahead.

12  Q       No, I am sorry, I interrupted you.

13  A       Go ahead, I forget what I was going to say.

14  Q       How would you evidence that someone received

15  that training if you put it in the trash, that you

16  put it in the trash?

17  A       By their performance of what they do at

18  work.

19  Q       So, for example, Exhibit 1 belongs to a

20  Laura Yoder, is that correct?

21  A       Correct.

22  Q       She is a staff member during 2017?

23  A       Yes.

24  Q       Her checklist was in her file, is that

25  Correct?

1    A        I am assuming, yes.

2    Q        Well, it, obviously, was maintained since

3    we have it in front of us?

4    A        Yes.

5    Q        It was not thrown in the trash, is that

6    correct?

7    A        Yes, that's correct.

8    Q        Why would this one not be thrown in the

9    trash and the other ones might be thrown in the trash?

10   A        I don't know.

11   Q        Who makes the decision to throw it in the

12   trash?

13   A        Anybody's decision after their training.

14   Q        So let me make sure I understand.  On the

15   training checkoff list, which you have indicated is

16   the same for every employee, is that correct?

17   A        Correct.

18   Q        You have the employee's name, their

19   starting date, is that their initial date of employment?

20   A        That's the initial date of when I started

21   the checkoff.  If you look at the job title, she was

22   an extern so that's when she started her externship.

23   Q        So this is not the starting hire date, it's

24   the starting date of training?

25   A        Correct.

1   lock down that was sent up there by a corrections
2   officer, would they add that person to the medical
3   lock down list?

4   A       Okay.   They have a unit upstairs that is
5   a lock down unit, 3A, and they are locked down for
6   medical, disciplinary and for whatever other reasons
7   that the officers lock them down.   It is not
8   specifically because of medical.   Our medical goes up
9   there to pass medications and if we are not notified
10  of somebody that is on lock down that an officer has
11  put on lock down, then we do not know that.   We only
12  know who we put on lock down.   It is the officers'
13  responsibility to let medical know if they are on
14  lock down.

15  Q       So you indicate that on the training
16  activity called medical lock down list your lack of
17  initials you say does not indicate that they did not
18  receive their training?

19  A       Correct.

20  Q       '    If they did receive that training, why is
21  your initial not there?

22  A       We could have been busy and I didn't have
23  time.   I do not require, this is not a document
24  that I require to be filled out and dated.   This is
25  for our personal use to make sure that we cover

everything. Eventually, everybody is going to be
trained on every single thing here. Whether or not
I have time or they have time to initial and date it
is not necessary for us.

Q        Okay. Are you familiar with the State
doing audits of the medical department?

A        Yes.

Q        If the auditor from the State of Ohio comes
in and wants to see your training record, has that
ever happened?

A        No.

Q        They never ask you for your training
records?

A        Never. I don't think it's a part of their
audit.

Q        Do you know if they speak to Dr. Malvasi
about training records?

A        I don't know.

Q        Have you ever spoken to an officer during
the time that they were doing the audit?

A        No.

Q        If we come down on the training activity
and orientation we see medical emergencies --

                MS. AMBROSE RUBRIGHT:  Where are you?

                MR. RUCKER:  2/22, I believe the second

1  Q        How would you determine that a situation

2  was life threatening?

3  A        Well, the officer would call us there and

4  then I would assess that inmate with whatever

5  conditions or complaints or problems that they are

6  experiencing and then I would relay that to the

7  doctor.

8  Q        What are the staff trained to do?

9  A        Which staff, officers or medical?

10 Q        Medical.

11 A        They are trained to do the same thing.

12 Q        So if a corrections officer calls up to

13 the medical or calls down to the medical department

14 and says what they perceive to be a medical

15 emergency, what would happen at that point?

16 A        The staff, medical staff would take their

17 bag and go upstairs and assess that inmate.

18 Q        And what constitutes an assessment?

19 A        You are constantly assessing inmates.

20 Q         Do you  teach specifically what a staff,

21 medical staff should do in assessing an inmate for

22 a serious medical condition?

23          MS. HOHENBERGER:  Objection.

24 A        Can you repeat that?

25 Q        Do you train medical staff as to what

1  constitutes a serious emergency medical situation?

2  A          Yes.

3  Q          What is it that you teach them?

4  A          All medical emergencies get assessed and

5  we will determine, we have booking assessment forms,

6  we have general assessment forms and once they

7  gather all their assessment it's either called in to

8  me or Dr. Malvasi.

9  Q          Are vitals a part of assessing?

10 A          Yes.

11 Q          And so how do you instruct your staff

12 members that when they arrive on the scene of a

13 medical emergency the action that they should take?

14 A          I tell them to do vital signs.

15 Q          What constitutes vital signs?

16 A          Everything.

17 Q          In laymen's terms, I am not medically

18 trained, as a medical person what constitutes

19 vital signs?

20 A          All emergency situations.

21 Q          Is blood pressure a vital sign?

22 A          Yes.

23 Q          What else would be a vital sign?

24 A          I am sorry, you are specifically asking

25 me what vital signs are, a pulse, respiration,

1    temperature, blood pressure, pulse ox.

2    Q        You say pulse ox?

3    A        Yes.

4    Q        What is pulse ox?

5    A        That gives you the pulse and the oxygenation

6    level.

7    Q        How is that done?

8    A        It's an electronic device that you put on

9    their finger.

10    Q        Is that contained in that bag that they

11    are supposed to bring with them?

12    A        Yes.

13    Q        If they don't bring that bag, they are not

14    capable of doing that pulse ox, is that correct?

15    A        Correct.

16    Q        It would be your expectation that they

17    would bring that bag, is that correct?

18    A        Correct.

19    Q        Would you consider the pulse ox an

20    important part of the assessment of an inmate?

21    A        One important factor.

22    Q        What would be the purpose of that assessment,

23    of taking all the vitals?

24    A        So that the doctor can diagnose the

25    problem.

1     Q         Can you make a diagnosis?

2     A         No.

3     Q         Can you initiate protocols without

4 speaking to the doctor?

5     A         Yes.

6     Q         You can do that?

7     A         Yes, protocols that he has approved.

8     Q         Protocols he has approved, they are

9 protocols he has approved in general, is that correct?

10     A         I am not sure.

11     Q         For a specific inmate, if a specific

12 inmate is having high blood pressure, vomiting, are

13 you able to diagnose him as withdrawal and on your

14 own decide that you are going to put him on opiate

15 withdrawal protocol?

16     A         Well, I do an assessment and if that

17 inmate is having nausea and vomiting per the protocol

18 I could give them Maalox for the nausea and vomiting.

19 And we could go down the list of what their complaint

20 or problem is, I could give them on the policy or

21 procedures per specific that problem.  I know what

22 their vital signs ranges are.  If they go out of

23 that range, I know it's an abnormal and I contact

24 the doctor.  I don't diagnose somebody with withdraws.

25 I can only assume by what they tell me and their

physical assessment that they are going through

withdraws or whatever else that the problem is.

Q       So if an inmate told you he was going

through withdrawal without calling the doctor you

would initiate a protocol based on what the inmate

told you?

A       I would initiate what he is complaining

of from his withdrawal so if he is complaining of

nausea or vomiting I would give him Maalox.  If he

was complaining of diarrhea, I would give him the

Immodium and so on and so forth.  I would treat him

according to his complaints that are approved on the

protocol by Dr. Malvasi.

Q       So in that situation as long as you are

dealing with what symptoms you see, signs and symptoms?

A       Correct.

Q       You would not feel the need to call

Dr. Malvasi?

A       It depends on which signs and symptoms.

Q       The ones you just stated.

A       The ones I just stated, the diarrhea,

nausea and vomiting, yes, I would not call him for

that.

Q       If blood pressure was high, would you call

him then?

Q        We had discussed, I had mentioned earlier
signs and symptoms.  What are signs and symptoms?
         MR. RUCKER:  Strike that.

Q        Is there a protocol for signs and symptoms?

A        Yes.

Q        What is that protocol for signs and
symptoms?

A        You would have to look through the
protocol and see.

Q        You don't know that?

A        I mean I know specific things have signs
and symptoms, what we're looking for but I mean
that's specifically.

Q        Opiate withdrawal, what are signs and
symptoms of opiate withdrawal?

A        Nausea, vomiting, overall aches and pains,
sweating, goose bumps.

Q        If an inmate exhibits those signs and
symptoms, what should be the action of the medical
assistant?

A        They will treat per protocol what the
symptoms are so if they have nausea or diarrhea we
would give them Immodium or Maalox, Tylenol, Motrin.

Q        But if those are the signs and symptoms
of withdrawal --

1    of an elevated blood pressure, would you as their

2    trainer and supervisor expect them to recognize that

3    as a serious medical condition?

4                    MS. HOHENBERGER:  Objection.

5                    MS. AMBROSE RUBRIGHT:  Objection.

6    A        Yes.

7    Q        Are you familiar with Inmate Gregory

8    Wright?

9    A        Somewhat, yes.

10   Q        How are you familiar with Inmate

11   Gregory Wright?

12   A        He was an inmate here.

13   Q        Did you have contact with him?

14   A        Yes, I did.

15   Q        On how many occasions?

16   A        Two times.

17   Q        What was your first occasion?

18   A        He was over in booking being booked in and

19   I was called over because he had medication and he

20   had a wound on his leg.

21   Q        What was your conversation with him?

22   A        I asked him, I did a booking assessment

23   form, asked him the questions on there.

24   Q        Did you annotate on that booking assessment

25   what he told you?

1    A         Yes.

2    Q         What other information did he give you?

3    A         Whatever is written down on my assessment

4    form.  I know that he said he did heroin that

5    morning, that he was on Xarelto medication.  He

6    needed dressing changes on his leg wound.

7    Q         Did you annotate on your booking

8    assessment that he told you that he had used heroin

9    that morning?

10   A         Yes.

11   Q         You would have annotated that specifically

12   on what form?

13   A         The booking assessment form.

14   Q         And you're sure you annotated that on

15   that form about the heroin?

16   A         In my statement it says that I did, that

17   means I did.

18   Q         When was the second occurrence?

19   A         The next day, which would have been the

20   4th.  When he was getting his dressing changed I

21   heard a commotion.  I was in my office.  I went to

22   see what was going on in the treatment room and he

23   was being uncooperative and he only wanted his

24   dressing taken off and a clean one put on.  He didn't

25   want it cleaned.  He didn't want any antibiotic

1  ointment put on it.

2  Q        Did you hear him make a statement regarding

3  withdrawal?

4  A        No, not to me.

5  Q        Did you hear him make a statement to

6  Medical Assistant Lobdell in regards to withdrawal?

7  A        No.

8  Q        During May of -- Let me show you what we

9  will mark as Plaintiff's Exhibit 2.

10          (Plaintiff's Exhibit No. 2 was marked for

11  identification by the court reporter.)

12  Q        You have been handed what's been marked

13  as Ahart Exhibit 2.  Are you familiar with this

14  document?

15  A        Yes.

16  Q        What is this document?

17  A        The doctor's sick call list.

18  Q        The names of the, where it's redacted in

19  the black box, those would have been the names of

20  inmates that were on that sick call list?

21  A        Correct.

22  Q        Indicated in brackets it says, "5-1-17,"

23  is that the date of that sick call?

24  A        That is the date that the doctor seen the

25  inmates for sick call, yes.

A       Correct.

Q       And some of those policies and procedures deal specifically with withdrawals, is that correct?

A       Correct.

Q       I am going to hand you what we will mark as Ahart Exhibit 3.

(Plaintiff's Exhibit No. 3 was marked for identification by the court reporter.)

Q       You have been handed what has been marked as Ahart Exhibit 3.  Are you familiar with that?

A       Yes.

Q       Do you see where -- Is this a part of the medical procedures of the medical department?

A       Yes.

Q       Do you see the section in the middle of that, "Withdrawals From Drugs"?

A       Yes.

Q       And the first line indicates under "Withdtawals From Drugs inmate must have signs and symptoms - refer to protocol sheet," is that correct?

A       Correct.

Q       And we previously discussed signs and symptoms and how you believe the medical assistant

```
 1        would just treat those signs and symptoms as they
 2        presented themselves, is that correct?
 3                    MS. HOHENBERGER:  Objection.
 4        A         Yes.
 5        Q         If they had diarrhea, you would give
 6        Immodium?
 7        A         Whatever it said.
 8        Q         It indicates, the next line  says,
 9        "Must get doctor's approval before putting on
10        medications"?
11        A         Yes.
12        Q         When it says -- Would that include
13        Immodium?
14        A         No.  It's on the nursing protocols.
15        Q         When it says, "Must get doctors' approval
16        before putting on medications you believe that does
17        not include all medications?
18        A         Correct.
19        Q         What medications would it include?
20        A         Everything that's on the -- Repeat that
21        question.
22        Q         What medications would you have to call
23        the doctor prior to giving them to the inmate?
24        A         Any prescription medication that is on
25        the assessment form for opiates.
```

1    Q        Okay.  So it's your understanding  that
2    that line does not include Immodium or what's the
3    other ones that --

4    A        Maalox.

5    Q        Maalox.  That's not included in that?

6    A        Correct.  The over-the-counter medications
7    is not included in that.

8    Q        I will hand you what we will call
9    Exhibit 4.

10            (Plaintiff's Ahart Exhibit No. 4 was
11   marked for identification by the court reporter.)

12   Q        What's been captioned as Ahart Exhibit
13   No. 4 has been handed to you.  Do you recognize
14   this exhibit?

15   A        Yes.

16   Q        What is this exhibit?

17   A        The opiate withdrawal scale.

18   Q        What is the opiate withdrawal scale used
19   for?

20   A        For withdrawals of opiates.

21   Q        When would this form be used?

22   A        When they are not getting better with
23   the Motrin or Tylenol that they are given or
24   nausea and vomiting medication or diarrhea
25   medication.

and you would read them and circle the appropriate
number to that and so on and so forth. Then you
would add up the numbers, put the score down here.
And down here in the last box it says the score of
5 to 12 is mild, 13 to 24 is moderate, 25 to 36 is
moderately severe and so on. And that score they
can look on the guideline and it will tell you what
to do based on the numbers.

Q      Okay. And as a trainer and supervisor
when would you expect that your medical assistants
would use this form?

A      When they are still complaining of
whatever they give them, if they give them Immodium
and they are still having diarrhea, if they are still
vomiting and the Maalox isn't working, then we would
use this, so on and so forth.

Q      So if a medical assistant saw what's on
the second time that they saw an inmate complaining
of signs and symptoms, would you have expected them
to fill out the clinical opiate withdrawal scale?

        MS. AMBROSE RUBRIGHT:  Objection.

        MS. HOHENBERGER:  Objection.

A      It would depend.

Q      What would it depend on?

A      Depend on the situation.

1          MS. AMBROSE RUBRIGHT:  Objection.

2          MS. HOHENBERGER:  Objection.

3     A          No.

4     Q          You don't?

5     A          Huh-uh.

6          MR. RUCKER:  This is what we will mark

7     as 5.

8          (Plaintiff's Ahart Exhibit No. 5 was

9     marked for identification by the court reporter.)

10    Q          You have been handed what's been

11    marked as Ahart Exhibit 5.  Are you familiar with

12    this policy?

13    A          Yes.

14    Q          This is a part of the policies and

15    procedures of the medical department of the Trumbull

16    County Jail?

17    A          Yes.

18    Q          It is the policy for withdrawals.  You

19    see that first paragraph?

20    A          Yes.

21    Q          It says, "Inmates must show these signs

22    and symptoms before being placed on medications

23    and you must get an order from Dr. Malvasi.  Not

24    everyone will experience withdrawal symptoms.  Must

25    use score sheet or COWS (Opiate) score sheet."

1    A       Yes.

2    Q       How is that policy implemented in the

3 medical department under your supervision?

4    A       Well, they must show signs and symptoms

5 before being placed on the medication. We're

6 talking about the prescription medication where

7 they use the assessment form, the COWS, for the

8 opiate, the alcohol, the CIWA for the alcohol,

9 the scoring sheet.

10    Q       What are the prescription medications

11 that you're saying this refers to?

12    A       Catapres, Thiamine and Bental.

13    Q       Is there a protocol in writing that

14 indicates these prescriptions?

15    A       Yes.

16    Q       Is that included in the policies and

17 procedures?

18    A       Yes.

19    Q       And all of these prescriptions are, well,

20 all of these are prescriptions, they are not non-

21 prescription drugs, is that correct?

22    A       Correct.

23    Q       And these can only be administered

24 through a doctor's orders; is that correct

25    A       No.

Q        It is not?

A        The doctor can order medication for medical to administer it, yes.

Q        That's what I am saying.  It's only through a doctor's orders, you cannot administer those drugs just on your own by your own volition?

A        I cannot prescribe the medications.  I am not understanding, you use the word administer.

Q        You cannot on your own, you cannot walk into the pharmacy, get Catapres based upon what you see from the COWS or anything else and administer it without doctor's orders, is that correct?

A        Correct.

Q        Did you ever review the medical records of Gregory Wright?

A        Yes.

Q        When did you review the medical records?

A        I don't know a date but shortly after the incident.

Q        So you did not review the records until after his death?

        MS. HOHENBERGER:  Objection.  I am not clear what you're asking.

Q        Did you ever review the medical records of Gregory Wright, you indicated that you had?

MS. AMBROSE RUBRIGHT:   Objection.

MS. HOHENBERGER:   Objection.

A        No.

Q        So there is no records maintained as evidence that you completed that training?

A        No.

Q        What direction does Dr. Malvasi give you in regard to supervision of the medical assistants?

A        I am not sure what you are asking.

Q        Does Dr. Malvasi give you directions as to what he expects from you as a supervising nurse in the medical department?

A        Yes.

Q        What are those directions?

A        Supervising the assistants, making sure that they are doing what they are supposed to be doing, passing meds, calling doctors, writing orders, doing evaluations.  I supervise their daily shift, whatever they haveto do.

Q        But you're not on their shifts, is that correct?

MS.HOHENBERGER:   Objection.

A        I may not physically be in this building but I am on call 24/7.  They call me each shift several times a shift.

Q        Does Dr. Malvasi ever sit with you and discuss training personally?

A        Yes.

Q        When was the last occasion that he did that?

A        I talk to Dr. Malvasi several times a day everyday and we discuss on what to train them on, what to re-train them on, things change.  So it's a daily thing, it doesn't stop.

Q        Is he personally sitting face to face when that occurs?

A        Sometimes, yes.

        MR. RUCKER:  If you just give me a minute to run through and make sure I hit everything.

        (A brief recess was taken.)

Q        Do the inmates refer to the medical assistants as nurses?

A        They can.

Q        Do you refer to them as nurses?

A        Sometimes.

Q        Do the corrections officers refer to them as nurses?

A        You will have to ask them.  I have no idea.

IN THE UNITED STATES DISTRICT COURT
        NORTHERN DISTRICT OF OHIO
              EASTERN DIVISION


-----------------------------------
ESTATE OF GREGORY WRIGHT          :
BARBARA WRIGHT, ADMINISTRATOR,    :
1756 SHARIDAN AVENUE, N.E.        :
WARREN, OHIO 44483                :
                                  :
        and                       :
                                  :
BARBARA WRIGHT,                   :
                                  :
              Plaintiffs,         :
                                  :
        vs.                       : Case No.
                                  : 4:17-CV-002383
TRUMBULL COUNTY BOARD OF          :
COMMISSIONERS,                    :
160 HIGH STREET                   :
WARREN, OHIO                      :
                                  :
        and                       :
                                  :
SHERIFF, TRUMBULL COUNTY          :
IN HIS OFFICIAL CAPACITY          :
150 HIGH STREET                   :
WARREN, OHIO                      :
              Defendants.         :
                                  :
-----------------------------------

              Monday, October 1, 2018

1 please?

2      A      It's Bethany Lobdell -- L-O-B-D-E-L-L.

3      Q      Okay.  And, Ms. Lobdell, could you give me

4 your address, please?

5      A      414 Joyce Drive, it's Glen Burnie, Maryland,

6 21061.

7      Q      Okay.  And how long have you lived in Glen

8 Burnie, Maryland?

9      A      Since December of 2017.

10     Q      And prior to that where did you live?

11     A      In Warren, Ohio.

12     Q      And what was that address?

13     A      1340 Hazelwood Avenue, Southeast, Warren,

14 Ohio, 44481.

15     Q      Okay.  Is it 81 or 84?

16     A      I believe it's 81.

17     Q      Okay, then.  Are you currently employed?

18     A      Yes, sir.

19     Q      And where are you currently employed?

20     A      I work for Johns Hopkins Medical Institute in

21 their Oncology Department.

1     Q    And how long have you worked there?

2     A    Since March of 2018.

3     Q    And what position do you hold there?

4     A    Medical assistant.

5     Q    Okay.  Prior to your employment at Johns

6 Hopkins, where were you employed?

7     A    I was not employed between the jail and Johns

8 Hopkins.

9     Q    Okay.  And when did you leave the jail?

10    A    November of 2017.

11    Q    And when we refer to "jail," we're referring

12 to your employment at Trumbull County jail; is that

13 correct?

14    A    Yes, sir.

15    Q    Okay.  And when were you hired at Trumbull

16 County jail?

17    A    I was hired April of 2015.

18    Q    And you were hired as?

19    A    A medical assistant.

20    Q    Okay.  And prior to your employment at

21 Trumbull County jail where were you employed?

1      A      I was employed at a convenience store in

2  Leavittsburg, Ohio.

3      Q      Okay.  What training did -- when did you

4  become a medical assistant?

5      A      I was in school for medical assisting

6  starting in 2014.

7      Q      And when did you complete that study?

8      A      It ended -- I graduated January of 2015.

9      Q      So how long was the actual course of study?

10      A      It was a two-year program.

11      Q      And what certificate did you -- or what type

12  of license did you receive after graduation?

13      A      I have an associates degree in medical --

14  it's in applied science and medical assisting, and I

15  also did the state testing to become a registered

16  medical assistant.

17      Q      Okay.  When you say "state testing," is that

18  Ohio?

19      A      Yes.

20      Q      Okay.  Can you explain to me what is a

21  medical assistant?

1    A    As in regards to like the job and what they

2 do, or --

3    Q    The job and what they do.  That will be a

4 good place to start.

5    A    For a medical assistant, they give -- they

6 can do vital signs, give injections, write orders from

7 their doctors, make appointments, bandage change, minor

8 emergency care.

9    Q    Okay.  And can you -- I'm sorry, were you

10 done?

11    A    Yes.

12    Q    What is it that a medical assistant cannot

13 do?

14    A    We cannot prescribe medications.  We cannot

15 give IVs.

16    Q    Can you exercise medical judgment?

17         MS. HOHENBERGER:  Objection.

18         BY MR. RUCKER:

19    Q    Okay.  Can you diagnose --

20    A    No.

21    Q    -- disease or conditions?

1     A    No.

2     Q    What does it mean to diagnose?

3     A    To say what you know for a fact what somebody

4 has, or can say this is what they have, this is the

5 treatment that we give.

6     Q    So you are not allowed to determine treatment

7 for someone; is that correct?

8     A    We do not prescribe medications.  Like just

9 because somebody says "I have this condition" doesn't

10 mean, oh, okay, well, we can automatically give you

11 this.  We have to go through the doctor.

12     Q    Okay.  You left Trumbull County jail in

13 November of 2017?

14     A    Yes, sir.

15     Q    Under what conditions did you leave?

16     A    My fiancat the time was transferred from his

17 job to a Maryland location back in June of that year,

18 and December was just the time for us to move forward.

19 It was just when we got everything together to move.

20     Q    Okay.  Did you resign or were you terminated?

21     A    I resigned.

1    Q    Okay.  During your period of working at

2  Trumbull County jail which would have covered -- well,

3  when were you hired in Trumbull County jail?

4    A    I was hired April of 2015, but I also did the

5  externships through my schooling with Trumbull County

6  jail in 2014.

7    Q    Okay.  Prior to your employment at Trumbull

8  County jail, had you ever worked as a medical assistant

9  before?

10   A    No.

11   Q    So you had no previous experience as a

12  medical assistant?

13   A    Other than my externships, no.

14   Q    And that externship was at Trumbull County

15  jail; is that correct?

16   A    Yes.

17   Q    Okay.  So when you were hired at Trumbull

18  County jail, what was the process of your --

19        MS. HOHENBERGER:  You cut out, Gil.

20        MR. RUCKER:  Orientation, I guess, is a

21  better word.

1  correct?

2      A    Yes, sir.

3      Q    So if you were to view a shift report and it

4  indicated that you were working from 2:00 to 10:00 I

5  would have no reason to doubt that, would I?

6      A    No.

7      Q    Okay.  How long was your extern --

8           MS. HOHENBERGER:  Can I just note my

9  objection, and again, you're talking about that

10 particular day, that particular shift report?

11          MR. RUCKER:  Yes.

12          MS. HOHENBERGER:  Okay.

13          MR. RUCKER:  That is correct.

14          BY MR. RUCKER:

15     Q    How long was your externship?

16     A    It was 150 hours.

17     Q    Okay.  And how did you complete those hours?

18     A    By working at the jail in eight-hour

19 segments.

20     Q    And what is it that you did during your

21 externship?

1     A    Followed around whoever was on shift at that

2 time, took vitals, gave -- you know, dealt with the

3 diabetics on shift with their finger sticks, any

4 insulin injections that they needed, watched medication

5 passes, and emergency --

6     Q    And (indiscernible) you on during your

7 externship?

8     A    I'm sorry?  Can you repeat that?

9     Q    Okay.

10     MS. HOHENBERGER:  And I don't know that

11     she ---

12     BY MR. RUCKER:

13     Q    Yeah.  What shift were you --

14     MS. HOHENBERGER:  I don't know that she was

15 finished with her answer, Gil, but go ahead.

16     MR. RUCKER:  Yeah.  Well, she can finish

17 because what it did, it stalled on my end.

18     MS. HOHENBERGER:  Okay.

19     MR. RUCKER:  So, I'm sorry to interrupt you.

20 At any time you feel that I'm interrupting you before

21 your answer is complete, please say so, because what's

1  happening is it is a poor connection and I'm not

2  getting anything, and so I think that you've stopped.

3  So, yeah, so please feel free to interrupt me and say,

4  hey, I'm not finished.  Okay?

5          THE WITNESS:  Yes.

6          BY MR. RUCKER:

7  Q     Okay.  So I'm going to allow you to finish.

8  A     What was the last thing that you heard?

9  Q     The court reporter can probably tell you

10 that.

11         MR. RUCKER:  You said something about --

12         THE REPORTER:  Just a second.  Here we go.

13         MR. RUCKER:  Oh, go ahead.

14         (Whereupon, the reporter played back the

15         previous answer.)

16         THE REPORTER:  Did you hear that part?

17         MR. RUCKER:  I heard that part.

18         BY MR. RUCKER:

19 Q     Do you have anything you would like to add to

20 that, Ms. Lobdell?

21 A     We also supervised -- you know, not

1  supervised but followed around during med passes and

2  any of the medical emergencies that happened on shift.

3      Q    Okay.  Did you participate in any medical

4  emergencies during (indiscernible) --

5          THE REPORTER:  Can we go off the record a

6  second?

7          MR. RUCKER:  Yes.

8          (Whereupon, a brief recess was taken.)

9          THE REPORTER:  All right.  We're back on.

10         BY MR. RUCKER:

11     Q    Okay.  I believe my last question to you, Ms.

12 Lobdell, was during your externship did you encounter

13 any medical emergency?

14     A    Yes, but I do not remember the specifics of

15 the ones that I attended.

16     Q    Okay.  Do you realize what it was associated

17 with?  What kind of medical condition?

18     A    I do not.

19     Q    Okay.  And as a result of that -- strike

20 that.  As part of your externship did you have to --

21 you evaluated?

1      A      As in -- I don't understand exactly what you

2 mean.

3      Q      Your performance.  Was your performance

4 evaluated during your externship?

5      A      Yes.  They were given -- there were reports

6 given back to the school.

7      Q      Okay.  During your externship were your

8 experiences ever memorialized?  For example, in your

9 medical emergencies would that have been annotated in

10 your training file or your evaluation?

11      A      I do not know what they put in there or what

12 they sent back to the school.

13      Q      Okay.  So during your externship when you

14 encountered a medical emergency, would your supervisor

15 or a trainer go over with you the procedures that were

16 utilized in that emergency?

17      A      There was some discussions after the

18 emergency happened about what was going on, but I do

19 not recall the specifics.  I just remember having

20 discussions.

21      Q      Okay.  Were those discussions written down?

1      A    I do not know.

2      Q    What type of formal training did you receive

3 during your externship?

4      A    It was all on the hands training, learning,

5 making sure that you were doing your vital signs

6 properly, making sure that you can do bandage changes

7 properly, making sure that you knew how to give

8 injections to the inmates.

9      Q    At any time during your externship were you

10 giving area specific training in opiate withdrawal?

11      A    There was the forms present at that time,

12 i.e. the COW forms to use if need be for severe opiate

13 withdrawal.

14      Q    Okay.  But did you ever have any formal

15 training in regards to opiate withdrawal?

16           MS. HOHENBERGER:  Objection.

17           BY MR. RUCKER:

18      Q    Let me define what I mean by formal training.

19 Were you ever in a classroom situation or sitting down

20 with a supervisor or Dr. Malvasi and taken step-by-step

21 as the procedures you should follow if you witnessed or

1  felt that an inmate was going through a drug-related

2  withdrawal?

3      A    We did have a policy in place for withdrawal.

4  It was in our instruction manual that we had available

5  to us every day, and there were also instructions

6  hanging on the wall in the office that we could refer

7  to at any given moment.

8      Q    Okay.  Did Dr. Malvasi ever sit with you and

9  go through that manual?

10      A    He made sure that we had access to that

11  manual at any given moment.  He did make sure to tell

12  us that we needed to refer to the manual, and we were

13  able to call him at any given moment if we had any

14  questions.

15      Q    Okay.  Did Dr. Malvasi every personally sit

16  with you and go through that manual?  It's a yes or no

17  answer.

18      A    No.

19      Q    Did you ever sit with any supervisor -- a

20  medical supervisor and actually go through the manual

21  and discuss the process and procedures of drug

1 withdrawal?

2      A     At the time I was hired, no.

3      Q     Okay.  During your tenure there was an

4 employee, at any time did you physically sit down with

5 Dr. Malvasi and go through the process and procedure of

6 what to do if an inmate exhibited what you believed to

7 be signs of withdrawal from drugs?

8      A     We had meetings when the opioid epidemic

9 became more relevant for things to look for, too, and I

10 do know there were some meetings that he sat in on as

11 well as supervisor Carla at the time.

12      Q     Okay.  Did Dr. Malvasi ever personally sit

13 with you and train you as to what you were to do if an

14 inmate exhibited signs of drug withdrawal?

15           MS. HOHENBERGER:  Objection.  Asked and

16 answered.

17           BY MR. RUCKER:

18      Q     Yes or no?

19      A     No.

20      Q     Did Carla Ahart ever sit with you personally

21 and go through the process and procedure that you were

1  to follow if an inmate was exhibiting the signs or

2  symptoms of drug withdrawal?

3      A    Again, she did hold a meeting to address that

4  with everybody on things that, you know, to look out

5  for and the procedures if we noticed or had any signs

6  or symptoms of a severe withdrawal.

7      Q    And -- I'm sorry.  Were you finished?

8      A    Yes, sir.

9      Q    Okay.  Was that training annotated in some

10 formal manner?

11          MS. HOHENBERGER:  Objection.

12          BY MR. RUCKER:

13     Q    Okay.  Let me rephrase it.  Was there any

14 record of that training?

15     A    I do know --

16     Q    Strike that.  Strike that.  Was there any

17 record of that meeting?

18     A    Carla did keep records of the meetings,

19 things that she went over, things that we discussed,

20 any concerns we could have written and given them back

21 to her.  There was somebody keeping minutes during

1  those meetings.

2      Q    So you're indicating that there was someone

3  keeping records?

4      A    Yes.  We would have signed in for our

5  meeting.  She would have had a list of what we were

6  going to talk about, and there was somebody who would

7  have written down anything else that we had added to

8  what we were discussing.

9      Q    Can you indicate to me where those records

10  would have been kept?

11      A    Carla would have had all of those.  Probably

12  in the office that she was occupying.

13      Q    In your training -- well, in your educational

14  process at Ross (phonetic); is that correct?

15      A    No, sir.

16      Q    Where were you -- where was your school?

17      A    I attended Trumbull Business College in

18  Warren, Ohio.

19      Q    Okay.  In your educational process at

20  Trumbull Business School did you receive any training

21  in regards to correctional medicine and procedures?

1    A    Other than the externship, no.

2    Q    Did you receive at Trumbull Business College

3 in your course curriculum any training in drug or

4 alcohol withdrawal?

5    A    Not that I can remember.  I know there was a

6 section over it but it wasn't a specific in depth class

7 training.

8    Q    During your employment at Trumbull County

9 jail, were you ever assessed by Dr. Malvasi or any

10 supervisor in the medical department as to your level

11 of knowledge as to what to do in the case of an inmate

12 suffering from withdrawal?

13        MS. HOHENBERGER:  Objection.

14        THE WITNESS:  I do not know.  There wasn't

15 any one-on-one, but Carla made sure that we all knew

16 what we were doing.

17        BY MR. RUCKER:

18    Q    And how would Carla check to see if you knew

19 what you were doing?

20    A    She had her own checklist and things that she

21 knew that we were supposed to do, and she would go over

1  -- you know, she kept making sure that, you know, if

2  she noticed something and someone said "oh, I said

3  something to somebody else," she would check into that

4  and make sure that we were following the procedures,

5  look over the COWs that we done, make sure that we'd

6  gotten a hold of Doc (phonetic) when needed to.

7       Q    Okay.  If you had to place a percentage on

8  how much of your schooling dealt with administrative

9  work, which would include things like taking calls,

10 computers, billing, and scheduling, things along that

11 matter, what percentage would you place that?

12      A    I do not know.  I cannot give an accurate

13 answer.

14      Q    Did you have a class or course work in making

15 assessments of patients' medical conditions while you

16 were at Trumbull Business School?

17           MS. HOHENBERGER:  Objection.

18           THE WITNESS:  Yes.  There were intake

19 procedures.  They did teach us to ask follow-up

20 questions to get more information to notate.

21           BY MR. RUCKER:

1    Q    And when you indicate "to notate," does that

2  mean to include into medical records of the patient?

3    A    Yes.

4    Q    As a medical assistant, do you have any

5  continuing education requirements?

6    A    Yes.

7    Q    And what are those continuing education

8  requirements?

9    A    Every year we have to have at least so many

10  continuing education credits that we decide what we do,

11  whether it's articles and answering questions, like

12  taking additional classes, recertifying our CPRs.

13  Anything of those natures.

14    Q    Okay.  You get to pick the classes?

15    A    Yes.

16    Q    Okay.  And that continuing education

17  requirement, is it a class requirement?

18    A    No.  You do not physically have to be in a

19  classroom.  You can read different articles and answer

20  different questions, or you can choose classroom

21  training, or lectures, or seminars.

1    Q    Okay.  When you say "answer questions," who

2 would you answer the questions to?

3    A    They would give you an article for you to

4 read and you're answering follow-up questions and

5 understanding questions of the article in which you

6 just read.

7    Q    Okay.  And who would give you the article?

8    A    You can get the articles from any of the AMT

9 technology catalogues that they send out, anything

10 online that they supply, meaning the American Medical

11 Technology Association.

12    Q    Okay.  And during your two plus years at

13 Trumbull jail, did you meet those requirements?

14    A    Yes.  It's 30 continuing education credits

15 for the three years, I believe.

16    Q    And how did you meet those requirements?

17    A    I had on-the-job training, which they give

18 credit for, my CPR classes, and I also did online

19 articles.

20    Q    Okay.  Did Dr. Malvasi or any supervisor of

21 the Medical Department ensure that you completed those

1 continuing education requirements?

2     A    It is our responsibility to continue our

3 credits and to stay certified.

4     Q    Okay.  Does that mean that Dr. Malvasi or any

5 medical supervisor did not ensure that you did those?

6     A    They would check to make sure that our

7 licenses were still valid, and then it was our

8 responsibility to make sure that they stay valid.

9     Q    Okay.  Would you have obtained any

10 certificates indicating that you have met those

11 requirements?

12     A    I can access the records that I need to

13 through the American Medical Technology.

14     Q    Okay.  Did you take -- in your compliance

15 with the continuing education requirement, did you take

16 any classes in correctional medicine?

17     A    No.

18     Q    Were you at any time encouraged by Dr.

19 Malvasi or any medical supervisor to take classes in

20 correctional medicine?

21     A    No.

1      Q    Can you tell me what are the signs and

2  symptoms for withdrawal from heroin?

3      A    There's nausea, vomiting, diarrhea, stomach

4  cramps, tremors, perfuse sweating, pale.  An inmate or

5  a person could be pale.  Pain.

6      Q    Okay.

7      A    Delusions -- I'm sorry.  I'm not finished.

8  Delusions, hallucinations, possibly in hallucinations

9  hearing voices, muscle cramps.

10     Q    Is that it?

11     A    Yes, sir.

12     Q    Okay.  At any time did Dr. Malvasi give you

13  training as what you were to do if you witnessed those

14  signs?

15     A    We did have a policy in place and which was

16  always available to us and was hanging in front of us

17  for us to reference, and again, we could also go to him

18  with any questions and if there was anything out of the

19  ordinary we would call him and explain the situation.

20     Q    Okay.  Did Dr. Malvasi personally at any time

21  give you instructions as to what you were to do if you

1 witnessed those signs?

2    A    We were supposed to go over our COWs with the

3 inmate and notify him of the scores after, you know, a

4 certain level on the score sheet, or if there was

5 anything out of the ordinary.

6    Q    Did Dr. Malvasi personally give you that

7 training?

8         MS. HOHENBERGER:  Objection.  Asked and

9 answered.

10        BY MR. RUCKER:

11   Q    Or is your answer in response to policies and

12 procedures that were written?

13        MS. HOHENBERGER:  Objection.

14        THE WITNESS:  They were all -- we were given

15 the policies and procedures.

16        BY MR. RUCKER:

17   Q    Okay.  Did you ever have a face-to-face

18 training with Dr. Malvasi instructing you as to what

19 you were to do if you witnessed an inmate exhibiting

20 the signs of withdrawal?

21   A    I do not remember.

1    Q    Were you ever given face-to-face training by

2 any medical supervisor in regards to what you were to

3 do if you witnessed an inmate exhibiting signs of

4 withdrawal?

5    A    We did have meetings that went over the

6 policies and procedures.

7    Q    And who was the supervisor in those meetings?

8    A    Carla Ahart.

9    Q    And were those meetings that they documented?

10    A    Yes.

11    Q    And document by who?

12    A    Carla had what she wanted us to go over as

13 well as examples.  Other than that I don't know who at

14 that time would have taken the minutes.

15    Q    But minutes were taken?

16    A    I do not remember, but it was common

17 practice.

18    Q    Did you have to sign in for the training?

19    A    Yes.

20    Q    Would the training have been on your shift?

21    A    Not necessarily.

1       Q    If it was not on your shift, would you have

2   had to come back --

3       A    Yes.

4       Q    -- to the jail?

5       A    Yes.

6       Q    Was all the training held in the jail?

7       A    Yes.

8       Q    How do you define a medical emergency?

9            MS. HOHENBERGER:  Objection.

10           THE WITNESS:  In the jail, a medical

11  emergency could be called for any reason.  The officers

12  would call down and say, "Hey, we need a medical up

13  here with their medical and emergency bag," and then we

14  would have to assess the situation when we arrived.

15           BY MR. RUCKER:

16      Q    Okay.  My question was how would you -- what

17  would you consider to be a medical emergency?

18           MS. HOHENBERGER:  Objection.

19           THE WITNESS:  As in like what you saw, or --

20  I'm not completely understanding what you mean.

21           MR. RUCKER:  Okay.  Well, I'll rephrase it.

1          BY MR. RUCKER:

2     Q     As a medical assistant, if you were called to

3    a full (phonetic) with an inmate in some type of

4    medical distress, what would you look for to determine

5    whether or not that that condition represented a

6    medical emergency?

7     A     Well, the first thing is automatically -- I

8    mean, first you're going to look for any signs of

9    trauma to see if it was an open wound, if it is any

10   physical signs of, you know, shaking as in a seizure or

11   tremors, or if there's any secretions as in is there

12   any vomit on the floor, if so, what's it look like.

13   Then you're going to take vital signs for more in-depth

14   information.

15    Q     Okay.  And what would the vital signs have to

16   be or represent in order for you to believe that it was

17   a medical emergency?

18    A     It's different for every person.

19    Q     Okay.  If an inmate was going through

20   withdrawal -- drug withdrawal, how would you -- what

21   would the vital signs be that would put you on an

1  alert?

2      A    It could be an increased blood pressure, but

3  also you would have to know what the inmate's baseline

4  is.  Like just because it's elevated isn't necessarily

5  that he's always elevated.  How elevated it is, because

6  a couple points of elevation doesn't necessarily mean

7  that it's a withdrawal.  You would look for heart rate.

8  It could be fast.  But again, with the heart rate you'd

9  have to also -- is his baseline kind of high, was he

10 just working out, was he throwing up, is he nervous, is

11 he anxious about anything.

12     Q    Okay.  So where would you obtain these

13 baseline readings?

14     A    You'd have to go back and look either at his

15 chart or you'd take it one time and you would have to

16 check it again later on in the situation, or you might

17 have to do a couple days' worth of vital sign checks to

18 see if it's a constant or if it was a one-time thing.

19     Q    Okay.  Is blood pressure taken when an inmate

20 comes to Trumbull County jail?

21     A    Can you be more specific?

1      Q    There's a booking medical intake; is that

2  correct?

3      A    Yes.

4      Q    Is taking of blood pressure, is that one of

5  the procedures that take place?

6      A    We do not take the blood pressure on

7  everybody who comes in.

8      Q    So when you say "baseline," there is no --

9  and you said -- indicated that you would look back at

10 the chart.  Would the chart have a baseline?

11     A    The chart could indicate if anyone has blood

12 pressure issues or heart issues or anything that could

13 say this could be a little bit out of normal range.

14     Q    Let's look at what will be marked as Exhibit

15 25, which on my list would be Exhibit 4.

16          MS. HOHENBERGER:  The medical questionnaire,

17 Gil?

18          MR. RUCKER:  Yes.

19          (Whereupon, Lobdell Deposition Exhibit No. 25

20          was marked for identification.)

21          BY MR. RUCKER:

1      Q    Have you had a chance to look at what's been

2 marked as Exhibit 25?  Plaintiff's Exhibit 25?

3      A    Yes.

4      Q    Okay.  Have you ever seen this document

5 previously?

6      A    This document is in the computer system that

7 the officers take when the inmate arrives.

8      Q    Okay.  When was the first time that you

9 encountered Mr. Gregory Wright?

10      A    It would have been the afternoon of May 4th.

11      Q    And what were the circumstances under which

12 you met -- you saw him?

13      A    I was notified about a bandage change that

14 the individual needed.

15      Q    Okay.  And what action did you take upon that

16 notification?

17      A    I had him brought down so that I could do his

18 bandage change.

19      Q    Okay.  And what action did you take?

20      A    I undressed the -- endeavored at the old

21 bandage, attempted to clean the area, and to redress

1  the wound.

2      Q    Okay.  And did Mr. Wright make a comment to

3  you about his medical condition?

4      A    He had said that he was throwing up a little

5  bit and he was a little sick to the stomach.

6      Q    And he said he was a little sick to the

7  stomach?

8      A    Yes.

9      Q    And he had indicated that he had been -- he

10  had thrown up a little bit?

11     A    Yes.

12     Q    Did you annotate that anywhere?

13     A    No.

14     Q    And why did you not annotate that anywhere?

15     A    Because it is not uncommon for an individual

16  to say that they're sick for many different reasons.

17     Q    Could the fact that they were sick be one of

18  the reasons that they indicated that they were sick?

19          MS. HOHENBERGER:  Objection.

20          THE WITNESS:  Can you clarify?

21          BY MR. RUCKER:

1   Q   Could he have indicated that he was sick, or

2   the reason that he actually was sick?

3   A   I do not understand.

4   Q   Is it possible that Mr. Wright was sick?

5   A   It's possible that he was sick but it could

6   have been just a stomach sick or it could have been

7   something more extreme.

8   Q   Did you take vital signs at that time?

9   A   I did not.

10  Q   Why not?

11  A   Because you don't take vital signs for

12  everybody who's just sick to the stomach.

13  Q   And you did this on the 4th; is that correct?

14  A   Yes.  The afternoon of the 4th.

15  Q   And Mr. Wright died on the 5th; is that

16  correct?

17      MS. HOHENBERGER:  Objection.

18      BY MR. RUCKER:

19  Q   Is that correct?

20      MS. HOHENBERGER:  Objection.

21      MR. RUCKER:  Okay.

1            THE WITNESS:  I was made aware that he passed

2  away on the 5th.

3            BY MR. RUCKER:

4     Q    In light of the fact that he passed away, do

5  you now think that you should have taken vital signs?

6            MS. HOHENBERGER:  Objection.

7            THE WITNESS:  No.

8            BY MR. RUCKER:

9     Q    Okay.  Is it still your belief that he was

10 faking illness when he indicated to you that he wasn't

11 feeling well, that he had vomited and had nausea?

12           MS. HOHENBERGER:  Objection.  That wasn't her

13 testimony.

14           THE WITNESS:  I never said that he was faking

15 it.  I never make any indication that he was faking

16 anything or any diseases.

17           BY MR. RUCKER:

18    Q    You indicated that inmates say they were sick

19 just to say they were sick?

20           MS. HOHENBERGER:  Objection.  I don't think

21 that's what she testified to.

1          THE WITNESS:  I did not say they say that

2    they're sick just to say that they're sick, but there

3    are many reasons why someone will say that they are

4    sick.  It doesn't necessarily just to say that they're

5    sick.

6          BY MR. RUCKER:

7    Q    Okay.  But you failed to make any further

8    medical inquiry as to what his medical condition was;

9    is that correct?

10          MS. HOHENBERGER:  Objection.

11          THE WITNESS:  In my statement I did ask if he

12   was coming off of anything and he -- it sounded like he

13   had said heroin, but he wouldn't give any other

14   indication of how much or how often or, you know, when

15   the last time he was using, or anything of that nature.

16          BY MR. RUCKER:

17   Q    And did you inquire further --

18   A    I tried but he wasn't giving me any type of

19   information.

20   Q    You did not take any vitals; is that correct?

21   A    Right.

1     Q    You did not call Dr. Malvasi; is that

2 correct?

3     A    Right.

4     Q    You did not contact Carla Ahart; is that

5 correct?

6     A    No, not at that time.

7     Q    Carla Ahart, at the time that you were

8 putting on the bandage, was in the building; is that

9 correct?

10     A    Yes, she was.

11     Q    And she would have been easy for you to

12 reach; is that correct?

13     A    Yes.

14     Q    And you did not attempt to reach her; is that

15 correct?

16     A    I did not go back and talk to her, only to

17 ask if she knew about the bandage change that he was

18 supposed to have.

19     Q    All right.  Thank you.  If we can go back to

20 Exhibit 25, did you -- when he spoke to you about his

21 issues being vomiting, did you go check his chart?

1          BY MR. RUCKER:

2     Q     Have you had a chance to look at that shift

3  report?

4     A     Yes.

5     Q     And it indicates Nurse Bethany; is that you?

6     A     Yes, sir.

7     Q     And were you on the shift from 2:00 p.m. to

8  10:00 p.m.?

9     A     Yes.

10    Q     Okay.  What is the purpose of a shift report?

11    A     To write down anything that was out of the

12 ordinary, to jot down things that you have done for

13 your shift.  Anything that you could use as a reference

14 guide to know what may or may not happen the shift

15 before to see if an officer asks or if any of the

16 commanding lieutenants ask if something happened prior

17 to your shift.

18    Q     Okay.  And as you review this shift report

19 marked as Exhibit 26, is there any mention on this

20 shift report -- well, strike that.  Is this the period

21 of time in which you would have seen Mr. Wright?

1     A    Yes.

2     Q    Okay.  And it was during that May 4th shift

3 that you saw Mr. Wright; is that correct?

4     A    Correct.

5     Q    It indicates in -- starting at line 11 that

6 you did a -- it says "sick call."  Should that be sick

7 call?

8     A    Yes.

9     Q    And Mr. Wright was brought down to medical.

10 You testified to that earlier; is that correct?

11    A    Correct.

12    Q    Okay.  In the next paragraph it asks you --

13 Lieutenant Shay asked you how you would be notified if

14 a inmate had medical issues, and in 24 you indicate

15 that you would be notified about the medication and any

16 type of medical problem this inmate may have.  Were you

17 notified of the medical conditions that Mr. Wright had?

18    A    I was notified that he needed a bandage

19 change, from one of the officers who called me on the

20 afternoon shift, stating that Mr. Wright needed a

21 bandage change.

1      Q      And that was the only medical condition that

2  you were notified of?

3      A      At that time, yes.

4      Q      Okay.  You say "at that time."

5      A      Uh-huh.

6      Q      At any other time were you notified of any

7  medical condition he may have had?

8      A      No, I was not.

9      Q      Okay.  So when you say "at that time," you

10  were never -- is your testimony that you were never

11  notified of his preexisting medical condition?

12      A      I was not.  The first time that I saw and

13  talked to him was on May 4th.

14      Q      Okay.  So were you aware that he was on

15  Xarelto?

16      A      He did have that medication written on his

17  MAR form.

18      Q      Okay.  On May 4th when you saw him in sick

19  call, were you aware that he was on Xarelto?

20      A      At that time when I saw him I did not.  I had

21  to go back and check his chart and I would have seen

1 that when I did the transfer sheets for when he was

2 going to prison the next morning.

3     Q   Okay.  And when did you do that transfer

4 sheet?

5     A   I did that sometime on my shift.  I do not

6 know the exact time.  I mean, we do have copies of

7 transfer sheets that we send to the prison.

8     Q   Okay.  Would you have done that transfer

9 sheet after you saw Mr. Wright?

10     A   It's possible.  It could have been done

11 before or after.  I do not know the exact time in which

12 it was done.

13     Q   Would the time be noted on the transfer

14 sheet?

15     A   It would not.  It would be noted on when it

16 was faxed to the prison.

17     Q   Okay.  You indicated that at the time that

18 you saw Mr. Wright that you were not aware that he was

19 on Xarelto; is that correct?

20     A   Not at that time when he came down to get his

21 bandage changed.

1  would that have been included with his chart?

2      A    No.  It does not go into his chart.  We do

3  file it in a separate area for the office, but it does

4  not go into his chart.

5      Q    Okay.  When you treat an inmate for a sick

6  call, do you look at his chart?

7      A    Not necessarily right off the bat.  You want

8  to treat why they're coming down first.  I had gone to

9  Carla and asked her if she was aware that he needed a

10  bandage change.  She said that she was, that she had

11  written the order for it.  So I went ahead and I did

12  the bandage change.

13      Q    And you never checked his chart?

14      A    No.

15          MS. HOHENBERGER:  And, Gil, just for the

16  record, you have that transfer form.

17          MR. RUCKER:  Okay.

18          BY MR. RUCKER:

19      Q    Okay.  If you go to page 4, line 20.

20          MS. HOHENBERGER:  We're missing page 4.

21          THE WITNESS:  I have 3 and then 5.  Oh,

1 conjunction with the inquiry into the death of Mr.

2 Wright?

3     A    Yes.

4     Q    Okay.  And you indicate at line 16 "Other

5 than that there was nothing else that he said to think

6 it was anything more than just" -- and in line 20 you

7 complete the sentence, "stomach problems."

8     A    Yes.

9     Q    What is it that made you believe that it was

10 stomach problems?

11     A    There were no other signs and symptoms of any

12 type of withdrawal.  He wasn't shaking.  He wasn't

13 complaining of any diarrhea.  He wasn't -- he was able

14 to get out of the chair and onto the table by himself

15 without any assistance.  He was aware and oriented of

16 his, you know, what was going on and where he was at.

17 There wasn't any other complaints of cramps or being in

18 a lot of pain.  He just had some pain at the site where

19 his wound was, and that was the only things that he was

20 saying, was just that his stomach was upset and there

21 was no other visual signs or symptoms to say that it

1 was anything more than just having some stomach issues.

2     Q    Okay.  Did you relay that information to Dr.

3 Malvasi?

4     A    I did not.

5     Q    So that was based upon your independent

6 experience and judgment?

7     A    Yes.  There are plenty of times where people

8 will say "my stomach is upset," and it could be acid

9 problems from the food that they're eating, or it could

10 be, you know, they're anxious or nervous about

11 something.  There are so many things that can cause an

12 upset stomach that you don't first go to any type of

13 severe withdrawal.

14     Q    Okay.  So you made your assessment of Mr.

15 Wright based upon your aggregate experience with

16 inmates during your time at Trumbull County jail?

17         MS. HOHENBERGER:  Objection.

18         THE WITNESS:  I looked for any other visual

19 cues that would suggest that it was something more than

20 just being an upset stomach.

21     Q    Okay.  And you believe that you making that

1 judgment call was within your scope as a medical

2 assistant?

3     A    Yes.

4         MS. HOHENBERGER:  Objection.

5         BY MR. RUCKER:

6     Q    You indicate at line 25 of page 6, "Well, I

7 did ask if he was coming off anything;" is that

8 correct?

9     A    Yes.

10     Q    And then in line 3 you indicate "because

11 that's a common side effect of withdrawing."

12     A    It is a common side effect of withdrawing,

13 but it can also be a common side effect of, you know,

14 multiple other things, not just necessarily 100 percent

15 withdrawal.

16     Q    Okay.  And then we go to line 6, "He admitted

17 that he was coming off opiate."

18     A    Yes.  But at that time there were no other

19 signs and symptoms of a severe opiate withdrawal.

20     Q    So, his admission was not enough for you to

21 call Dr. Malvasi?

1     A     At that time, no, because you do not know and

2     there wasn't any forthcoming answer of how much it was,

3     when was the last time he used, how often he used, and

4     opiates could be heroin or it could be medication that

5     they give, or anything of that -- of the nature of

6     being an opiate.

7     Q     Okay.  Did part of your training include that

8     you have the ability to make an assessment as to

9     whether or not to call Dr. Malvasi if an inmate is

10    complaining of withdrawal?

11    A     We do have a COW form that gives a scale of -

12    - for like severe withdrawal forms we would fill that

13    out, and it would say, okay, at this point this is when

14    you would call.  We also, in our policy manual, had if

15    these are the other things that we noticed, that we

16    would call, even if he was only at a 1 or a 2 but he

17    maybe had a history a seizures, then you would call.

18    Q     Okay.  Did you complete the COW form?

19    A     I did not write on a COW form, but with my

20    training I did go over the signs and symptoms.  It asks

21    if we see any tremors, which he did not at the time.  It

1 asks if there's any hallucinations, you know, the

2 nausea and vomiting. If so, on what scale? How often?

3 Is he standing in front of you dry heaving, which he

4 was not. It asks about anxiety levels, which he was --

5 he did not say that he had any anxiety whatsoever.

6     Q   Okay. So you're indicating you did the COW

7 form in your head?

8     A   Yes. I went over that list of the things

9 that I knew to look out for and went based on what it

10 said.

11     Q   Okay. Well, I'm going to forward to you what

12 I had marked as Exhibit 17, Malvasi 156. The COW form.

13     MS. HOHENBERGER: Well, Gil, we already have

14 it marked as an exhibit -- Plaintiff's exhibit.

15     MR. RUCKER: Oh, okay.

16     MS. HOHENBERGER: From a prior deposition. So

17 again, going along with why we kept these sequentially.

18 So it's Exhibit 7 -- Plaintiff's Exhibit

19 7.

20     MR. RUCKER: Okay, then. All right. Thank

21 you.

1          MS. HOHENBERGER:  So if you just want to

2   use --

3          MR. RUCKER:  Thank you.

4          MS. HOHENBERGER:  So we won't remark it, in

5   other words.

6          MR. RUCKER:  Thank you.

7          (Whereupon, Lobdell Deposition Exhibit No. 7

8          was presented for identification.)

9          BY MR. RUCKER:

10     Q    Do you have Plaintiff's Exhibit 7 in front of

11  you?

12     A    Yes.

13     Q    Do you recognize that?

14     A    Yes.

15     Q    And what is that?

16     A    This is the COWs form that we use for opiate

17  withdrawal.

18     Q    Okay.  You indicated that you did this COWs

19  form in your head; is that correct?

20     A    Yes.

21     Q    Okay.  What was the blood pressure?  Do you

1  recall?

2      A    I do not.  I did not take a blood pressure

3  because at that time he was not severe.  There were no

4  other indications that would say that there was more

5  going on, other than just having a stomach issue.

6      Q    Okay.  But the COWs form requires a blood

7  pressure reading; is that correct?

8      A    It does have a spot for a blood pressure.

9      Q    Did you take his pulse?

10     A    I did not.

11     Q    And the COWs form clearly calls for a pulse

12 reading; is that correct?

13     A    It does have a place for a pulse, but again,

14 he was not exhibiting any other signs of having a

15 severe withdrawal that would require more in-depth

16 steps.

17     Q    Now, you earlier indicated that if an inmate

18 indicated that he was withdrawing, that you do a COWs

19 form; is that correct?

20     A    For a severe withdrawal.

21     Q    But you indicated that you also had the

1 experience to do a COWs form in your own mind; is that

2 correct?

3       A     Yes.

4       Q     Without annotating it on the form which was

5 provided to you to perform the COWs evaluation; is that

6 correct?

7       A     Right.  I did not write it down, but I was

8 going through -- over the more symptoms that needed

9 just in case these were needed at that time.

10      Q     Okay.  Were you trained to do the COWs form

11 in your mind?

12      A     Yes.  It's one of the things we look for

13 signs and symptoms so that we know if we need to go

14 further steps.

15      Q     So you believe that your training allowed you

16 to ignore the actual filling out of the form; is that

17 correct?

18            MS. HOHENBERGER:  Objection.

19            THE WITNESS:  At the time that I saw him I

20 was not ignoring the filling out of the form.  I was

21 going over to see if we needed to make sure that he had

this form. We were going over more signs and symptoms.
In our policies it does say that we have to notice some
of these signs and symptoms, not just automatically
going, oh, okay, so you're withdrawing, and --

        BY MR. RUCKER:

    Q    Okay.

    A    Oh, go ahead.

    Q    No, I'm sorry.  I'm sorry.

    A    No, go ahead.

    Q    Okay.  Do you believe the actions you took
were authorized by your training?

    A    Yes, I do believe it was.

    Q    And are you indicating that you believe you
covered every issue of this COWs form?

    A    With the exceptions of the heart rate and the
blood pressure.  I did notice that he was not sweating,
that there was no abnormal pupil reaction.  Other than
the pain that he was complaining of in his ankle, he
was -- there was no other complaints of pain anywhere
else in the body, which you would see.

        I do not remember about the skin at that

1 time, what it was, but he wasn't sniffling or his nose

2 was not running.  He was complaining just of the nausea

3 and the vomiting, no diarrhea.  He had no tremors.  He

4 wasn't yawning and he was not acting irritable or

5 anxious or anything of those natures.

6           So going through this list, there was nothing

7 that would say that this is to the point where he

8 needed any prescription medications, a doctor

9 notification, or anything other than an upset stomach.

10     Q     Okay.

11     A     It is not --

12     Q     It is not -- I'm sorry.  Go ahead.

13     A     At that time I did offer the medication pass

14 that we could give over-the-counter medications to help

15 with the nausea and the vomiting, and Ibuprofen in case

16 there was -- you know, to help with the pain in his

17 ankle, as well as Immodium in case he did have any

18 diarrhea that he did not say that he had.

19     Q     And there's a third one that you also

20 authorized, wasn't it?

21     A     It was just the Ibuprofen, Maalox, and

1  Immodium.

2      Q    Okay.  Now, is that a protocol for

3  withdrawal?

4      A    For a minor withdrawal to help with just the

5  symptoms, yes.

6      Q    But you indicated you didn't think he was

7  going through withdrawal.

8      A    I didn't say he was going through severe

9  withdrawal.  There could have been a minor withdrawal

10  which could cause the upset stomach, but minor

11  withdrawal and severe withdrawal, you're not going to

12  give a prescription medication for a severe withdrawal,

13  just like you wouldn't give a Percocet for a twisted

14  ankle.  You would give them something less serious for

15  a less serious injury or withdrawal.

16      Q    So you felt there was a possibility he was

17  going through withdrawal?

18      A    He very well could have gone through

19  withdrawal, or he could have had an upset stomach from

20  something that he ate, or it could have been anything

21  that was going on.  You don't see an upset stomach and

1  automatically think withdrawal.

2       Q    Okay.  And you made the judgment to -- for

3  him to receive those medications for what you

4  characterized as minor withdrawal?

5       A    Yes.

6       Q    Did you get permission from Dr. Malvasi to do

7  that?

8       A    For over-the-counter medications you do not

9  have to get permission for those.  Just like if another

10 inmate would turn in a thing that said "I have a

11 headache," you can write down to have a medication for

12 Ibuprofen or Tylenol.

13           MR. RUCKER:  I would like to enter what's

14 been marked -- what is indicated on my list as

15 Procedures -- Exhibit 14, Malvasi 152.

16           MS. HOHENBERGER:  Let me make sure it's not

17 been previously marked.

18           MR. RUCKER:  All right.

19           MS. HOHENBERGER:  Gil, it was part of

20 previously marked Exhibit 15, and then it was page 159

21 of Plaintiff's deposition, Exhibit 15.  So I've got it

1 symptoms of withdrawal, he was only showing the nausea

2 and vomiting.  There were no other of these symptoms

3 that would say, okay, this is definitely 100 percent a

4 severe withdrawal.

5     Q    Okay.  And you believe that implied in these

6 policies and procedures it's only for severe

7 withdrawal?

8     A    It is for when -- you don't put people on

9 prescription medication for minor withdrawal.

10    Q    Did you do a COWs form for minor withdrawal?

11    A    You would do a COWs form if there were more

12 symptoms other than just being nauseated and vomiting.

13 Because like I said, nausea and vomiting does not

14 automatically say that they're associated with the

15 withdrawal.

16    Q    Okay.  It indicates at the bottom, "All

17 inmates should be placed on medical isolation when they

18 start to have" -- S/S is signs and symptoms; is that

19 correct?

20    A    Yes.

21    Q    "of withdrawal."  Did you place Mr. Karin

1   (phonetic) on medical isolate -- not Mr. Karin -- Mr.

2   Wright on medical isolation?

3        A    I did not, because after this was placed out,

4   Dr. Malvasi has said that certain levels of withdrawal

5   does not require being medically isolated because if

6   you're going through moderate withdrawal, the anxiety

7   of being isolated on top of the isolation of -- or the

8   anxiety of withdrawals -- excuse me -- that it can make

9   it worse.

10        And again, he was only having nausea and

11  vomiting.  You don't lock somebody down because they're

12  upset to their stomach.  That's not beneficial to them.

13        Q    You said Dr. Malvasi told you that?

14        A    Dr. Malvasi has told us that if they're going

15  through like a moderate withdrawal with some anxiety,

16  you do not isolate them unless they are severe and, you

17  know, they're starting to hallucinate, or he says to

18  put them on lock-down.  You don't always medically

19  isolate somebody just because of nausea and vomiting.

20        Q    Okay.  Did Mr. Wright exhibit anxiety to you?

21        A    No, he did not.  He wasn't agitated.  He

1  wasn't fidgeting with anything.  He wasn't like

2  fidgeting or being shifty, you know, darting around the

3  room looking at different things.  There was no other

4  signs other than having nausea and vomiting.

5       Q    So it's your understanding that those

6  policies are only for severe withdrawal?

7       A    Moderate to severe.

8       Q    Okay.

9            MR. RUCKER:  I want to, you know, look at

10 your statement which is marked as Trumbull 139, which

11 is -- all right.

12           MS. HOHENBERGER:  I don't know if we have

13 that, Gil.

14           MR. RUCKER:  It was her statement in the

15 interview.

16           MS. HOHENBERGER:  Oh, the one that we already

17 marked?  27?

18           MR. RUCKER:  No, not the -- it's her other

19 statement.  Her actual written statement.

20           MS. HOHENBERGER:  I don't have that with me.

21           MR. RUCKER:  Well, let me send it to you. And

1    A    Yes.

2    Q    Okay.  In that statement -- well, strike

3  that.  You've read the statement?

4    A    Yes.

5    Q    Is the statement true and accurate?

6    A    Yes.

7    Q    Is that your signature at the bottom of the

8  statement?

9    A    Yes, it is.

10   Q    In that statement you indicate "when Wright

11 arrived at medical, he complained of having some nausea

12 and vomiting."

13   A    Yes.

14   Q    "Nothing else was said about the consistency

15 or any color variation of the vomit."

16   A    Correct.

17   Q    Did you ask about the consistency or the

18 color variation of the vomit?

19   A    We were having a conversation about, again,

20 his symptoms, anything else that he felt that he needed

21 to let me know at that time.  You know, we base it off

1  of what we see and also what the inmate says.  There

2  was no other complaints about how it looked or it was,

3  you know, this was how it was coming up, or if he was

4  having the dry heaves on top of it or anything of that

5  nature.

6       Also while I was sitting there with him

7  talking to him about these things, he was not dry

8  heaving.  He was not acting like something was coming

9  up.  He was just sitting there having a conversation

10 with me one-on-one about just the fact that he was

11 nauseated and he has thrown up a little bit.  There

12 wasn't anything out of the ordinary that would say,

13 okay, your vomit would suggest some other issue that

14 was going on.

15      Q    Did you specifically inquire with Mr. Wright

16 regarding the consistency or color variation of the

17 vomit?

18      A    I do not remember word for word what was said

19 about his vomit at that time.

20      Q    Okay.  But you made no annotations, no notes,

21 or no record of that conversation; is that correct.

1        A     I did not.

2        Q     What would be the significance of the color

3   and the consistency of his regurgitation?

4        A     It could -- there are certain things that you

5   can look for, like if someone has vomited something

6   that looks like coffee grounds it could, you know, say

7   if something is more severe.  If it's just yellow then

8   it could be just vile that he's not eating enough.  It

9   could also indicate, you know, what you've eaten.  If

10  it's just what you're eating is coming up, or if it's

11  bile, or if you're drinking enough fluids and you're

12  just bringing up water.  And then you have to factor in

13  maybe some other risk factors that could be mixed in

14  with it.

15            So there was no often -- there was no

16  conversation of how often that he was throwing up.  He

17  didn't make any statement that he was throwing up

18  everything.  He made no statement that he wasn't

19  keeping anything down, just that he had some nausea and

20  vomiting, but there was nothing else there in this

21  conversation with him that would say that it was worse

1  than just some mild vomiting and nausea.

2      Q    Have you received specific training that

3  would indicate that you should make inquiry concerning

4  the color and consistency of vomit?

5      A    We are trained to look for some things.  If

6  we do see the vomiting, we do -- in our classroom

7  training we are shown different piles of pictures of

8  vomit and things that you could look for.

9          You know, the main thing with it is if it's

10 coffee grounds in it, what else he's throwing up, what

11 he's keeping down, you know, and how much he's throwing

12 up.

13     Q    Okay.  And did you call Dr. Malvasi?

14     A    I did not.  Because again, if we called Doc

15 for every single time a patient said "I'm throwing up,"

16 we would never be off of the phone with him.  Our whole

17 day would be spent with Dr. Malvasi about a patient

18 throwing up.

19     Q    Okay.  Did you -- strike that.  Were you

20 responsible for Med Pass (phonetic) on your shifts?

21     A    I was.

1      Q      And did you do Med Pass to Mr. Wright -- the

2  8:00 p.m. Med Pass that evening?

3      A      I did arrive at the pod that he was in and I

4  made sure once everybody else was done with his

5  medications, I had to specifically call Mr. Wright up

6  to the cart because he did not show up to take the

7  medications.  But he got up, he walked up to the cart.

8  I did ask if he wanted these medications, and which at

9  the time he agreed for these medications, which was

10  handed and given to him, and then he walked back to his

11  bunk.

12          There were no other issues going on.  He

13  wasn't having a hard time walking around.  He got up on

14  his own accord.  He sat back down.  He wasn't shaking.

15  He wasn't sweating.  He wasn't dry heaving at the cart

16  or anything of that nature.  You know, we had a small

17  conversation just about how he was doing.  He didn't

18  say that there were anything else going on at the time,

19  other than he was still feeling a little nauseated

20  which is why I gave him the Maalox to kind of help coat

21  his stomach and calm it at that time.

1     Q    Okay.  Why would you not give Ibuprofen to

2  someone with ulcers?

3     A    Because it can irritate the ulcer.

4     Q    Okay.  Was Dr. Malvasi present when you were

5  doing sick calls?

6     A    He was not there when Mr. Wright came down to

7  medical or when I was doing Med Pass, because sick call

8  could be, hey, we let you know that he was coming down

9  because it could have been the doctor's sick call or

10  the medical staff's sick call, and at that time it was

11  just a medical staff sick call.

12     Q    Was Dr. Malvasi there that day at sick call?

13     A    According to his sick call list he was.  But

14  I was not there for the morning shift so, you know, I

15  was not there to see him that morning.

16         MR. RUCKER:  If you will just give me a

17  minute.

18         BY MR. RUCKER:

19     Q    Okay.  After you saw Mr. Wright and he

20  admitted to you that he was withdrawing from heroin,

21  you just sent him back upstairs; is that correct?

1          MS. HOHENBERGER:  Objection.

2          THE WITNESS:  I had the conversation with him

3    and did offer the medications for him to have them on

4    Med Pass, and then I did send him back up to his pod.

5    It wasn't just a "I'm withdrawing," "Okay, bye" type of

6    situation.  We had a conversation, tried to figure out

7    what was going on.  I went over the COWs in my head to

8    make sure this wasn't anything more severe than just a

9    little nausea and vomiting.

10          BY MR. RUCKER:

11     Q    Okay.  And you saw Mr. Wright approximately

12    4:00 p.m. on your shift of the 4th?

13     A    Approximately -- it was between 4:00 and

14    4:30.  It was around that time.

15          MR. RUCKER:  If you'll give me just a couple

16    more minutes, I'll see what else I --

17          MS. HOHENBERGER:  Okay.

18          THE WITNESS:  Yeah.  I saw him at the 4:30

19    but I also saw him of course again at Med Pass.  It

20    wasn't just a one and done thing.  I checked on him

21    again at Med Pass, and we have officers that every hour

1 are walking through the pods checking on inmates and

2 making sure that there's nothing more going on, and I

3 was not notified of anything else that was going on,

4 and they're really good about saying, hey, something's

5 not right, we need you to check on this guy again, or,

6 hey, I noticed that, you know, yes, he might have just

7 been vomiting but now these are some other things that

8 I noticed, or, he's coming up to me and complaining

9 that, you know, things are getting worse or, you know,

10 other inmates are hitting the button saying something's

11 not right.

12          So it's not just me just having one

13 interaction with him.  I had those couple interactions

14 with him, and officers are also checking on inmates

15 every single hour.

16          MR. RUCKER:  Okay.  I want to show you -- are

17 you familiar with general assessment forms?

18          MS. HOHENBERGER:  You can answer.

19          THE WITNESS:  Oh, yes.  Yes.

20          MR. RUCKER:  We would have done Malvasi 04.

21 Do you have that there?

94

1    Q    Okay.  So prior to her coming back, did you

2 have a trainer?

3    A    I was trained -- I did my externships under

4 Mary Schuler, and then when I got hired I was training

5 and working with a Michelle Stanec, who was an LPN at

6 the time.

7    Q    And how long was Michelle Stanec your

8 trainer?

9    A    I do not remember when she left, but it's two

10 weeks of training.  At that time she would have done

11 some training.  We also had done some training with a

12 Kara Lightner who's another medical assistant, and

13 Amanda Kolley, who was also a medical assistant.

14    Q    So was there a lapse of time between Michelle

15 Stanec and Carla Ahart?

16    A    I do not know when Michelle left and when

17 Carla came.  I do not know when that happened.

18    Q    But neither one of them worked a shift with

19 you; is that correct?

20    A    Michelle only did her shift with me while we

21 were training.  Afterwards it wasn't two people on a

1  shift unless -- I'm sorry -- unless Carla had things

2  that she had to do and work on while she was there.

3      Q    Okay.  And was Dr. Malvasi ever in the

4  building supervising you?

5      A    There were times that he would be in the

6  building that I, you know, may not have seen him.  But

7  as far as like was he on a shift with me throughout my

8  whole shift?  No.  But we were able to get a hold of

9  him for any situation that we needed to.  We had three

10  or four different ways that we could get a hold of him,

11  as well as Carla.  They both were always available

12  24/7.

13      Q    Is that by phone?

14      A    Yes.

15      Q    But you did not always have onsite

16  supervision; is that correct?

17          MS. HOHENBERGER:  Objection.

18          THE WITNESS:  Correct.

19          BY MR. RUCKER:

20      Q    Did you ever place Mr. Wright on Dr.

21  Malvasi's sick call list?

1    A   I did not, and that was because, again, at my

2 point in my shift he was supposed to be leaving for the

3 prison in the morning.

4        MR. RUCKER:  Okay.  Leah, just give me a

5 couple of minutes to go through and see --

6        MS. HOHENBERGER:  Okay.  Gil, we're just

7 going to note for the record, you asked about her zip

8 code earlier for her Warren address.  It was 44484.

9        MR. RUCKER:  Okay.

10       BY MR. RUCKER:

11    Q   Ms. Lobdell, the Med Pass of 5/4/2017, was

12 that the last time that you saw Mr. Wright?

13    A   Yes.

14    Q   And your shift of 5/4/2017 would have ended

15 on 10:00, 5/4/2017?

16    A   Yes.  The shift was from 2:00 to 10:00.  I

17 think I actually left maybe 15 minutes after 10:00

18 because we were finishing up Med Pass that night.  But

19 there was no other interactions.  There was no other

20 complaints from Mr. Wright.  There was no other -- you

21 know, no officers had, you know, said, hey, something's

1 not right, come back.  And, you know, there has been

2 times when you get called off of Med Pass because

3 something else has happened after you've seen an

4 individual.

5     Q    Okay.  Do you remember as a result of your

6 training after you were hired, were you given any

7 written documentation in regards to training other than

8 the policies and procedures you've already spoken

9 about?

10     A    Can you clarify a little more?  Like what

11 written materials are you looking for?

12     Q    Were you given any area of training --

13 specific written documentation in regards to training?

14     A    Just the policies and procedures, and that we

15 had all of them also in a book on our desk at any given

16 time for those, and we were all given our initial new

17 hire packet.  But other than that I did not have

18 anything else while I was there.

19     Q    Did your personnel file include training

20 records?

21     A    Honestly, I do not know what was in my

1 personnel file.  Carla kept that.  I had not received

2 any write-ups at that time with Carla for any personnel

3 issues, or any training paperwork that was in there, I

4 don't know if that was in there or not.

5     Q   Okay.  Was the protocol for drug withdrawal

6 the same throughout your employment at the Trumbull

7 County jail?

8     A   At the beginning we did not use the COWs as

9 often, and then once Carla came back over she made sure

10 to enforce those policies.  Whoever was in charge

11 before Carla did not enforce -- like Doc would say you

12 need to use those, but they were not enforced as well

13 as Carla enforced them.

14     Q   So on May 4th, Carla was an employee of Dr.

15 Malvasi; is that correct?

16     A   Yes.

17     Q   Yet you still did not fill out the COW, did

18 you?

19     A   I did not.  But that doesn't mean that I

20 didn't talk to Mr. Wright to see how he was feeling, to

21 figure out, you know, what was going on.  It does not

mean that I did not go over and make sure there were no

other major symptoms and signs of withdrawal that would

make me question the severity of it.  You know, you

just have that, hey, I have some nausea.  Okay.  Well,

there's no other signs and symptoms from that list that

would say, okay, this is more than just a little

nausea.

Q    Okay.  And what instructions did Dr. Malvasi

give you in regards to when you should call him

regarding a patient's medical condition?

A    We would call, of course, when there were

any, you know, severe outliers if, you know, I was

going over the COW form and I noticed that there were a

lot more signs and symptoms.

Like if I had noticed that he's got a severe

tremor, if he was throwing up, if he was anxious, if he

was fidgeting, if he was having trouble getting around,

if he had an altered mental status, anything like that

I would have called and say, hey, look, these are the

things that are going on, what do you need me to do?

What's the next step?

1    Q    So it would be a judgment decision that you

2 would make as to when you would call Dr. Malvasi?

3          MS. HOHENBERGER: Objection.

4          THE WITNESS: Yes. You know, I --

5          BY MR. RUCKER:

6    Q    Would you please -- go ahead.

7    A    When it comes to Dr. Malvasi, you know, there

8 were times that I would talk to him more than I would

9 talk to anybody else because of things that were going

10 on that day. There were times where you talked to him

11 10, 15 times a day, and then there were maybe other

12 days where it might only be one or two phone calls. It

13 wasn't a -- you know, it was based on what was

14 happening that day.

15    Q    Okay. So based on what was happening or

16 based on what you felt warranted a call is what you

17 would base whether or not you would call Dr. Malvasi?

18    A    Based on the observations. It was not where

19 we needed to give him a call. It had nothing to do

20 with anything about how I felt. It was based on the

21 observations and the signs and symptoms of what I was

1   seeing and what, you know, the patient was complaining

2   about.

3       Q    So Dr. Malvasi or Carla Ahart never indicated

4   to you that upon the signs of any withdrawal that you

5   should contact them?

6       A    Not when it came to just being nausea.  You

7   wouldn't call a doctor every time you turned around

8   because your stomach was upset.

9       Q    Okay.  But if you suspected withdrawal, did

10  Dr. Malvasi indicate to you that you should call him?

11      A    Yes.  If it was a moderate to severe

12  withdrawal according to procedures and policy you would

13  call him.  Or, of course, there's also like if he is,

14  you know, known to have seizures then you would call

15  him and say, look, he told me he was coming off of

16  this; he's known to have seizures.

17          But there was none of that indicated that

18  said, okay, you need to call him and say there's a

19  withdrawal but he's only having nausea.

20      Q    So it would be within your independent

21  judgment to determine whether or not it was severe or

1  moderate; is that correct?

2          MS. HOHENBERGER:  Objection.

3          THE WITNESS:  It would be based off of what

4  we observed and what the patient stated.

5          BY MR. RUCKER:

6     Q    Okay.  Was Dr. Malvasi there for sick call

7  every day?

8     A    He would call every day to see if there was

9  anybody on his list to be seen.  There were times that

10  even if there was nobody to be seen he would come in

11  and he would either need to have a meeting with Eric,

12  or he'd come into the office and check for, you know,

13  orders that needed to be signed, any questions that we

14  may have had for him.  So he would visit often.

15     Q    Is "often" five days a week?

16     A    It could be five days a week.  It could be

17  more.  It could be, hey, I called him because somebody

18  needed stitches and he had to come in and get it done.

19  But he did call and would ask, you know, do I have

20  anybody who needs to be seen.

21     Q    Would he -- during your time at Trumbull

2                    UNITED STATES DISTRICT COURT
                    NORTHERN  DISTRICT OF OHIO
3                          EASTERN DIVISION

4

5
ESTATE OF GREGORY        )CASE NO. 4:17-CV-02383
6  WRIGHT,et al.           )JUDGE BENITA Y. PEARSON
                          )
7                          )
                 Plaintiffs )   DEPOSITION OF
8  vs.                     )
                          )   RACHEL M. HAKE
9  TRUMBULL COUNTY BOARD   )
   OF COMMISSIONERS,et al  )
10                         )
                          )
11               Defendants  )

12

13

14              Deposition taken before me, Micheline

15  Simoni, Notary Public within and for the State

16  of Ohio, on the 23rd day of August, 2018, at

17  9:30 AM, pursuant to notice, taken at the

18  offices of Simoni Court Reporting, 153 Pine

19  Avenue, NE, Warren, Ohio 44481, to be used in

20  accordance with the Federal Rules of Civil

21  Procedure or the agreement of the parties in

22  the aforesaid cause of action pending in the

23  United States District Court within and for the

24  Northern District of Ohio, Eastern Division.

25

1  A.    September of 2015.

2  Q.    September of 2015?

3  A.    I believe.

4  Q.    Fair enough.  Tell me why you pursued

5            being a medical assistant.

6  A.    I wanted to help people.  The medical

7            field has always interested me.

8  Q.    Did you have any prior experience or had

9            you done anything, say, related to

10           the medical field prior to starting

11           ETI?

12  A.    No.

13  Q.    Okay.  Tell me about your course work

14           there.  Tell me about the program.

15  A.    We had anatomy classes, administrative

16           classes, theory classes, and lab

17           classes.

18  Q.    Okay.  So, is it fair to say you started

19           in May of 2015?  Does that seem

20           correct to you?

21  A.    Yes.

22  Q.    Do you remember your graduation date?

23  A.    I do.  It was February 16, 2016.

24  Q.    What if I told you it was January 15,

25           2016?

1  A.    That sounds right.

2  Q.    Is that okay?

3  A.    Yes.

4  Q.    Okay.

5  (OFF THE RECORD)

6  (PLAINTIFF'S EXHIBIT 12 MARKED)

7  Q.    Have you had a chance to look at

8           Plaintiff's Exhibit 12?

9  A.    Yes.

10 Q.    Are you familiar with that?  Have you seen

11          that before in any form?

12 A.    This, I have not.

13 Q.    You have had a chance to look at it.  Does

14          it seem to represent the courses that

15          you actually took at ETI College?

16 A.    Yes.

17 Q.    And, at ETI you earned a medical assistant

18          diploma.  Is that correct?

19 A.    Yes.

20 Q.    To your knowledge, does ETI offer any

21          other degree, if you will, as a

22          medical assistant?

23 A.    The Associate's Degree.

24 Q.    The Associate's Degree?

25 A.    Uh huh.

1                    MS. HOHENBERGER:  Yes?

2   A.    Yes.

3   Q.    Have you done anything in pursuit of an

4             associate medical assistant degree?

5   A.    I started, and then I switched to the

6             diploma.

7   Q.    Okay.  So, when you initially started,

8             your intention was to get the

9             Associate Degree as a medical

10            assistant?

11  A.    Yes.

12  Q.    What made you change your mind?

13  A.    It was a shorter length of time, and the

14            medical assistant diploma is my

15            stepping stone further into the

16            medical field.

17  Q.    Okay.  So, you have your medical assistant

18            diploma; and, have you pursued any

19            other certificates after you received

20            the diploma?

21  A.    EKG, and phlebotomy.

22  Q.    Where did you obtain those?

23  A.    ETI.

24  Q.    Was that after you graduated, or was that

25            during the time that you were

1  A.    Billing, coding, how to use an electronic

2          medical records system.

3  Q.    Anything else that you recall?

4  A.    No.

5  Q.    So, you finished -- you graduated in

6          January, and then you started working

7          for Dr. Malvasi on May 5 of 2016?

8  A.    Yes.

9  Q.    Can you tell me whether you had any

10         medically-related employment between

11         your graduation date and when you

12         first started working for

13         Dr. Malvasi?

14  A.    I did not.

15  Q.    Okay.  Now, tell me about your first day

16         at Trumbull County Jail.

17  A.    I shadowed Carla.

18  Q.    Just so the record is clear, you are

19         referring to Carla Ahart?

20  A.    Yes.

21  Q.    Did you report directly to Carla Ahart?

22  A.    Yes.

23  Q.    Tell me what you mean by you "shadowed"

24         Carla.  Do you recall what time you

25         went in; what shift were you working?

1   A.   6:00 a.m.

2   Q.   So, you come in and you're going to shadow

3        Carla.   Take me through the day.

4        Take me through what happened.

5   A.   I arrived.   She met me outside.   She

6        walked me through the building, gave

7        me a tour so that I would know how to

8        get through all the security doors.

9        She taught me how to use the radio.

10       She showed me where all of our

11       equipment was.

12            She showed me -- she had me flip

13       through a couple of charts to see how

14       things were properly documented, see

15       how the charts were organized.   She

16       had me fill out a few papers for her,

17       such as we were getting ready to do a

18       couple drug screens; so, she had me

19       fill out the names and the number of

20       the dipsticks that we were using.

21            She then took me on med pass for

22       the first time where she distributed

23       medications and documented that she

24       was giving medications to inmates.

25            Then we went back downstairs; and, a

1               was an orientation on the first day?

2  A.    Yes.

3  Q.    And maybe we have already covered it a

4               little bit; but, in your mind what

5               would you say was the orientation?

6  A.    Showing me around, showing me some of the

7               charts, showing me the medical

8               department itself, where things were,

9               how things were done.  And then she

10              physically showed me, as well, as

11              they came along throughout the day.

12 Q.    Did she go over issues about shift reports

13              with you?

14 A.    Yes.

15 Q.    She explained the phone system to you?

16 A.    Yes.

17 Q.    And what you're describing to me is this

18              is just an ongoing dialogue -- you do

19              not recall Ms. Ahart taking any

20              notes, making any notes or anything?

21              This is on-the-job training?

22 A.    Yes.

23 Q.    Do you recall ever having signed off on

24              any documents indicating that you had

25              received training on certain issues?

1  A.    I don't remember.

2  Q.    Do you know whether there was any file

3        maintained by Trumbull County in the

4        medical department that would have

5        had documentation of what was covered

6        with you in training?

7  A.    Not to my knowledge.

8  Q.    Before you left Trumbull County, did you

9        ever have an opportunity to go

10        through your employment file?

11  A.    Yes.

12  Q.    Okay.  And did you see in there any

13        references to the training that you

14        had been provided?

15  A.    No.  I saw my evaluations.

16  Q.    You saw your evaluations?

17  A.    Yes.

18  Q.    Okay.  Now, how many days did you shadow

19        Ms. Ahart?

20  A.    Carla herself?

21  Q.    Carla, yes.

22  A.    Two or three, maybe four.

23  Q.    And you were at that time -- what was your

24        primary shift?

25  A.    Afternoons.

1  Q.   Afternoons.  Okay.  And, so, you said -- I
2            asked you how many days you shadowed
3            Carla and you said it was four or
4            five.  Did you shadow other persons?
5  A.   Yes.
6  Q.   Who were they?
7  A.   Bethany Lobdell, and Jessica Clay.
8  Q.   What type of things did Ms. Lobdell go
9            over with you?
10 A.   What she did throughout her day.  I
11           watched her as she worked.  I asked
12           my questions; she tried to explain
13           things to me to the best of her
14           ability.
15 Q.   Now, Ms. Lobdell -- do you know what her
16           job title was at the time she was
17           training you?
18 A.   Medical assistant.
19 Q.   She was a medical assistant.  Did you have
20           an idea as to how long she had been
21           there?
22 A.   I believe she was there for about two
23           years when I started.
24 Q.   Okay.  And can you distinguish for me the
25           type of information that was related

1              to you by Ms. Lobdell as opposed to
2              the information that was given from
3              Ms. Ahart?
4    A.   I'm not understanding the question.
5    Q.   Okay.  Thank you.  Ms. Lobdell was a
6              medical assistant; correct?
7    A.   Yes.
8    Q.   So, she was training you, and you had just
9              received your diploma as a medical
10             assistant back in January of that
11             year?
12   A.   Yes.
13   Q.   Okay.  Now, and as I understand it,
14             Ms. Ahart -- what was Ms. Ahart's --
15             what was her job title, first of all?
16   A.   LPN.
17   Q.   She was an LPN.  So, licensed nurse;
18             correct?
19   A.   Yes.
20   Q.   Licensed by the State of Ohio.  So, did
21             she train you on subjects that was
22             different from what Ms. Lobdell
23             offered to you?
24   A.   No.
25   Q.   Basically, what to do throughout the day

1              in the jail?

2    A.    Yes.

3    Q.    Do you recall whether Ms. Lobdell gave you

4              any written materials as she was

5              training you?

6    A.    No.

7    Q.    Or whether -- did she take any notes and

8              so forth or have a check-off list in

9              terms of subjects that she was

10             covering with you, as you recall?

11   A.    No.   There was just verbal communication

12             between her and Carla about how I was

13             doing.

14   Q.    So, tell me about the communication

15             between Ms. Lobdell and Ms. Ahart.

16   A.    Throughout the day we would have to call

17             Carla multiple times when medications

18             would come into the jail.  We would

19             have to have them approved by either

20             Dr. Malvasi or Carla; and, throughout

21             those conversations sometimes she

22             would ask how I was doing or how

23             things were going, and that's where

24             the communication came into play.

25   Q.    So, during the training with Ms. Lobdell,

1           I believe you said you would call
2           Ms. Ahart multiple times during the
3           day; is that correct?
4   A.   Yes.
5   Q.   Tell me the reason you were calling
6           Ms. Ahart.
7   A.   Things needed to be approved for us to be
8           able to give these medications to
9           inmates.  They had to be approved by,
10          again, by Dr. Malvasi or Carla.
11  Q.   And that is because there were some -- let
12          me ask you the question this way.
13          When you started working at the
14          Trumbull County Jail was there ever
15          an explanation given to you of, say,
16          what the limitations were on your
17          ability to work in the medical field
18          as a medical assistant?
19  A.   I'm not understanding your question.
20  Q.   Okay.  Thank you.  What do you understand
21          a medical assistant -- what are you
22          allowed to do with respect to the
23          treatment of patients?
24  A.   Assess and report.
25  Q.   Assess and report.  So, tell me what you

1   Q.    Okay.  And I think you said that you were

2              also -- that you also shadowed Jessie

3              Clay; is that correct?

4   A.    Yes.

5   Q.    As you sit here, do you have an idea how

6              long Jessie Clay had worked as a

7              medical assistant when you started in

8              2016?

9   A.    I want to say about a year.

10  Q.    Okay.  So, your understanding is that --

11             and I'm not holding you to it -- but,

12             your recollection was that you

13             believe Ms. Lobdell was even senior

14             to Ms. Clay with respect to seniority

15             in the jail?

16  A.    Yes.

17  Q.    So, what type of things did you do with

18             Jessie Clay?

19  A.    The same things that I would do with

20             Bethany.  I would shadow.  Everybody

21             has a different way of doing things.

22  Q.    What about procedures?  Did any of them go

23             over certain specific procedures and

24             so forth with you?

25  A.    If the situation came up that we had to

1                    address something that needed to be

2                    done under procedure, then yes.

3  Q.   Okay.  And I want to try to understand --

4                    when you say "if things needed to be

5                    done under procedure," tell me what

6                    you mean by that.

7  A.   If a situation presented itself where we

8                    had to do something specific instead

9                    of just day-to-day things, they would

10                   walk me through that process.

11 Q.   Okay.  So, this is the jail.  If you can

12                   relate to me, say, the things that

13                   happened -- what did you consider the

14                   things that happened on a day-to-day

15                   basis where maybe you did not have to

16                   really look at the procedure?  Tell

17                   me about the routine or common

18                   things, if you will.

19 A.   You come in; you get your shift report

20                   from the person that you're

21                   relieving.  On my shift, particularly

22                   afternoons, I got diabetes checks

23                   twice a day.  I got them at 3:00 and

24                   7:00 -- right after I came in and

25                   right before med pass.

1          You check the blood sugar.  You

2          had your dressing changes.  You

3          reported to Doctor if there was an

4          out-of-range blood sugar.  You would

5          administer insulin; and, then you

6          would go about med pass and you would

7          do all of the diabetic checks and

8          dressing changes again at 7:00 p.m.

9          when you went up to med pass.

10          You distributed medications, got

11          medical request forms, and then you

12          gave your shift report and you left.

13 Q.   So, the things that you would say took

14          place on a normal day; shift reports,

15          diabetic reports, checking blood

16          sugar, changing dressings, and

17          reports to the doctor -- those common

18          place things happened every day?

19 A.   Yes.  There were also booking assessments,

20          checking in medications.

21 Q.   And I didn't complete the list.  I think

22          you also put changing -- doing med

23          pass?

24 A.   Yes.

25 Q.   And shift reports?

1  A.    Yes.

2  Q.    And would you review on a daily basis the

3           assessments of inmates coming into

4           the jail?  Is that something that's

5           done every day?

6  A.    Yes.

7  Q.    Now, those are the things that I think we

8           agreed were kind of common place,

9           kind of the routine.  Now let's talk

10         about those issues where you said

11         that now procedure had to be

12         followed.  I'm trying to get an

13         understanding.  So, tell me what you

14         mean by that.  Tell me about maybe

15         the uncommon things or the things

16         that didn't happen on a daily basis.

17  A.    If somebody's blood sugar, for example,

18         were spiked over a certain number,

19         you would call Doctor.  You would get

20         an order from him.  You would

21         administer the proper amount of

22         insulin, and then you would write an

23         order in the chart that it was

24         documented that you gave said

25         insulin.

1  Q.  Okay.  And, so, a blood sugar being out of

2      range or a spike, there was a

3      procedure to deal with that; correct?

4  A.  Yes.

5  Q.  Okay.  And so, after you did your

6      assessment then, pursuant to the

7      procedures, it was to call the

8      doctor?

9  A.  Yes.

10 Q.  Why did you call the doctor?

11 A.  Because there was something out of range.

12 Q.  Something was out of range; so, your

13     assessment -- you found out what the

14     blood sugar was, and then you

15     completed the circle, so to speak, by

16     calling the doctor because there was

17     information that he needed?

18 A.  Yes.

19 Q.  So, tell me about another situation where

20     procedure needed to be followed.

21 A.  If somebody has a high body temperature,

22     you would want to let the doctor

23     know.  If somebody got in a fight and

24     they needed stitches, you would let

25     the doctor know so he would come and

1              give stitches.  If there was an

2              abnormal EKG, you would send him a

3              picture of the EKG, he would assess

4              it, and he would let you know what to

5              do.

6  Q.   Dr. Malvasi was available for you to call?

7  A.   Yes, at any time.

8  Q.   At any time.  So, he would have been

9              available for you to call during the

10             day shift; is that correct?

11 A.   Yes.

12 Q.   And he would have been available when you

13             worked the afternoon shift; is that

14             correct?

15 A.   Yes.

16 Q.   And the afternoon shift, the time for that

17             was what?

18 A.   2:00 to 10:00.

19 Q.   2:00 to 10:00?

20 A.   Yes.

21 Q.   And Dr. Malvasi was also available during

22             the midnight shift, the 10:00 to

23             6:00 a.m.  Is that correct?

24 A.   Yes.

25 Q.   So, part of the procedure was you do your

1          assessments and then, if necessary,

2          then you could report to the doctor

3          the information you believe that he

4          needed to know?

5    A.    Yes.

6    Q.    And, about how long would you say this

7          training period was that you had

8          shadowing Ms. Ahart, Ms. Lobdell, and

9          Ms. Clay?  How long did that last

10         overall?

11   A.    When I was shadowing, about two weeks.

12   Q.    About two weeks?

13   A.    Uh huh.

14              MS. HOHENBERGER:  Yes?

15   A.    Yes.

16   Q.    So, are you saying to me that for those

17         first two weeks that you shadowed

18         Ms. Ahart, Ms. Clay, and Ms. Lobdell

19         pretty much -- I mean, what was your

20         interaction with them during the day?

21         Did you follow them around all the

22         time?

23   A.    Absolutely.  I wanted to see how they

24         handled everything on a day-to-day

25         basis so I would know how to handle

1          it on my day-to-day basis.

2   Q.    What about your interaction with

3          Dr. Malvasi during this period of

4          time?

5   A.    There was constant communication.  Any

6          time that something needed to be

7          addressed I would call him, I would

8          text him, and he would always get

9          back to me in a timely manner.

10  Q.    What about Dr. Malvasi personally showing

11         you through the jail or you following

12         him?  Was there any personal

13         one-on-one training by Dr. Malvasi of

14         you?

15  A.    When I worked the morning shift; when I

16         would shadow Carla.

17  Q.    So, was Dr. Malvasi -- tell me about how

18         frequent or infrequent Dr. Malvasi

19         was present when you were shadowing

20         Carla.

21  A.    He did sick call three or four times a

22         week, depending on the volume of

23         patients that needed to be seen.  He

24         would also come in to sign orders.

25         He would come in just to see how we

1              were doing.  That would always happen

2              in the morning before he would go to

3              his office or the hospital.

4  Q.    So, as you recall -- so, if you are

5              starting at 6:00 a.m. or the times

6              that you were there at 6:00 a.m.,

7              approximately what time would

8              Dr. Malvasi appear?

9  A.    About five minutes to 6:00, and it ranged

10             at that time to maybe 6:30.  Never

11             later than 7:00.

12 Q.    Never later than 7:00.  And, as you

13             recall, what time did he usually

14             leave to go to his office?

15 A.    It depends.

16 Q.    Give me -- tell me what you observed.  I

17             know it could depend.  So, what time

18             did you normally see him leave or

19             what time are you normally aware that

20             he normally left?

21 A.    We did med pass at 8:00 a.m. on the

22             morning shift.  He would sometimes

23             leave five minutes before.  He would

24             sometimes still be there when we were

25             done.

SIMONI COURT REPORTING
(330) 399-1400    (330) 746-0934
1-800-399-6686

1  Q.   So, he would be present up until around
2            med pass?
3  A.   Yes.
4  Q.   And the med pass on the day shift is
5            generally conducted at 8:00 a.m.  Is
6            that correct?
7  A.   Yes.
8  Q.   And so, shortly either before that or
9            shortly after that, your recollection
10            is that Dr. Malvasi would leave?
11  A.   Yes.
12  Q.   So that your opportunity to actually be
13            trained by Dr. Malvasi during the
14            period that you were shadowing Carla
15            and so forth, generally that would
16            have occurred; between 6:00 a.m. and
17            8:00 p.m.  Is that fair?
18            MS. HOHENBERGER:  Objection.
19  A.   Ask me that question one more time,
20            please.
21  Q.   Your direct on-site supervision by
22            Dr. Malvasi, or his training you,
23            that would generally occur between
24            6:00 a.m. and 8:00 a.m.?
25  A.   Generally; but, there was always ongoing

1              training when there was communication

2              via phone.

3  Q.   So, tell me, when you say "training" --

4              tell me what you considered training

5              over the phone.

6  A.   We would have to explain what was

7              happening with the inmate, patient,

8              and then he would let us know how to

9              handle that situation.

10 Q.   So, you provide your assessment and then

11             he tells you what to do?

12 A.   Yes.

13 Q.   Was there ever a time when Dr. Malvasi sat

14             you down personally and said, "These

15             are the rules.  These are the

16             regulations"?  Any type of

17             interaction like that?

18 A.   Yes.

19 Q.   Tell me about that and tell me when that

20             happened.

21 A.   It would be right before patients came

22             down to the medical department.  We

23             would bring him the sick-call list,

24             we would bring him all the charts.

25             He would generally ask how I was

1              doing and if I was understanding

2              everything; and, if I had any

3              questions he would answer them.

4  Q.    When you say he would ask how you were

5              doing -- I mean, I met Dr. Malvasi.

6              He seems to be a pretty -- very nice

7              guy; but, when he asked how you were

8              doing was he trying to find out

9              whether you were understanding what

10             was going on with regard to the

11             patients?  Is that what was going on?

12 A.    Yes.

13 Q.    So, tell me the type of things that he

14             would discuss with you in that

15             respect.

16 A.    If I was understanding med pass, if I was

17             understanding how things needed to be

18             approved, if I was having any issues

19             with my co-workers, if I was having

20             issues with the way that I was being

21             trained.

22 Q.    So, in terms of this shadowing and what we

23             will call your training period, your

24             recollection is that it lasted for

25             approximately two weeks?

1  A.    Yes.

2  (PLAINTIFF'S EXHIBIT 14 MARKED)

3  Q.    I'm showing you what's been marked as

4          Exhibit 14; and, I want you to take a

5          few moments and go ahead and kind of

6          look it over, if you will.

7                MS. HOHENBERGER:  Just note for

8  the record this is one of the documents that we

9  talked about in the beginning that's marked

10 confidential.

11                MR. SMITH:  Absolutely.

12 Absolutely.

13 Q.    Ms. Hake, have you had a chance to look

14          over what's been marked as

15          Plaintiff's Exhibit 14?

16 A.    Yes.

17 Q.    And can you tell me what this is?

18 A.    The policy book.

19 Q.    And can you tell me whether you have seen

20          that before?

21 A.    Yes.

22 Q.    Okay.  Can you give me -- tell me when you

23          saw it.

24 A.    My first day.

25 Q.    Your first day.  Okay.  And tell me who

1              presented this to you.

2  A.    Carla.

3  Q.    Okay.  So, tell me, then, what you and

4              Carla did with respect to the

5              procedures here.  Go through that for

6              me, please.

7  A.    We had a binder.  She gave it to me while

8              she did a couple of orders.  I sat

9              down and went through it.

10 Q.    So, she's doing a few orders and she gave

11             you a binder that you remember these

12             procedures being in?

13 A.    Yes.

14 Q.    Now, when I asked you at the beginning of

15             the deposition about your training

16             with Ms. Ahart, you didn't tell me

17             about the two of you going through

18             these medical procedures.  I mean, I

19             asked you, "What did you all do?"

20             Did you forget at that time?

21             MS. HOHENBERGER:  I'm going to

22 object, but go ahead.

23 A.    Not necessarily forget; but, when

24             something is placed in front of you,

25             you remember where it came from.

1          just referring back to?

2   Q.   Yes, Ma'am.  Let's go back a little bit.

3          The first time I asked you about them

4          you said that while Ms. Ahart was

5          going through some charts you flipped

6          through them.

7          And then you said to me that you

8          did have some engagement about it;

9          and, I'm trying to just now try to

10         really find out the extent of it and

11         what you actually went over.

12  A.   The procedures and the policies were gone

13         over multiple, multiple times; just

14         not with this in front of me.

15  Q.   So, how would you know you were going over

16         policies and procedures if you were

17         not referring to this document?

18  A.   I would ask a question and it would be

19         answered with, "Well, the policy and

20         procedure for this is" --

21  Q.   And that would happen with who?

22  A.   Either Carla or Doc.

23  Q.   Okay.  So, do you then recollect the time

24         when they said to you -- and let's

25         start with Ms. Ahart -- where she

1                    it reads your heart rate and oxygen

2                    levels.

3   Q.    Was there any emergency training that you

4                    received at ETI?

5   A.    Emergency training?  No.

6   (PLAINTIFF'S EXHIBIT 15 MARKED)

7   Q.    I'm going to show you what's been marked

8                    as Plaintiff's Exhibit 15 and ask you

9                    to take a moment and look at that,

10                   please.

11  A.    Okay.

12                   MS. HOHENBERGER:  I'll just note

13  for the record that this similarly is marked as

14  confidential.

15                   MR. SMITH:  Absolutely.

16  Q.    Have you had a chance to look at what's

17                   been marked  as Plaintiff's

18                   Exhibit 15, Ms. Hake?

19  A.    Yes.

20  Q.    Can you tell me whether or not you

21                   recognize that document?

22  A.    Yes.

23  Q.    Okay.  And tell me when you first saw it,

24                   if you will.

25  A.    Orientation on my first day.

1    Q.    Okay.  And, so, that's the same time that

2           you were also presented with what we

3           were discussing previously as the

4           medical department policies and

5           procedures that was Exhibit 14; is

6           that correct?

7    A.    Correct.

8    Q.    So, explain to me, then, what happened

9           with this document.  You have the

10         medical department procedures and

11         policies given to you in a binder.

12         Is that correct?

13   A.    Correct.

14   Q.    How did you receive the medical manual?

15   A.    In the same binder.

16   Q.    They were in the same binder.  Do you

17         remember whether the medical policies

18         and procedures was placed in the

19         binder first or whether the manual

20         was in first?

21   A.    I do not remember.

22   Q.    Okay.  And, so, those -- so, what do you

23         remember doing with Exhibit 15?

24   A.    Reading over it.

25   Q.    Reading over it?

1  A.    Reading over it.

2  Q.    Okay.  So, did Ms. Ahart go over any

3        specific provisions of this medical

4        manual with you at that time?

5  A.    If I had a question about something that

6        wasn't self-explanatory, I would ask

7        and she would answer.

8  Q.    Okay.  And, so, this is happening when you

9        show up at 6:00 a.m.  You fill out

10       some paperwork with Ms. Ahart --

11       correct?

12 A.    Yes.

13 Q.    You have the opportunity -- you flip

14       through what we have talked about as

15       the medical policies and procedures,

16       and then you flip through what is the

17       medical manual.  Is that correct?

18             MS. HOHENBERGER:  I'm going to

19 object.  I don't think she said "flip through;"

20 but go ahead.

21 A.    Yes.

22 Q.    Well then, is it your testimony that you

23       actually read through -- that during

24       that first meeting that you had an

25       opportunity to fully read through the

1            medical department policies and

2            procedures?

3 A.    Yes.

4 Q.    You read through them page by page, word

5            for word?

6 A.    Maybe not word for word; but, I read

7            through the whole thing.

8 Q.    All right.  And approximately how long did

9            that take you?

10 A.    Maybe 45 minutes.

11 Q.    About 45 minutes you spent with it.  Then

12            you moved on to the medical manual?

13 A.    Yes.

14 Q.    And approximately, then, how long do you

15            recall it took you to go over that?

16 A.    Probably another 20 minutes to a half

17            hour, but I can't be sure.

18 Q.    And just so I am correct, there is no --

19            well, do you recall yourself asking

20            Ms. Ahart any questions?

21 A.    I don't remember.

22 Q.    Okay.  And I should have asked you before,

23            but I'll ask you now.  Let's take

24            them separately.  Do you remember

25            asking Ms. Ahart any specific

1  Q.  And there is his home number; correct?

2  A.  Yes.

3  Q.  So, at some point did you have

4         Dr. Malvasi's cell phone number

5         probably in your cell phone?

6  A.  Yes.  I had both.

7  Q.  So that at any time when you were in a

8         facility, or even if you were not at

9         work, you had a means of contacting

10        Dr. Malvasi to provide him -- to

11        report an assessment to him.  Is that

12        fair?

13  A.  Yes.

14  Q.  Okay.  So, in the medical manual -- let's

15        go to page 144, please.  Can you

16        explain what this is?

17  A.  Medical Administration Record Sheet.

18  Q.  As a medical assistant, what do you take

19        from this?  What's the purpose of

20        this document here?

21  A.  The purpose is if you are changing a

22        dressing, giving insulin, documenting

23        blood sugar, giving a prescribed or

24        over-the-counter medication, it is

25        documented that you either

1  Q.   Number 4, "What Route," what does that

2            mean?

3  A.   What route -- that would be by mouth, by

4            injection.

5  Q.   All right.  Then go to page 147.  It kind

6            of outlines what the duties and

7            responsibilities are for the specific

8            shifts.  Is that fair?

9  A.   Yes.

10 Q.   So, let's go down to -- on the bottom

11           where it says "Midnight shifts,"

12           that's 10:00 p.m. to 6:00 a.m.?

13 A.   Yes.

14 Q.   So, during the period that you were

15           employed at the Trumbull County Jail,

16           how many medical assistants usually

17           work the midnight shift?

18 A.   Usually Jessie worked midnights, Bethany

19           was day shift, and I was afternoon

20           shift.

21 Q.   So, that would be one?

22 A.   Yes, for the most part.  Sometimes we

23           would switch.

24 Q.   Okay.  So, during the period that you were

25           there, are you saying to me that on a

1            and "Check medication."  Is that

2            right?

3  A.    Yes.

4  Q.    Are you saying to me that that's generally

5            the start of a shift report for a

6            certain day?

7  A.    Yes.

8  Q.    And then the medical staff on the

9            afternoon and midnights; then it just

10            continues?

11  A.    Yes.

12  Q.    Go to page 152 for me, please.  Page 152

13            for me, please.  In the middle

14            section it says "Withdrawals from

15            Drugs."  Is that correct?

16  A.    Yes.

17  Q.    Tell me how you first became aware of what

18            to do when an inmate may be

19            displaying signs and symptoms of

20            withdrawal.  How did you learn that?

21  A.    I'm sorry, do you want a specific instance

22            or --

23  Q.    How did you get the information?  As a

24            medical assistant employed in

25            Trumbull County, how did you first

1             receive the information in terms of
2             what to do when an inmate is
3             experiencing -- may be experiencing
4             withdrawal?
5    A.    While I was shadowing.  It's a common
6             occurrence.
7    Q.    So, you learned what to do by watching
8             whom?  Do you recall?
9    A.    I don't remember who exactly it was the
10            first time; but, both Bethany, Carla,
11            and Jessie.
12   Q.    So, would there have been a time when you
13            personally sat down with either
14            Ms. Ahart or Dr. Malvasi and gone
15            over this withdrawal-from-drugs
16            policy that is on page 152?  Do you
17            recall that ever taking place?
18   A.    Not with the document in front of us, no.
19   Q.    Not with the document in front of you.
20            Okay.  Would you turn to page 156,
21            please, and tell me what that is,
22            please?
23   A.    That's "Clinical Opiate Withdrawal Scale."
24   Q.    Same question.  Were you ever trained --
25            was there ever -- did you ever go

1           over this document specifically with
2           either Ms. Ahart or Dr. Malvasi?
3  A.    With Carla, yes.  She showed me a couple
4           of them that had been completed so
5           that I knew how to fill them out.
6  Q.    Okay, do you recall when you learned how
7           to fill out a COWS specifically?
8  A.    I don't recall.
9  Q.    Do you recall if it was during the two
10          weeks of your training, or was it
11          sometime afterwards?
12 A.    It was within the first two weeks of
13          training.
14 Q.    Okay.  So, you were then familiar with all
15          of the information that is supposed
16          to go on the COWS; correct?
17 A.    Yes.
18 Q.    So, on the top of the COWS, on the second
19          line it says "Blood Pressure," right?
20 A.    Yes.
21 Q.    So, the inmate's blood pressure would go
22          in there?
23 A.    Yes.
24 Q.    And there's a place for pulse?
25 A.    Yes.

1              records.  Is that correct?

2  A.    Yes.

3  Q.    And so, then, you appreciated that when

4              you were learning that at ETI the

5              purpose was to assist you in the

6              future in providing better care for

7              the patients that you might

8              encounter; correct?

9  A.    Yes.

10 Q.    And complete and accurate medical

11             information is a critical factor in

12             providing the care; right?

13 A.    Yes.

14 Q.    So, can you turn to page 159, please?

15             Tell me, have you seen this before?

16 A.    Yes.

17 Q.    Okay.  Tell me, did you -- tell me when

18             the first time you saw it and the

19             context, please.

20 A.    In training, when I read through it.

21 Q.    Okay.  And this talks about signs and

22             symptoms of withdrawals.  Correct?

23 A.    Yes.

24 Q.    It specifically states that before anyone

25             is placed on medications, then they

1  Q.    So, you remember Mr. Gregory Wright; do

2         you not?

3  A.    Yes.

4  Q.    That's the case that we are here about.

5         Correct?

6  A.    Yes.

7  Q.    So, are you saying to me that when

8         Mr. Wright was perceived to be going

9         through opiate withdrawal, that

10        pursuant to the manual he should have

11        been placed on medical isolation and

12        taken up to 3A?  Is that correct?

13  A.    If his symptoms were severe enough, yes.

14  Q.    Maybe we read that differently.  "All

15        inmates should be placed on medical

16        isolation when they start to have

17        signs and symptoms of withdrawal."

18          What you're saying to me is that

19        a determination has to be made as to

20        whether they are serious signs of

21        withdrawal as to whether they are

22        going to be transferred to medical

23        isolation on 3.  Is that correct?

24  A.    If we had placed every inmate on medical

25        lockdown that had been showing signs

1           and symptoms of basic opiate

2           withdrawal in lockdown cells, there

3           would be no lockdown cells left.

4   Q.   And I appreciate the narrative; but, it

5           doesn't answer my question.

6               My question is, this says that

7           when someone -- when they start to

8           have signs and symptoms of

9           withdrawal, they go to medical

10          isolation.  Correct?

11  A.   That's correct.

12  Q.   That's what this is?

13  A.   Yes.

14  Q.   And your job, as I understand it, was to

15          assess and report; correct?

16  A.   Yes.

17  Q.   And so, then, you do the assessment and

18          you report to Dr. Malvasi in terms of

19          whether this person then needs to go

20          to medical isolation.  Correct?

21  A.   Correct.

22  Q.   Now, Ms. Lobdell had told you that

23          Mr. Wright was withdrawing.  Is that

24          correct?

25  A.   Yes.

1  Q.  Did she verbally tell you that, or was it

2      in a shift report, or how do you

3      recall getting that information?

4  A.  It was verbal.

5  Q.  So, you start at 10:00 p.m. on May 4.  So,

6      you probably showed up for work,

7      what, about 9:50, 9:45, or something

8      like that?  Does that seem fair?

9  A.  Yes.

10 Q.  Okay.  So, you and Ms. Lobdell had the

11     conversation and she says that

12     Mr. Wright is withdrawing?

13 A.  Yes.

14 Q.  What did that mean to you?

15 A.  That I was going to have to keep an eye on

16     him.

17 Q.  Okay.  And when she told you that it was

18     Gregory Wright; did that name mean

19     anything to you at that time?

20 A.  Not at the time.

21 Q.  Did you do something later to -- did you

22     realize that you had treated

23     Mr. Wright before?

24 A.  After the first encounter, yes.

25 Q.  After the first encounter.  Why is a

1            person in medical isolation -- you
2            said it's ten-minute tours?
3  A.    Yes.
4  Q.    For the record, tell me what that means.
5  A.    It means an officer goes around and looks
6            in the window of the cell to make
7            sure that the inmate is still okay.
8  Q.    How do the officers know to do that?
9  A.    What do you mean?
10 Q.    How do the officers; the correctional
11           officers -- how do they know that
12           they should observe an inmate every
13           ten minutes?
14 A.    By being told by medical staff.
15 Q.    How would medical staff communicate that
16           information to the corrections
17           officers?
18 A.    Direct verbalization.
19 Q.    There's no form that would be completed to
20           say that, or to communicate that
21           information?
22 A.    No.  It would be in the officer's report.
23 Q.    It would be in the officer's report?
24 A.    Yes.
25 Q.    So that your understanding is that if you,

1  Q.   This is the form you explained earlier?

2  A.   Yes.

3  Q.   And do you see your signature down there?

4  A.   Yes.

5  Q.   What does your signature mean on this

6          form, Ms. Hake?

7  A.   We always signed the bottom of the sheets

8          because at some point or other we are

9          going to sign off on medication, and

10         we have to sign off on something

11         besides our initials.

12 Q.   Does this mean that you did administer

13         medication to him or you may have?

14 A.   No.  This means I may have in the future.

15         One of these requires every

16         employee's signature because at some

17         point or another you may give

18         over-the-counter or prescription

19         medications.

20 Q.   Okay.  So, this doesn't mean that you

21         administered any medication to him;

22         but, had he stayed there longer and

23         so forth, you may have?

24 A.   Yes.

25 Q.   Do you recall going to work on May 4,

1              2017?

2  A.    Yes.

3  Q.    And tell me what shift you were working

4              that day.

5  A.    10:00 p.m. to 6:00 a.m.

6  Q.    Okay.  So -- Ed Venz -- who was that?

7  A.    One of the corrections officers.

8  Q.    Do you remember corrections officer Venz

9              getting in contact with you?

10 A.    No.

11 Q.    Do you recall being requested to go to

12             Gregory Wright's cell?

13 A.    Yes.

14 Q.    What did you observe when you went there?

15 A.    He was lying down.  He was angry --

16             visibly angry.  He would not let me

17             take his blood pressure.  He kept

18             pulling away from me.

19                 He kept asking me for his

20             glasses and said that his stomach

21             didn't feel good.

22 Q.    So, you go there.  Do you recall that

23             Corrections Officer Sarah Whitacker

24             may have accompanied you there?

25 A.    Yes.

1  Q.  So, you, Corrections Officer Whitacker are

2         there; and, tell me what you mean

3         when you say that he was visibly

4         angry.  What made you think he was

5         angry?

6  A.  The look on his face.  The second that I

7         walked in he shook his head.

8  Q.  Now, was there any -- you said he was

9         talking about his glasses.  What was

10        he saying about his glasses?

11 A.  He wanted his glasses, which I did not

12        have.

13 Q.  Is that what the corrections officers told

14        you as to why they asked you to come

15        up there was because he wanted his

16        glasses?

17 A.  No.  He had vomited.

18 Q.  He had vomited; and, he told you that his

19        stomach was hurting?

20 A.  Yes.

21 Q.  And the vomit on the floor would be some

22        indication that, well, yeah, there

23        may be something wrong with his

24        stomach.  Correct?

25 A.  Yes.

1    Q.   So, you didn't attribute that look on his

2         face to pain?

3    A.   I may have.

4    Q.   So, his stomach is hurting.  What were

5         your other observations of him when

6         you walked in there?

7    A.   As far as I can remember, there was vomit

8         on the floor.  I asked him what was

9         wrong.  He said, "My stomach hurts.

10        I want my glasses."

11             I tried to obtain vitals.  He

12        kept pulling away from me.  Then I

13        offered him Maalox for his stomach

14        and he refused.

15   Q.   So, tell me how you proceeded to do -- to

16        get his vitals at that time.

17   A.   I tried having Sarah Whitacker hold his

18        arms off of his side so I could wrap

19        the blood pressure cuff around it,

20        and he kept pulling away from her as

21        well.

22   Q.   Did you try to talk to him to see why he

23        was acting that way?

24   A.   Yes.  I made multiple attempts.

25   Q.   And what, if anything, did he say to you?

1  A.  He would just grunt back at me and he
2          would tell me again that he wanted
3          his glasses and his stomach hurt.
4  Q.  How did you interpret his reaction to you?
5          What was on your mind?  What were you
6          thinking?
7  A.  That he was being combative.
8  Q.  He was being combative.  Tell me what else
9          you -- so, he vomited.  He is acting
10         uncooperative.  What do you use the
11         pulse ox for?
12 A.  To check the heart rate and the oxygen
13         level.
14 Q.  To check the heart rate and the oxygen
15         level.  You didn't have the pulse ox
16         with you, did you?
17 A.  I did not.
18 Q.  Now, you had your emergency bag, though,
19         right?
20 A.  Yes.
21 Q.  And the pulse ox wasn't in there?
22 A.  Yes.
23 Q.  So, you got a call to come up to 2A.  Do
24         you recall that this was about four
25         minutes after 12:00?

1  A.    Yes.

2  Q.    So, you're going -- in your mind, was this

3        just routine or was this emergency,

4        or exactly what was going through

5        your mind at the time?

6  A.    Upon the initial call I thought that it

7        was an emergency; so, I grabbed my

8        emergency medical bag.  And then,

9        when I got there, it seemed more than

10       routine.

11 Q.    Okay.  Isn't the pulse ox supposed to be

12       in the emergency bag?

13 A.    Yes.

14 Q.    Why wasn't it there?

15 A.    I'm not sure.

16 Q.    So, this is the midnight -- yes, the

17       midnight shift?

18 A.    Yes.

19 Q.    You are the only medical assistant that's

20       on duty; correct?

21 A.    Yes.

22 Q.    You are the only medical person that is

23       present in the jail at that time;

24       correct?

25 A.    Yes.

1    Q.    Whose responsibility is it to make sure

2          that the emergency bag has the

3          appropriate medical equipment in it?

4    A.    The last person to use it.

5    Q.    So, that wouldn't have been you?

6    A.    No.

7    Q.    But -- so, you start the shift.  So,

8          you're saying -- would you know that

9          Ms. Lobdell used it on her shift on

10         May 4, 2017?

11   A.    I can't be sure.

12   Q.    But, all you know is that when you went at

13         that time it was not in the bag?

14   A.    Yes.

15   Q.    So, when Mr. Wright was being -- was he

16         being combative or uncooperative?

17         Which one?

18   A.    He was being more combative by pulling

19         away.

20   Q.    Okay.  Did you think that that may have

21         factored into -- what did you think

22         he was going through at that time?

23         What was your assessment of him when

24         you saw that there was vomit on the

25         floor; and, you also had the

1         information that Ms. Lobdell had

2         given you.  Correct?

3  A.   Yes.

4  Q.   So, now you are in the cell.  Tell me

5         about your assessment.  Tell me what

6         you're thinking process is in terms

7         of what's going on with Mr. Wright.

8  A.   You immediately think "opiate withdrawal."

9  Q.   So, you immediately thought "opiate

10        withdrawal."  So, what did that say

11        to you should happen?

12 A.   I offered him the Ibuprofen, Imodium, and

13        Maalox.  He did not want that.  And

14        then I told officers to keep an eye

15        on him and let me know what

16        happens -- if anything got worse or

17        if it got better.

18 Q.   So, you left his cell without a blood

19        pressure at that time?

20 A.   Yes.

21 Q.   You did not have the pulse ox rate at that

22        time?

23 A.   Yes.

24 Q.   You didn't get that vital sign?  That's

25        what you mean; correct?

1           he's doing.

2    Q.    I'm just reacting to -- the transcript

3           says "weird;" but, that's probably

4           not it.  Keep an eye on him?

5    A.    Yes.

6    Q.    So, you go back -- you don't call

7           Dr. Malvasi?

8    A.    No.

9    Q.    You don't call Ms. Ahart?

10   A.    No.

11   Q.    Okay.  What did you do in terms of your

12          work at that point?

13   A.    I document in his chart what had happened,

14          that I was unable to obtain vitals,

15          and then I go back to my routine.

16   (PLAINTIFF'S EXHIBIT 20 and 21 MARKED)

17   Q.    Showing you what's been marked as

18          Plaintiff's Exhibit 20, will you take

19          a look at that, please?

20   A.    Yes.

21   Q.    Tell me whether you recognize that.

22   A.    Yes.

23   Q.    Okay.  And tell me what it is, please.

24   A.    It's a General Assessment Form.

25   Q.    Do you recall when you completed that

1          form?

2  A.    It states at about 12:15 a.m.

3  Q.    So, 12:15 a.m. would have been after you

4          saw Mr. Wright for the first time; is

5          that correct?

6  A.    Yes.

7  Q.    And so, you write here that he is "Coming

8          off of heroin.  Says, 'I'm sick.'

9          Won't tell me anything else."?

10  A.    Yes.

11  Q.    Those were your observations and that's

12          what you remember?

13  A.    Yes.

14  Q.    Okay.  And in the -- there's a line here

15          that starts with the letters, "BP."

16          Do you see that line there?

17  A.    Yes.

18  Q.    What is supposed to go in that line there?

19  A.    Blood pressure.

20  Q.    What's the "P"?

21  A.    Pulse.

22  Q.    The "R"?

23  A.    Respirations, temperature, pulse ox.

24  Q.    And that is all blank?

25  A.    Yes.

1  Q.  And those are the vitals that we have been
2         talking about that are important for
3         your assessment; correct?
4  A.  Yes.
5  Q.  That's the information that you need to
6         provide to Dr. Malvasi so that he can
7         evaluate the situation and come up
8         with the proper diagnosis for
9         treatment; correct?
10 A.  Yes.
11 Q.  You were unable to do that because you
12        didn't have any vitals; correct?
13 A.  Yes.
14 Q.  Did you ever think about asking -- Sarah
15        Whitacker was in there?  CO Sarah
16        Whitacker was in there with you?
17 A.  Yes.
18 Q.  Did you ever think of asking maybe one of
19        the male COs and ask him to talk to
20        Mr. Wright?  Did you think about
21        doing that?
22 A.  We all tried to talk to him.
23 Q.  So, you're leaving someone -- Mr. Wright.
24        We have no vitals, and you go back to
25        your job.  Correct?

1  A.   Yes.

2  Q.   And you go back to doing the routine

3       things that you would do on your

4       shift; is that correct?

5  A.   Yes.

6  Q.   So, sometime later you get another call

7       concerning Mr. Wright; correct?

8  A.   Yes.

9  Q.   Tell me what you recall about that.

10 A.   They said it was a possible seizure.  I go

11      up.  He's really just laying kind of

12      shaking.  I immediately activated my

13      smelling salts.  He turned his head

14      away.  I took his left hand and put

15      it over his mouth so that he couldn't

16      breathe through his mouth, and this

17      forced him to inhale the smelling

18      salts.  That's when he got even more

19      angry.

20 Q.   You say "angry"?

21 A.   Yes.

22 Q.   And he was laying in this bunk with the

23      top of his torso laying outside the

24      port-a-bunk?

25 A.   It was when I first walked in.  I tried to

1       get him onto his side in case if it
2       was a seizure he wouldn't swallow his
3       tongue or vomit.
4   Q.  So, when you arrived there he still
5       shaking?
6   A.  He was shaking, but not profusely.
7   Q.  Now, it was Corrections Officer Washington
8       that had called you to come; correct?
9   A.  Yes.
10  Q.  And the information that you received from
11      him was that, "I think he's having a
12      seizure."  Correct?
13  A.  Yes.
14  Q.  And you show up.  And then, what Officer
15      Washington told you was confirmed;
16      that he was still shaking somewhat?
17  A.  Yes.
18  Q.  Okay.  Vomit on the floor next to his
19      port-a-bunk?
20  A.  Yes.
21  Q.  Vomiting and nausea being one of the signs
22      of opiate withdrawal; is that fair?
23  A.  Yes.
24  Q.  Now he's sweating profusely, isn't that
25      true?

1  A.    More than before, yes.

2  Q.    Again, looking back at the COWS and the

3        protocol, those are other factors

4        related to opiate withdrawal;

5        correct?

6  A.    Yes.

7  Q.    And what's being confirmed in front of you

8        are symptoms that led you to believe

9        that this was opiate withdrawal?

10  A.    Yes.

11  Q.    And you're being called back for a second

12        time.  So, then you appreciate, "Now,

13        this is more serious than it was

14        before."

15  A.    I realized that it may have needed more

16        attention.

17  Q.    So, then you proceed to do the -- we got

18        to get the vitals now.  It's

19        important to do the vitals; right?

20  A.    Yes.

21  Q.    Okay.  We are going to do the pulse ox;

22        correct?

23  A.    Yes.

24  Q.    Pulse ox is not in the bag; is it?

25  A.    No.

1  Q.    So, when you went back downstairs after
2              the first time after the episode with
3              Mr. Wright, you didn't pack the
4              emergency bag; correct?
5  A.    That's right.
6  Q.    So, now Officer Harvey has to go get the
7              pulse ox; right?
8  A.    Yes.
9  Q.    And you're there with -- Sergeant Tomko is
10             there with you; right?
11 A.    Yes.
12 Q.    So, you use his watch.  He let you use his
13             watch to try to get the pulse?
14 A.    Yes.
15 Q.    Are you successful?
16 A.    No.  You have to count a full 60 seconds,
17             do a little bit of math.
18 (WHEREUPON A RECESS WAS TAKEN AT 12:57 PM AND
19 TESTIMONY RESUMED AT 1:09 PM)
20 BY MR. SMITH:
21 Q.    So, this was your second encounter of the
22             evening with Mr. Wright?
23 A.    Yes.
24 Q.    And, Ms. Hake, on two occasions you have
25             described him as being angry.  I

1          mean, could he be mad because he was
2          sick, mad because he was hurting?
3              I mean, did your perception of
4          him being angry, did that affect the
5          way you were dealing with him?
6  A.   No.
7  Q.   Okay.  So, you are there.  You can't get
8          the pulse; but, this time you were
9          able to get his heart rate?
10 A.   Yes.
11 Q.   Okay.  And I think his heart rate -- you
12         determined that it was like 150?
13 A.   I don't remember the exact number.
14 Q.   It was elevated?
15 A.   Yes.
16 Q.   And he was presenting to you -- you
17         observed him to be breathing very,
18         very fast?
19 A.   Yes.
20 Q.   And, you also said -- was he folding his
21         arms?  He was moving his arms and so
22         forth?
23 A.   He wasn't clutching.  He was more or less
24         trying to get away from what I was
25         trying to do.

1  Q.   He was trying to move away from you?

2  A.   Yes.

3  Q.   It couldn't have been that he's holding

4       his heart because of shortness of

5       breath, or whatever?

6  A.   No.

7  Q.   And you were able to distinguish that from

8       him -- he's breathing very, very

9       fast.  What do you attribute that to?

10 A.   It could have been that he had just

11      inhaled smelling salts and he was

12      trying to eliminate that smell from

13      his nose.  He could be trying to

14      catch his breath from possibly faking

15      a seizure.  It could be multiple

16      things.

17 Q.   Faking a seizure?  Have you been present

18      when people fake a seizure?

19 A.   Yes.

20 Q.   One of the things that was going through

21      your mind at that time, then, was

22      that Mr. Wright may have been faking?

23 A.   You always have to know that that is a

24      possibility.

25 Q.   A possibility.  Okay, he's sweating

1                  profusely; correct?

2   A.   Yes.

3   Q.   You had to give him smelling salts when

4              you arrived to help him start

5              breathing again; correct?

6   A.   No.

7   Q.   You administered the smelling salts?

8   A.   Yes.  That's basic procedure for possible

9              seizures.

10  Q.   But, he was shaking?

11  A.   Yes.

12  Q.   He was sweating?

13  A.   Yes.

14  Q.   And all of those things are things that

15             are on the COWS form in terms of an

16             assessment of opiate withdrawal;

17             correct?

18  A.   Yes.

19  Q.   But he may have been faking a seizure?  In

20             medical terms you call that

21             "malingering."  Right?

22  A.   Yes.

23  Q.   So, what made you think that he could

24             have -- that he was faking?

25  A.   I activated the smelling salts.  He

1          started breathing through his mouth

2          as opposed to through his nose,

3          because he didn't like the smell of

4          them.

5              When I then took my left hand

6          and covered his mouth so that he was

7          forced to smell through his nose, he

8          turned his head away.

9    Q.   And that, in and of itself, that minimized

10         all those other factors that you were

11         observing?

12             MS. HOHENBERGER:  Objection.

13   A.   That told me that he was not having a

14         seizure.

15   Q.   That told you that he was not having a

16         seizure; but, you believed and you

17         had information to know that opiate

18         withdrawal was an issue?

19   A.   I'm sorry -- say that again.

20   Q.   Opiate withdrawal.  Ms. Lobdell had told

21         you that he was having an issue with

22         withdrawals; correct?

23   A.   Correct.

24   Q.   The previous time a few hours earlier that

25         you had been there your assessment

1          Mr. Wright that evening.  Correct?

2   A.    Yes.

3   Q.    And you told him, to the best of your

4              ability, the truth as you remembered

5              it at that time.  Correct?

6   A.    Yes.

7   Q.    All right.  So, now Mr. Wright is faking?

8              MS. HOHENBERGER:  Objection.

9   That's not what she testified to.

10             MR. SMITH:  She said, "You

11  always have to rule out whether somebody is

12  faking."

13  Q.    Correct?

14  A.    Yes.

15  Q.    So, aside from his reaction to the

16             smelling salts, what else made you

17             think that Mr. Wright may be faking?

18  A.    He was alert.  He was oriented.

19  Q.    Okay.  You thought he just didn't want to

20             go to jail; right?  That's what you

21             told Lieutenant Shay, didn't you --

22             that you thought one of the things --

23             he was trying to stop the process of

24             going to jail.  Didn't you say that?

25  A.    Yes.

1   A.   Based on the way that he acted when I

2          activated the smelling salts, I

3          believed there was a very good

4          possibility that it wasn't a seizure,

5          but I can't diagnose.

6   Q.   And we all agree that "pretty sure" is not

7          a medical term.  Correct?

8   A.   Correct.

9   Q.   And then the next line -- well,

10         Lieutenant Shay says, "Okay.  So, you

11         think he was faking or" -- and it

12         gets cut off.  Do you see that?

13  A.   Yes.

14  Q.   And then your response was, "I don't think

15         he was faking.  I just think that he

16         was working himself up."  Do you see

17         that?

18  A.   Yes.

19  Q.   So, based upon what signs and symptoms did

20         you make that statement?

21              MS. HOHENBERGER:  Objection.

22  A.   I'm not understanding the question.

23  Q.   Okay.  It says "I don't think he was

24         faking.  I just think that he was

25         working himself up."

SIMONI COURT REPORTING
(330) 399-1400    (330) 746-0934
1-800-399-6686

1             So, what were your observations
2             -- what was your medical assessment
3             that made you say that you thought he
4             was working himself up?  What
5             medically were you observing?
6  A.    He was alert and oriented.  His pupils
7             were reactive.  He was speaking.  He
8             was breathing heavily, but his pulse
9             ox was normal.
10 Q.    But I thought that we had agreed that he
11            wasn't speaking.
12 A.    No.
13 Q.    He was asking you for his glasses.  We
14            talked about that?
15 A.    Yes, and telling me that his stomach hurt.
16 Q.    And telling you that his stomach hurt.
17            So, Lieutenant Shay says, "When you
18            say "working himself up," what do you
19            mean by that?"
20            And so, your response is, "He
21            was breathing rapidly, extremely
22            rapidly, and when something like that
23            happens normally people just want to
24            get out of jail.  Normally people
25            just want to get 'send' out to the